Jay T. Jambeck (SBN 226018)
Mandy G. Leigh (SBN 225748)
Damien Troutman (SBN 286616)
LEIGH LAW GROUP, P.C.
582 Market St., Suite 905
San Francisco, CA 94104
Telephone:   415-399-9155
Facsimile:   415-795-3733

Jerry Girley (Florida Bar No. 35771)
The Girley Law Firm, PA
117 E. Marks Street, Suite A
Orlando, FL 32803
Tel: (407) 540-9866
Fax: (407) 540- 9867
phyllis@thegirleylawfirm.com
[pro hac vice pending]

*Attorneys for Plaintiff,*
JACKLINE MUTHOKA

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION)**

| | |
|---|---|
| JACKLINE MUTHOKA<br><br>              Plaintiff,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>              Defendant. | Case No.<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT;<br>2. VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT;<br>3. VIOLATION OF TITLE V OF THE AMERICANS WITH DISABILITIES ACT<br><br>JURY TRIAL DEMANDED |

## **PARTIES**

1. The Plaintiff, Jackline Muthoka, at all times relevant to this complaint, was a

1
COMPLAINT

medical student at the Defendant's School of Medicine at the University of California, Irvine.

2. The Defendant, Regents of the University of California, was at all times a Public University that operated a medical school in Irvine, California.

## JURISDICTION

3. Jurisdiction, in this case, is predicated upon Article III of the United States Constitution, and 28 U.S.C. §1331.

4. All conditions precedent that were required to be performed were performed prior to the Plaintiff filing this lawsuit.

## VENUE

5. Venue is proper in the Central District of California because Defendant is deemed to reside in the Central District of California. Additionally, most witnesses will also be located in this district.

## FACTUAL ALLEGATIONS

6. The Plaintiff enrolled at the University of California School of Medicine as a First-Year medical student for the 2016/2017 school year.

7. The Plaintiff almost immediately began to experience a difference in her treatment compared to her non-Black fellow medical students.

8. As a part of the learning process, the University encouraged medical students to formulate projects to study and to address emerging medical issues around the world. Students were further encouraged to submit a proposal to the University for approval and funding of these projects.

9. The Plaintiff researched, formulated, and proposed a project to provide medical services to a community located in Kenya. She also followed the Defendant's protocol and requested funding to conduct the project during the summer months of 2017.

10. The University declined to authorize the plaintiff's project for funding and IRB approval in 2017, claiming that Kenya was on the Travel list on the State Department website.

11. After traveling to Kenya for their learning project in 2017, the defendant mistreated the plaintiff by sending the plaintiff the same research edits over and over until the end of her trip. This delay meant that the Institutional Review Board (IRB) could not approve the plaintiff's research for data collection and publication. The delay by the defendant caused the plaintiff to lose several publications of her research despite working tirelessly on this project for nearly a year and spending thousands of dollars on the project.

12. The Defendant also, through Dr. Toohey, instructed Plaintiff to withdraw her learning project to Kenya in the summer of 2018. The email was addressed to the only two black students in a class of 104 students at a medical school with less than 20 black students at the time. The University had previously funded similar projects by non-Black medical students.

13. After the Defendant refused to approve the Plaintiff's summer 2017 and instructed her to withdraw her summer 2018 learning projects, it authorized a similar project to Kenya proposed by a non-Black male medical student in the summer of 2018. Kenya was still on the Travel list on the State Department website.

14. The University has an established process for new and returning students to register their disabilities with the Disability Service Center (DSC). Once a student has registered her disability and requested an accommodation, the University and its faculty are supposed to recognize the disability and provide an accommodation without the student having to justify it for each class.

15. At all times relevant to this lawsuit, the Plaintiff had a known disability, with respect to a Neurodevelopmental disorder related to visual processing and an Anxiety disorder. She was granted, on paper, a reasonable accommodation in 2017. She was

supposed to be provided time and a half to take exams. Withstanding this, the Associate Dean, Dr. Jullianne Toohey, refused to recognize the Plaintiff's accommodations in regard to her disability.

16. The University, through the DSC, also had a standard practice of facilitating the process for the medical students taking the National United States Medical Licensing Exam (USMLE) Step 1 Exam. The Plaintiff repeatedly requested assistance for approximately ten months before her scheduled test from DSC. The DSC employees misadvised, misinformed, and delayed the plaintiff's receipt of reasonable accommodations from the National Board of Medical Examiners (NBME). Through Rosezetta Henderson, the defendant misinformed the plaintiff that she spoke with NBME over the phone regarding the plaintiff's accommodations and that NBME denied the plaintiff's accommodation request. The School of Medicine Psychiatrist provided substandard medical documentation. Plaintiff was informed by the NBME and DSC that she would not be receiving reasonable accommodations. The plaintiff then took the USMLE Step 1 exam in May 2018 without reasonable accommodations and failed the first time in 2018.

17. After failing USMLE Step 1 for the first time, the plaintiff was required to meet with the Associate Dean of student affairs (Dr. Jullianne Toohey) per school policy. During the meeting, Dr. Toohey requested that the plaintiff provide her with Plaintiff's NBME application for accommodations so she could follow-up with NBME on her behalf. The Plaintiff was later informed by Dr. Toohey that NBME had made a decision for the second time to deny the plaintiff reasonable accommodations. Dr. Toohey's email to the plaintiff stated that she called the NBME to request reasonable accommodations because Plaintiff "has language issues." Dr.Toohey's assurances of her communications with NBME to the plaintiff were not true-she never had any communications with NBME, according to the records provided. Additionally, NBME does not make accommodation decisions via telephone; they do

4
COMPLAINT

so via letters. Resultantly, the plaintiff took and failed USMLE Step 1 the second time.

18.     The NBME has confirmed with both the Plaintiff and the Defendant, through the previous medical school Registrar, Joy Kim, that they do not make any accommodation decisions via phone calls. All communications from NBME are made through letters. The plaintiff did not receive letters from NBME when Ms. Rosezetta Henderson and Dr. Toohey claimed to have spoken to NBME. Additionally, the plaintiff must provide consent to the NBME for them to speak with a third party, such as the defendant. The plaintiff was not requested by the NBME and did not give the NBME consent to speak with the defendant. However, Rosezetta Henderson and Dr. Toohey claimed to have received my accommodation decisions from NBME via phone.

19.     After failing USMLE Step 1 for the first time, Dr. Toohey instructed the plaintiff to look for a USMLE tutoring program. She also added that this would "help fix" the plaintiff's language issues. This was discriminatory and against school policy. Defendant, through Dr. Toohey, also interrupted the plaintiff multiple times during a difficult Surgery rotation causing the plaintiff to fail the Surgery NBME exam. Prior to this interruption, the plaintiff had never failed an NBME subject exam.

20.     During the period plaintiff was going through USMLE Step 1 application and testing, she was also living in on-campus housing and had been placed on a leave of absence by the School of Medicine. Verano Housing requested that Dr. Toohey provide documentation for the plaintiff to continue to live in on-campus housing. The documents Dr. Toohey provided lacked pertinent information necessitating the plaintiff to meet with Dr. Toohey to explain what was needed. At this point, Dr. Toohey stated to the plaintiff that she should consider going back to her country if it was difficult to find housing. Dr. Toohey's email to Verano housing leadership after meeting with the plaintiff included discriminatory statements. Dr. Toohey wrote to

Verano Housing stating the following: "She (Plaintiff) has not been able to take the National Board Examination because she has applied for accommodations due to her language issues as a foreign student." Plaintiff also met with Verano place leadership, who also informed her that Dr. Toohey was not going to support her from the conversations they had with Dr. Toohey. As a result of Dr. Toohey's failure to provide accurate documentation, the plaintiff was rendered homeless. While homeless, the plaintiff suffered mental, emotional, and physical health deterioration, such that she gained more than 60 pounds of weight.

21. Due to the time period it took the plaintiff to obtain USMLE Step 1 accommodations, she could not take the test within one year of the last day of her second year of medical school, per policy. She was therefore required to have a hearing by the Promotions and Honors Committee (P&H). Her hearing was delayed multiple times and was held nearly a year after the policy violation. The school brought a lawyer to her hearing while she was going to have family members present. This was against their policy. The school had not brought lawyers to other students' hearings if students did not have their counsel present.

22. The P&H committee placed Plaintiff on academic probation in spite of the misadvising, misinformation, and homelessness she suffered under the university employees. Her Surgery grade, which was incomplete at that time, was also converted to an F. The P&H decision letter after the hearing was defensive and an inaccurate representation of what transpired despite the hearing being recorded. Dr. Toohey, at the hearing, stated that she was never informed that Plaintiff has a learning disability other than having "language issues" despite receiving an email from DSC in 2017 stating that Plaintiff has a documented disability and is registered with the DSC. The defendant also denied the plaintiff proper due process.

23. Because of her ongoing concerns regarding disparate treatment related to race, gender, country of origin, and the defendant's continued refusal to honor her

6
COMPLAINT

previously approved disability accommodations, the Plaintiff filed a discrimination complaint with the Office of Equal Opportunity and Diversity (OEOD). The OEOD is the Defendant's designated entity for processing and investigating students' claims of unlawful discrimination.

24. Withstanding the fact that Plaintiff was available and willing to assist in the investigative process, OEOD did not complete its investigation in a timely or objective manner. Instead, the timeframe for completing the investigation was extended twice. In addition, the senior investigator assigned to the plaintiff's case was changed from an African American female to a non-black male.

25. OEOD finally provided Plaintiff with a preliminary draft of the investigation which included statements from alleged witnesses. The Plaintiff submitted a rebuttal to these statements. Thereafter, OEOD took additional time to issue the final report. The final report was written in such a manner that it protected the Defendant and disclaimed that the Plaintiff was subjected to discrimination based upon her race, gender, country of origin, or that she was denied a reasonable accommodation (disability).

26. The investigation conducted by the OEOD was problematic in five key areas: Investigative bias, denied witnesses, omission and destruction of evidence, altered testimony, and ex post facto policy application. The senior investigator had been notified of the school policy change by the plaintiff via email during the investigation.

27. Following the OEOD investigation, Plaintiff suffered multiple retaliatory actions from Defendant. For example, the Plaintiff submitted a second request for reasonable accommodation with respect to test taking and the completion of the Surgery subject NBME exam at UCI. The request was submitted to the new P&H chair, Dr. Shannon Toohey. Roughly a month later, Dr. Toohey responded that the P&H would not decide on the request and that the plaintiff should send her request to the DSC.

28. The Plaintiff subsequently requested another accommodation request to the DSC in the form of being allotted more time to study and to prepare for the Surgery exam, given the distress she suffered from an unjust investigative report. The Plaintiff received the investigative report around the time she needed to take the Surgery NBME exam. This type of accommodation was provided to other students on a regular basis. At the time that Plaintiff made this request, she also provided supporting medical documentation from her doctor to demonstrate the necessity of the request.

29. After her first request was denied, ostensibly due to insufficient medical documentation, Plaintiff visited her medical provider for a second evaluation. She then requested reasonable accommodations a second time, with the requested supporting medical documentation.

30. Defendant, through DSC, delayed the decision to provide the requested accommodation because it wanted Plaintiff to provide additional medical documentation. The plaintiff was denied accommodations by Rosezetta Henderson, Senior Disability Specialist at DSC. The plaintiff submitted an appeal to the defendant through Karen Andrews, Director of DSC. By the time Defendant finally approved the request, the deadline to take the exam had already passed. The defendant, through Karen Andrews, later reversed the decision to grant the plaintiff accommodations at the last minute and required the plaintiff to take the exam on short notice. This led to the plaintiff missing a passing mark by only 6% due to the unnecessary distress the Defendant caused the plaintiff.

31. After Plaintiff complained to OEOD about being subjected to unlawful discrimination, her peers nominated her for the Gold Humanism Honor Society Award. This award is a very high honor that is awarded to exceptional students who stand out with respect to clinical care, leadership, compassion, and dedication to patient service. Being a recipient of such a prestigious award could have bolstered her future efforts to be accepted into medical residency programs. The Society that is in

charge of the award has chapters at various medical schools around the country. Each chapter has a selection committee that is supervised by a faculty member. The Plaintiff provided the committee with all the credentialing information it requested, such as a resume and a written statement.

32. The Plaintiff learned from a fellow student and a Gold Humanism Honor Society Committee member that the committee initially selected her to be a Gold Humanism Honor Society Award recipient but objected to her receiving the award because the Medical Education Leadership advised the faculty in charge of the committee that the plaintiff has "some litigation issues with the school."

33. Another retaliatory act was that the plaintiff was granted acceptance to the MD, MBA dual program at UCI. Her acceptance to the MBA program was later rescinded by the defendant without tangible explanations.

34. The plaintiff also continued to experience disparate treatment in her classes even after filing a complaint with the OEOD. One example is when she was rotating through the Internal Medicine rotation. She was the only black person in the entire team. The faculty in charge of the plaintiff's group made several racist statements during the rotation and subjected the plaintiff to a toxic learning environment which affected her performance in the class.

35. Additionally, the plaintiff was instructed to take four long national subject exams without breaks. If she needed to take a break, the defendant, through Dr. Wiechmann, required the plaintiff to leave her exam timer running. Because of this decision, the plaintiff would continue to lose time on her exams. Plaintiff had taken these exams with scheduled breaks previously with no issues from the defendant until the later part of her education. The NBME, the test sponsor of national subject exams, had and has not raised any concerns with the plaintiff taking breaks on her subject exams. Plaintiff later requested additional accommodations, which were

unnecessarily delayed and only granted after her lawyers were included in the email communication with the defendant.

36. Another retaliatory behavior that the plaintiff suffered was in regard to her third-year class schedule. The defendant, through Dr. Shannon Toohey, reorganized the plaintiff's schedule in a manner that denied the plaintiff any time to study for her national subject examinations between rotations. Per school policy, medical students create their own schedules in the third and fourth years. The defendant would later change the plaintiff's schedule only after the plaintiff's lawyers were included in the email communication and after subjecting her to unnecessary stress.

37. Another retaliatory behavior that the plaintiff experienced was in regard to the defendant's calculation of her graduation time period. Per school policy, all medical students are given six years to complete their degrees. When the Covid-19 global pandemic hit, the defendant placed the plaintiff on a leave of absence and was instructed to resume classes after passing the USMLE Step 1 exam. The rest of the student body was allowed to continue its education and experienced little interruption in their studies. Plaintiff was advised by the previous P&H chair, Dr. Forthal, that the time she was affected by the pandemic would not be counted against her. When the plaintiff returned to school, she requested that the new P&H chair, Dr. Toohey (Shannon), calculate her graduation period accurately. The defendant, through Dr. Toohey, refused to make this correction even after the plaintiff made multiple requests over a period of more than fifteen months and after sending more than ten emails. Ultimately, Dr. Toohey's decision denied the plaintiff a dedicated time to study for her USMLE Step 2 CK, a time provided to the rest of the medical students.

38. Plaintiff filed a retaliation complaint with the OEOD after making multiple requests to the P&H chair. OEOD refused to investigate and dismissed the plaintiff's complaint to investigate without substantial evidence for their inaction. Plaintiff's

lawyer requested that the defendant make corrections to the plaintiff's graduation period, which was partially made at the last minute.

39. The plaintiff failed her USMLE Step 2 CK exam for the first time after multiple interruptions, denial of a dedicated study time, emotional distress, and the toxic environment created by the defendant.

40. After failing USMLE Step 2 CK, the plaintiff requested accommodations from Dr. Shannon Toohey in January 2023. Dr. Toohey spent three weeks before responding to the plaintiff, to which she replied and included Rosezetta Hernderson in the email. Plaintiff waited for nearly two months before hearing back from the defendant. At which point, she was already preparing for her test retake.

41. Plaintiff requested the defendant, through Rosezetta Henderson, to be allowed to resume the conversation after taking her exams to avoid further disruptions. Defendant did not communicate with the plaintiff for nearly two months. While the plaintiff was taking her USMLE Step 2 CK exam, the defendant interrupted the plaintiff's exam by sending an email to the plaintiff, placing her under investigation based on false claims. According to the email the defendant sent the plaintiff, the defendant, through Dr. Wiechmann, knew the plaintiff was taking her exam at that time. The defendant even verified the plaintiff's test dates on the NBME website. Additionally, the defendant, via Dr. Wiechmann, also knew that students could access their electronic devices, such as cell phones, during exam breaks as Dr. Wiechmann is a physician and has taken USMLE exams. This interruption created a toxic environment that caused a significant drop in Plaintiff's USMLE Step 2 CK score compared to her practice tests.

42. After the USMLE Step 2 CK exam, the plaintiff requested the defendant to provide her with supportive documentation that necessitated the defendant to place the plaintiff under investigation during her exam. The defendant did not or could not

provide substantial evidence and had placed the plaintiff under investigation based on false or unsubstantiated allegations.

43.     In addition to severe interruptions during USMLE step exams, the plaintiff also suffered multiple interruptions during her NBME subject exams that caused her to retake several shelf exams due to the toxic environment created around her exams by the defendant. Prior to these incidents, the plaintiff never failed an NBME exam and was in good academic standing with the defendant.

44.     After the plaintiff passed her USMLE Step 2 CK exam, she informed the defendant of her passing and should have been provided with graduation information immediately as she was qualified to attend commencement. However, the defendant delayed this process claiming that the plaintiff would need approval from the P&H committee stating that she had completed her medical degree requirements within six years. This decision was delayed until less than two weeks before commencement when the P&H chair Dr. Shannon Toohey advised the plaintiff that her graduation material had been forwarded to the team responsible for commencement. Due to the short notice, the plaintiff requested the defendant to allow her to participate in commencement in 2024 since she had no time to invite her family living abroad and did not have enough time to prepare to attend the graduation ceremony. Defendant denied the plaintiff's request and reiterated that her graduation materials had been included in this year's commencement.

45.     Plaintiff was forced to prepare and attend the graduation ceremony with less than a week to prepare. She had no blood family members to attend her ceremony. Additionally, the plaintiff's graduation materials were different from the rest of the student body. For example, her information was hand-written on a yellow card, while others received a white professionally typed card. Plaintiff received a 2022 graduation gown, and her graduation tassel was changed from 2022 to 2023 a few minutes before the ceremony began. Furthermore, her achievements were not

1 recognized in the commencement program. This created a toxic environment for the
2 plaintiff on what was supposed to be a joyous event.
3 46. The Plaintiff has suffered and continues to suffer mental and emotional
4 anguish related directly to being subjected to discrimination and retaliation.

**COUNT I DISCRIMINATION BASED UPON RACE IN VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**

47. The Plaintiff incorporates the foregoing allegations into this count as though they were fully stated herein.

48. The Plaintiff is in a protected class. She is a Black/African American.

49. Plaintiff was subjected to disparate treatment when she was denied the same terms and conditions as non-Black students by not permitting her to enhance her medical training and experience during the summer of 2017 and 2018. The Defendant is a public university that receives funding and financial aid dollars from the United States government.

50. The University encourages medical students to research emergent medical issues in different parts of the world and formulate a project that would study and address these issues on some level. Prior to the Plaintiff submitting a proposal to provide a medical service in Kenya, the University approved other medical students' proposals to conduct similar projects around the Globe, moreover, the University provided funding to accomplish the projects.

51. The Plaintiff followed the Defendant's protocol with respect to the medical project she proposed. However, when she submitted the project to the school's administration for approval and funding, she was informed that the project would not be authorized due to Kenya being on the Travel list on the State Department website.

52. The Defendant treated non-Black students more favorably. The male non-Black medical student projects to Kenya were approved by the University and

funded by the University, even when Kenya was still on the Travel list on the State Department website.

53. As a direct and proximate result of the intentional discriminatory treatment in violation of 42 U.S.C. §2000d, Plaintiff suffered lost wages and educational opportunities that result in diminished educational and career opportunities.

## COUNT II FAILURE TO PROVIDE REASONABLE ACCOMMODATION BASED UPON DISABILITY IN VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

54. The Plaintiff incorporates the foregoing allegations into this count as though they were fully stated herein.

55. The Plaintiff is a person with a disability as defined by the ADA and AADA, to which she has a Neurodevelopmental disorder related to visual processing as well as an Anxiety disorder. The Defendant had notice of the Plaintiff's disability because she applied for and was awarded, on paper, a reasonable accommodation to have time and a half to take her exams in 2017. The Plaintiff was qualified to be a student and successfully graduated and obtained her medical degree from the defendant despite numerous barriers the defendant created. Plaintiff was and is able to perform the work assigned and to perform skill assessments with or without the requested accommodation(s).

56. The Plaintiff was denied accommodations when she requested them in the form of being allowed time and a half to take tests and being permitted to take exams at a later date. The Plaintiff was further denied reasonable accommodations when the school psychiatrist provided substandard documentation, and the DSC misinformed, and misadvised the plaintiff. Additionally, the Associate Dean interfered with the Plaintiff's request for accommodations to the NBME. The University regularly provided such assistance to students with known disabilities, but inexplicably, it failed to provide such assistance to the Plaintiff.

57. Additionally, the Defendant unreasonably delayed providing the Plaintiff with a reasonable request as it relates to the completion of the Surgery shelf exam. The Plaintiff properly requested continuing accommodation. She also provided the requisite supporting medical documentation. However, the Defendant denied the request and insisted that the Plaintiff obtain additional medical support from her doctor.

58. By the time the Defendant got back to the Plaintiff regarding the requested accommodation, the time for taking the Surgery shelf exam had already passed.

59. As a direct and proximate result of the intentional discriminatory treatment in violation of 42 U.S.C. § 12132, Plaintiff suffered lost wages and educational opportunities that result in diminished educational and career opportunities as well as general damages.

## COUNT III RETALIATION IN VIOLATION OF TITLE V OF THE AMERICANS WITH DISABILITIES ACT

60. The Plaintiff incorporates the foregoing allegations into this count as though they were fully stated herein.

61. The Plaintiff engaged in protected activity when she complained to OEOD about being subjected to unlawful discrimination. She also engaged in protected activity when she repeatedly requested reasonable accommodations. These requests were initially denied and then further unreasonably delayed.

62. The Defendant took an adverse action against plaintiff when it interfered with and opposed the Gold Humanism Society Award being given to her expressly because she "had litigation issues with the school" and had filed an OEOD complaint. The action is adverse because being a recipient of such a prestigious award would assist the Plaintiff in her future efforts to be admitted into a medical residency program, among other things.

63. The Defendant further retaliated against the Plaintiff by continuing to delay the processing of her reasonable accommodations requests for continuing accommodations.

64. There is a causal nexus between the Plaintiff's engagement in protected activity and the Defendant's blocking her from receiving an award that her peers believed that she was entitled to receive. The university expressly told the committee that it opposed the Plaintiff's nomination because of her protected activity.

65. Defendant therefore violated Title V of the ADA, 42 U.S.C. § 12203, and as a direct and proximate result, Plaintiff suffered lost wages and educational opportunities that result in diminished educational and career opportunities as well as general damages.

## JURY DEMAND

Plaintiff demands a jury trial on all matters for which a jury trial is afforded as a matter of right.

## PRAYER FOR RELIEF

The Plaintiff is seeking all relief that is available and provided for by the above referenced statutes and related case law. The Plaintiff is seeking compensation for general and special damages, related costs, record expungement, costs and reasonable attorney fees.

Dated: July 24, 2023

Respectfully submitted,

LEIGH LAW GROUP, P.C.

/s/ Jay T. Jambeck
By:_____
Jay T. Jambeck
*Attorneys for Plaintiff*

|   |   |
|---|---|
| 1 | |
| 2 | Jerry Girley, Esquire |
| 3 | Florida Bar No. 35771 |
|   | The Girley Law Firm, PA |
| 4 | 117 E. Marks Street, Suite A |
| 5 | Orlando, FL 32803 |
|   | Tel: (407) 540-9866 |
| 6 | Fax: (407) 540- 9867 |
| 7 | phyllis@thegirleylawfirm.com |
|   | [pro hac vice pending] |

17
COMPLAINT