Jerry Girley, Esquire
Florida Bar No. 35771
The Girley Law Firm, PA
117 E. Marks Street, Suite A
Orlando, FL 32803
Tel: (407) 540-9866
Fax: (407) 540-9867
phyllis@thegirleylawfirm.com
*Admitted Pro Hac Vice*

Jay T. Jambeck (SBN 226018)
Mandy G. Leigh (SBN 225748)
Damien Troutman (SBN 286616)
LEIGH LAW GROUP, P.C.
582 Market St. #905
San Francisco, CA 94104
Tel:   415-399-9155
Fax:   415-795-3733
jjambeck@leighlawgroup.com


Tania L. Whiteleather (SBN 141227)
Law Offices of Tania L. Whiteleather
5445 Del Amo Blvd. #207
Lakewood, CA 90712
Tel:   562-866-8755
Fax:   562-866-6875
tlwhiteleather@juno.com

*Attorneys for Plaintiff,*
JACKLINE MUTHOKA

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACKLINE MUTHOKA<br><br>Plaintiff,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Defendant.<br>_____/ | CASE NO:  8:23-cv-01333-FWS-JDE'<br><br>PLAINTIFF'S FIRST AMENDED COMPLAINT FOR:<br><br>1. Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq.;<br>2. Violation of Title II of the ADA, 42 U.S.C. § 12132, et seq.;<br>3. Violation of Title V of the ADA, 42 U.S.C. § 12203;<br>4. Violation of Section 220 of the California Education Code |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
## STATEMENT OF THE CLAIM

The Plaintiff complains herein against the Regents of the University of California at Irvine for subjecting her to discrimination based upon her race, gender, country of origin, and for repeatedly denying her request for reasonable accommodations and for unreasonably delaying the processing of her request for reasonable accommodations as it relates to test taking (disability). In addition, the Plaintiff complains of retaliation for participating in a protected activity.

## PARTIES

1.      The Plaintiff, Jackline Muthoka, at all times relevant to this complaint, was a medical student at the Defendant's School of Medicine.

2.      The Defendant, Regents of the University of California, was at all times a Public University that operated a medical school in Irvine, California.

## JURISDICTION

3.      Jurisdiction, in this case, is predicated upon Article III of the United States Constitution, and it is predicated upon 28 U.S. 1331.

4.      All conditions precedent that were required to be performed were performed prior to the Plaintiff filing this lawsuit.

## VENUE

5.      The venue is proper in the Central District of California because all violations of the Plaintiff's rights complained about herein occurred in an institution of the Regents of the University of California, which spans multiple districts in the State of California. Additionally, most witnesses will also be coming from this district.

**FACTUAL ALLEGATIONS**

6.      The Plaintiff enrolled at the University of California, Irvine School of Medicine as a First-Year medical student for the 2016/2017 school year.

7.      The Plaintiff almost immediately began to experience a difference in her treatment compared to her non-Black fellow medical students.

Ultrasound Research

8.      As a part of the learning process, the University encouraged medical students to formulate projects to study and to address emerging medical issues around the world. Students were further encouraged to submit a proposal to the University for approval and funding of these projects.

9.      In the Fall of 2016, the Plaintiff researched, formulated, and proposed a project to provide medical services to a community located in Kenya. She also followed the Defendant's protocol and requested funding to conduct the project during the summer months of 2017.

10.      IRB is a committee within the University that ensures research projects are ethical. University students seeking to conduct research projects involving human subjects have to obtain IRB approval for their projects. If IRB declines to approve a research project, then the student cannot collect data or publish any research paper concerning that project.

11.      At all times relevant to this lawsuit, Dr. Jullianne Toohey ("Dr. Toohey") was the University's Associate Dean of Student Affairs. Per school handbook policy, Dr. Toohey was the most senior person in the Office of Student Affairs, and her office was responsible for all student affairs and support services, including career and academic advising, health and wellness services, and financial aid resources. She was also a member and had a voting right on the Promotions and Honors (P&H) Committee, which was charged with

monitoring student academic progress, taking appropriate action for students in difficulty, and making recommendations for promotions, honors, leaves of absence, dismissals, and graduation. The Committee functions and renders recommendations in accordance with the rules adopted by the School of Medicine Academic Senate.

12.     On March 21, 2017, Plaintiff received an email from Dr. Toohey (the "March 2017 Email"), stating: "As promised, I reviewed the travel warning for Kenya with Dr. Le-Bucklin. Due to this warning, UCI will not be able to officially sponsor the trip. This means that the school cannot provide financial or administrative support. In addition, the principal investigator on the IRB must be aware of the travel ban and not be a Medical Education Dean."

13.     Therefore, through the March 2017 Email, Dr. Toohey informed Plaintiff that the University had denied her funding for her proposed 2017 summer project, giving the impression that her office was in charge of denying and approving student research projects.

14.     The March 2017 Email was sent to the Plaintiff very late; her group was leaving in May, having already booked flights and rooms. Plaintiff and the rest of the group members were relying on the University's support for their expenses. However, the University failed to fund the project.

15.     Despite being denied funding, Plaintiff and her group members went to Kenya to conduct the 2017 summer project. Plaintiff was the team leader of the group.

16.     The University provided two (2) research coordinators to assist team members with evaluating and editing IRB research proposals. The research coordinators also assisted and supported students with travel logistics for their research projects. In other words, they acted as a liaison between the University and the students conducting research projects abroad.

17.     Dr. Toohey and Dr. Christian Fox ("Dr. Fox") oversaw the work of the research coordinators. Dr. Fox was the previous Assistant Dean of Student Affairs.

18.     While Plaintiff and her group were in Kenya, and collecting data for their research, the research coordinators, under Dr. Toohey's supervision, kept sending Plaintiff the same research edits, which Plaintiff corrected over and over until the end of her trip. This delay meant that the IRB could not approve the Plaintiff's research for data collection and publication. The delay by the University caused Plaintiff to lose several opportunities to publish her research from the 2017 summer project despite Plaintiff working tirelessly on that project for nearly a year and spending thousands of dollars on the project.

19.     However, the University was able to benefit from Plaintiff's work in Kenya. For example, they published her work on UCI news showcasing how gifted university students are conducting impactful projects around the world. Additionally, Dr. Charles Vega ("Dr. Vega"), utilized Plaintiff's project photos in conference presentations. Dr. Vega is the Assistant Dean for Culture and Community Education at UC Irvine School of Medicine.

20.     Furthermore, the university benefited from Plaintiff's ability to speak multiple languages by translating surveys into Swahili for research in Tanzania that led to multiple paper publications.

21.     More importantly, the Defendant appropriated, promoted, and advertised the Plaintiff's ethnicity and nationality when it suited them.

22.     When Plaintiff and her group came back from the 2017 summer project, some of the group members attended meetings to plan a 2018 ultrasound summer project in Kenya. Plaintiff was not involved at all with planning of the 2018 summer project, but her group members replicated her 2017 summer project proposal.

23. The University usually sponsors students to conduct ultrasound and research projects abroad, for example, in Peru, Panama, Switzerland, Indonesia, Tanzania, Kenya, and Nigeria, among other countries.

24. Despite not being involved with planning the 2018 summer project, Plaintiff received an email from Dr. Toohey (the "October 25 Email"), stating: "We are beginning our planning for us the ultrasound trips, and of course, I have been concerned about the travel warnings for both Nigeria and Kenya. Unfortunately, I have confirmed that there have been no changes in the U.S. State Department of Travel Advisories for both of these countries, so UCI will not be able to sponsor these trips. We will be meeting with the ultrasound trip leaders soon and I want to make sure that you understand there is no disrespect if we continue without you."

25. The October 25 email was only sent to Plaintiff and another Black female student, Faith Njoku ("Njoku"), a Nigerian, even though they were not involved in planning any 2018 trip to Kenya nor Nigeria. Even more strangely, there was never any group planning a Nigeria Ultrasound trip in 2018 in the first place, and a Nigerian trip never took place in the 2017 school year.

26. Therefore, in her October 25 Email, Dr. Toohey assumed that Plaintiff and Njoku were responsible for the proposed 2018 summer projects in Kenya and Nigeria just because those two Black students had Kenyan and Nigerian ancestry.

27. The October 25 Email illustrates that Plaintiff and Njoku were being singled out because of their race and nationality.

28. Furthermore, Plaintiff and Njoku were the only two black students in a class of 104 medical students and in a university with less than 20 black students at the time. More importantly, Njoku suffered mental breakdown in

2018 and did not graduate from the Defendants institution while Plaintiff was delayed from graduating by three years.

29.     After the University refused to approve Plaintiff's summer 2017 and instructed her to withdraw summer 2018 learning projects associated with her, it authorized a similar project to Kenya proposed and led by Michael Lobasso ("Lobasso"), a non-Black male medical student in the summer of 2018.

30.     Lobasso traveled to Kenya with full support from the University (Funding and IRB approval) in 2018.

31.     Kenya was still on the Travel ban list on the State Department website.

Defendant's Testing Institution

32.     The University has an established process for new and returning students to register their disabilities with the Disability Service Center ("DSC"). DSC handles disability-related services for all university students. Once a student has registered her disability and requested an accommodation, the University and its faculty are supposed to recognize the disability and provide an accommodation without the student without having to justify it for each class.

33.     Additionally, faculty and staff outside of DSC play no role in matters of recognized disability or reasonable accommodations in terms of applications or processing. Their sole role is to recognize and provide the required services expeditiously.

34.     In 2017, Plaintiff was diagnosed with a testing anxiety disorder.

35.     In 2019, Plaintiff was diagnosed with Neurodevelopmental disorder related to visual processing.

36.     Both the testing anxiety and the neurodevelopmental disorders are considered learning disabilities in the medical field.

37.     At all times relevant to this lawsuit, the University knew of Plaintiff's learning disability because she was granted, on paper, a reasonable accommodation in 2017. She was supposed to be provided time and a half to take exams and a separate room for testing.

38.     Notwithstanding this, Dr. Toohey refused to recognize the Plaintiff's accommodations in regard to her disability and created confusion and misdirection within the DSC.

39.     As a direct result of Dr. Toohey's actions, the Plaintiff, a qualified and disabled student, was denied services rendered by the DSC and prevented from receiving services from National Board of Medical Examiners (the "NBME").

40.     The NBME is a national organization that is responsible for managing assessments of healthcare professionals such as the United State Medical License Exams step 1 and 2 for medical students and Step 3 for medical residents. These assessments are utilized by medical licensing authorities in the United States to determine qualifications to grant and recognize medical licenses.

41.     Around January 2017, Plaintiff was sent to register her disability and request reasonable accommodations from DSC by Dr. Toohey. During Plaintiff's registration process and subsequent to it, Dr. Toohey repeatedly interfered with the process by misleading the DSC. For example, she emailed Dr. Jan Serrantino ("Dr. Serrantino"), the previous Director of DSC, on January 23rd, 2017, saying, "... I realize that this is a language comprehension issue." On another occasion on February 1, 2017, Dr. Toohey said, "I don't want her language comprehension to set her back."

42.     After the second incident, the Plaintiff met with Dr. Toohey and informed her that it was incorrect to say this because the Plaintiff did not have

a language issue, and she was uncomfortable with the mischaracterization of the situation and the reasons for her need for accommodations.

43.     On both occasions Dr. Toohey refused to acknowledge the Plaintiff's documented disability and instead improperly labeled her disability as a non-disability issue - based upon her national origin - and the Plaintiff was subsequently denied, as a qualified individual with a disability, the opportunity to benefit from the services provided by the university through the DSC. For example, per school handbook policy "...DSC offers initial disability screenings to students who suspect their difficulty in the academic setting may be related to a disabling diagnosis..." However, Plaintiff was not offered such screening which would have shown that she has an additional learning disability (Neurodevelopmental disorder related to visual processing).

44.     The standard practice for students seeking reasonable accommodations during the intake process involves a comprehensive psychoeducational evaluation that determines the amount of additional time a student needs to take their exams. However, Plaintiff was not screened or provided a referral for psychoeducational evaluation from DSC until 2 years later (2019).

45.     Surprisingly, Dr. Serrantino was knowledgeable in regard to matters concerning reasonable accommodation processes for both the Defendant and the NBME. For example, she co-authored a guidebook called "UCSF School of Medicine USMLE Step Exam Guide." The book guides UCSF medical students on the step-by-step process of creating a successful NBME accommodation application.

46.     Strangely, Dr. Serrantino never offered any screening, assessments, or evaluations to the Plaintiff during Plaintiff's reasonable application and registration process at the DSC in 2017, despite being an expert in the field. However, Dr. Serrantino accepted Dr. Anju Hurria's ("Dr. Hurria"), psychiatric

evaluation that showed Plaintiff was diagnosed with testing anxiety disorder. This evaluation was utilized for Plaintiff reasonable accommodations in the Defendant's University.

47.     Dr. Hurria was the previous medical student psychiatrist at the University.

48.     On March 1, 2017, (the "March 2017 email") Dr. Serrantino wrote an email to Dr. Toohey stating, "Per the student's request, I am providing this letter of verification for the purpose of validating the student's disability-related need for accommodations. The student has a professionally documented disability and is currently registered with the Disability Services Center at UC Irvine."

49.     However, even after receiving the March 2017 letter, Dr. Toohey continued to label Plaintiff as having "language issues" and progressed to attach/associate Plaintiff's language issues to her country of origin. She created confusion within the DSC and as a result Plaintiff was denied screening services from DSC by both Ms. Henderson and Dr. Serrantino that were needed when she applied for her reasonable accommodations to the NBME. For example, the Plaintiff was not evaluated or referred for psychoeducational evaluation until two years later (2019) because of Dr. Toohey's "language issue" label and the misdirection she caused within the DSC.

NBME USMLE Step 1 exam Testing

50.     The University, through the DSC, also had a standard practice of facilitating the process for the medical students taking the National United States Medical Licensing Exam (USMLE) Step 1 Exam.

51.     USMLE Step 1 exam accommodations are requested through the NBME.

52.     In August 2017, nearly ten months before her test, Plaintiff approached DSC in preparation to request reasonable accommodations from the NBME for her USMLE Step 1 exam to be taken in May 2018. She was advised by Ms. Henderson, who facilitated the process to gather and prepare all the needed materials for submission.

53.     On November 27, 2017, Plaintiff submitted reasonable accommodations request packet to the NBME. Ms. Henderson's office crosschecked and approved all the Plaintiff's documentation before she submitted it to the NBME.

54.     On December 1, 2017, Plaintiff received an email from Elisea Hewitson, NBME Disability specialist saying, "Please provide to us the documentation from your mental health provider that Rosezetta N. Henderson said she reviewed in her November 20, 2017, letter." Ms. Henderson and Plaintiff had included the UCI mental health evaluation form provided by Dr. Hurria on 2/16/2017.

55.     Dr. Hurria's evaluation was written on an obscure UCI form and did not have Plaintiff's complete history, and NBME could not recognize it. Upon receiving this email, Plaintiff emailed Ms. Henderson to crosscheck with her about Dr. Hurria's document. Ms. Henderson replied to Plaintiff's email saying, "I believe you submitted the attached documentation. That is the documentation that was referred to my letter and the only documentation in your file." The Plaintiff corresponded with the NBME, confirming, and again providing Dr. Hurria's evaluation.

56.     On January 2, 2018, Plaintiff received an NBME denial letter. She asked Ms. Henderson if she could assist her in submitting an appeal on January 5, 2018. Ms. Henderson emailed Plaintiff, stating, "Come current on your documentation," but she did not provide any additional details.

57.     Further, Plaintiff emailed Dr. Hurria asking for help and advice on what she needed to do to make sure she submitted an appeal for the USMLE Step 1 exam. Dr. Hurria emailed Plaintiff back on 2/12/2018 saying "...The best way to get it is to have the disability center test you and then submit paperwork on your behalf. It is much stronger coming from the disability center...feel free to call me on my cell if you would like to discuss this." The Plaintiff called Dr. Hurria, and she said that it was impossible to get accommodations from NBME, she never advised Plaintiff on what she needed to do, and she requested that Plaintiff follows-up with DSC.

58.     Plaintiff returned to Ms. Henderson on February 13, 2018, to further discuss what documents she was referring to. During the discussion, there was no mention of what documentation she needed, but Ms. Henderson stated that she would contact NBME and advise the Plaintiff on the next steps.

59.     On April 19th, 2018, Plaintiff reached out again to Ms. Henderson to see if she had heard back from NBME about her USMLE accommodations. She emailed Plaintiff saying "I have not heard back. I can try calling again. When are you taking it?" Plaintiff again emailed Ms. Henderson on April 30, 2018, asking if she had heard back from NBME.

60.     On May 7, 2018, Ms. Henderson replied to the Plaintiff's email saying, "...The NBME decision is that your request did not qualify as a disability." The Plaintiff then took the USMLE Step 1 exam in May 2018 without reasonable accommodations and failed for the first time.

61.     In October 2019, Plaintiff discovered that the NBME does not make accommodation decisions over the phone. She emailed Ms. Henderson after finding out this on 11/4/2019 saying, "I was wondering if you can email me the decision email/letter that you received from NBME stating that my request did not qualify as a disability from the email you sent me on May 07, 2018, attached

below." However, Rosezetta replied to Plaintiff's email on 11/7/2019 saying "… I was not contacted by the NBME directly. That was from our conversation about the denial letter you received." In her prior email, Ms. Henderson misinformed Plaintiff about her NBME accommodations status by implying she had spoken with NBME about her application and that NBME decision was that her application did not qualify as a disability.

62.    The NBME has confirmed with both the Plaintiff and the Defendant, through the previous medical school Registrar Joy Kim, that they do not make any accommodation decisions via phone calls. All communications from NBME are made through letters. The Plaintiff did not receive letters from NBME when Ms. Rosezetta Henderson claimed to have spoken to NBME. Additionally, the Plaintiff must provide written consent to the NBME for them to speak with a third party, such as the Defendant. The Plaintiff was not requested by the NBME and did not give the NBME consent to speak with the Defendant. However, Ms. Henderson claimed to have received Plaintiff's accommodation decisions from NBME via phone.

63.    As a direct result of Ms. Henderson's misinformation, the Plaintiff was prevented from and denied, as a qualified individual with a disability, the opportunity to benefit from services provided by the NBME and Plaintiff failed her exam.

64.    After taking her USMLE Step 1 exam, the Plaintiff was required to start her third-year clinical clerkships or clinical rotations ("rotations"). Clinical rotations are training periods in a hospital setting where 3rd year medical students practice medicine under the supervision of established physicians. Medical students train in a single specialty for several weeks and then rotate to another clinical specialty.

65.     In May 2018, Plaintiff started her third-year clerkships and Surgery was her first rotation. In the middle of this busy Surgery Clerkship, the Plaintiff found out that she had failed the USMLE Step 1 exam for the first time. Because of the USMLE step 1 exam failure, Dr. Toohey emailed the Plaintiff advising her to finish the rest of the rotation and then take a leave of absence to study for the exam.

66.     However, Dr. Toohey refused to acknowledge the Plaintiff's documented disability and critically interfered with her surgery rotation (a notoriously difficult rotation with students working about 80 hours a week and studying for their end of rotation exam after 12 hour shifts every day). For example, Dr. Toohey repeatedly emailed the Plaintiff to meet with her, requiring multiple meetings that significantly detracted the Plaintiff from her surgery rotation studies.

67.     Additionally, Dr. Toohey also instructed the Plaintiff to search for a program that would "help fix her language issue" in the middle of the rotation. Dr. Toohey continued to assert language as the Plaintiff's problem based on no formal assessment and disregarding the DSC's verification letter specifically sent to her to prevent this continued denial of the Plaintiff's protected status.

68.     According to the school policy, "any student who fails Step 1 examination a <u>second time</u> will be immediately removed from the third-year curriculum and placed on a specially tailored board preparation plan as determined by the Office of Student Affairs." It was the Plaintiff's first fail at the USMLE Step 1 exam, and therefore, she should have not been forced to take a preparation course. More importantly, Plaintiff was not placed on a specially tailored board preparation plan as required per school policy. Instead, she was asked by Dr. Toohey to search for a program that will "help fix her

language issue", which is what the Dean claimed to be Plaintiff's problem based on no formal assessment.

69.     In addition, the Plaintiff was instructed by Dr. Toohey to take out additional loans, in the amount of $5,225, to pay for an unwarranted program, again, to "help fix her language issue." This was even after the Plaintiff explained to Dr. Toohey that she needed disability accommodations for the USMLE Step 1 exam. Plaintiff did not need a test preparation course for "[fixing] her language issue." As a direct result of Dr. Toohey's interference with the Plaintiff's rotation and studies, Plaintiff failed her first National Board Subject Exam ("shelf") examination.

70.     Shelf examinations are exams managed by the NBME that are administered to medical students after completion of every rotation. A student is expected to pass both the shelf exam and clinical skills subjective evaluations to successfully complete each rotation.

71.     Prior to this significant and repeated interference of her studies by Dr. Toohey, Plaintiff had never failed a National Board Subject ("shelf") examination at the Defendant's institution.

72.     On June 5th, 2018, at a meeting with Dr. Toohey, per school policy, she instructed the Plaintiff to provide her with Plaintiff's NBME accommodations documents so that she could follow-up with NBME on her behalf as she finished her Surgery rotation (it is the responsibility of DSC and not Dr. Toohey to handle students' reasonable accommodations request to NBME).

73.     Per the provided documentation, Dr. Toohey knew that Plaintiff was diagnosed with a testing anxiety disorder per Dr. Hurria's diagnosis (the Plaintiff also provided her supporting documents on June 5th, 2018, via email to Dr. Toohey). Despite Dr. Toohey's awareness of Plaintiff's anxiety diagnosis and ignoring her requests, Dr. Toohey continued to label the Plaintiff

as having "language issues" in multiple emails without the Plaintiff's consent and without any professional assessments to back those claims.

74.     Dr. Toohey informed the Plaintiff of her communications with NBME via email, stating the following: "I have spoken extensively to the NBME regarding any possible recourse for additional time due to a language issue. I have received their final word that because this is not a defined ADA disability, they are unable to provide any assistance.

75.     As a direct result of Dr. Toohey's "language issue label" label, the Plaintiff was prevented and denied, as a qualified individual with a disability, the opportunity to benefit from services provided by the NBME. The Plaintiff took the USMLE Step 1 exam without reasonable accommodations and failed the second time in October 2018.

76.     In October 2019, Plaintiff was advised by the NBME it does not make accommodation decisions via the telephone. On October 23, 2019, Plaintiff met with Dr. Megan Osborn ("Dr. Osborn"), the New Dean of Student Support and Dr. Toohey's replacement, to discuss the issues that she had experienced with UCI medical school administration. Following the meeting, Plaintiff emailed Dr. Osborn on 10/27/2019 requesting her to provide the NBME denial letter that Dr. Toohey was referring to in her email on July 5th, 2018. Dr. Osborn replied to Plaintiff's request in an email on November 10, 2019, saying "I was not able to locate any written communication between the NBME and the school with respect to your question, but I can continue to search." However, according to emails from Public Records, Dr. Osborn requested the School of Medicine Registrar, Joy Kim, to contact NBME and ask about the Plaintiff's denial letter.

77.     On November 1st, 2019, Joy Kim wrote an email to Dr. Osborn saying "I just called NBME, and they informed me that the denial letters are sent

directly to the student. They do not send out any items to 3rd parties or institutions unless they have written consent from the student." Dr. Toohey was untruthful about her communication with NBME, and she interfered with Plaintiff's NBME accommodation process. There was no evidence that she contacted the NBME and no paper trail to support her claims - neither on UC Irvine nor NBME records.

78.     Furthermore, the NBME has confirmed with both the Plaintiff and the Defendant, through the previous medical school Registrar, Joy Kim, that they do not make any accommodation decisions via phone calls. All communications from NBME are made through letters. The Plaintiff did not receive letters from NBME when Dr. Toohey claimed to have spoken to NBME. Additionally, the Plaintiff must provide written consent to the NBME for them to speak with a third party, such as the defendant. The Plaintiff was not requested by the NBME and did not give the NBME consent to speak with the defendant via Dr. Toohey.  However, Dr. Toohey claimed to have received the Plaintiff's accommodation decisions from NBME via phone—notably, Dr. Toohey claimed to have spoken to NBME regarding the Plaintiff's language issues as the reason for the accommodation request. She made these statements even after the Plaintiff repeatedly requested her to stop with the "language issue" label and even after receiving a verification letter from DSC.

79.     After failing the USMLE Step 1 exam for the second time, the Plaintiff was required, per school policy to meet with Dr. Toohey again. At this point, Dr. Toohey instructed Plaintiff to meet with Dr. Ashley Selva-Rodriguez ("Dr. Selva-Rodriguez") the previous school learning specialist and follow up with DSC to request accommodations again from the NBME.

80.     In December 2018, the Plaintiff met with Dr. Selva-Rodriguez, and she was surprised that the Plaintiff didn't get a psychoeducational evaluation for

NBME accommodations. She asked the Plaintiff how the DSC and the school determined how much extra time the Plaintiff needed to take her exams and what protocols they followed. The Plaintiff had no answers.

81.     Following their meeting, Dr. Selva-Rodriguez wrote to the Plaintiff stating the following "...I reached out to my colleagues, and they suggested the following: 1) Additional Assessments: Along with the standard evaluation tools used, you may consider a neuropsychological assessment to help uncover other opportunity gaps." This is when the Plaintiff was, for the first time made aware that she needed a psychoeducational evaluation to receive accommodation from NBME. Previously, she was told that her application was complete per email correspondence with Ms. Henderson. At this time, the Plaintiff had two Step 1 failures, and it had been over one year since she first submitted her NBME accommodation application. The Plaintiff had cross-checked with Ms. Henderson every time she submitted her application packet to the NBME.

82.     In December 2018 after receiving Dr. Selva-Rodriguez's email, the Plaintiff emailed Ms. Henderson saying: "I was wondering what the process is to get examined regarding my exam issues. Do you know how long the process takes? How much does it cost? When can I get it done...?" Ms. Henderson replied to the Plaintiff's email saying, "...I believe you are referring to a comprehensive psychoeducational evaluation, but I want to be clear" on another email later that day, Ms. Henderson emailed Plaintiff saying, "... You inquired about a comprehensive psychoeducational evaluation. I have included Dr. Toohey on this email per your request. As mentioned to you over the phone, DSC does not conduct assessments. There are two local offices that many students go to, and we have had solid reports from."

83.     This email indicates that Ms. Henderson knew the Plaintiff needed a psychoeducational evaluation, knew where she could send her for assessment,

and had never brought this up for more than a year. According to the School of Medicine policy that applies to students with disabilities and seeking accommodations, it states "...DSC offers initial disability screenings to students who suspect their difficulty in the academic setting may be related to a disabling diagnosis..." However, Ms. Henderson's email is contradictory to school policy which says that DSC does offer initial disability screenings to students. In fact, the DSC never offered the Plaintiff such screening as a student at the university that would have shown that she had an additional learning disability.

84. After the assessment, the Plaintiff qualified for accommodation based on the results from her psychoeducational evaluation that confirmed that she had a Neurodevelopmental disability related to visual processing. The NBME ended up approving her with partial accommodation on 7/24/2019 but the process to request further accommodations was paused as the university had now placed the Plaintiff under investigation. She was instructed to prepare for the Promotions and Honors (P&H) Committee hearing which was delayed multiple times and held on March 9th, 2020. At this time Plaintiff's counsel took over and appealed the Plaintiff's reasonable accommodations that were provided to the Plaintiff in August 2020, a delay that was caused by the COVID-19 global pandemic.

On-campus housing and homelessness: Non-disability-related

85. During the period Plaintiff was going through the USMLE Step 1 application and testing, she was also living in on-campus Verano housing and had been placed on a leave of absence (the "LOA") by the University.

86. Verano Housing leadership requested Dr. Toohey provide documentation for the Plaintiff to continue living in on-campus housing. Dr.

Toohey's role included being in charge of all student affairs and support services, including career and academic advising, health and wellness services, and financial aid resources. She was also in charge of students living in on-campus housing.

87.     A student is allowed to live in on-campus housing if one of the following requirements are met per Lora Romo's ("Ms. Romo") email dated 09/21/2018 and 12/13/2018 which stated the following: "With a university-approved leave of absence, you can continue living in your apartment. Our office would need the same approvals as you received before. Your intent must be to return and enroll again after the absence. If it's more than a full academic year, additional supporting documents will be required for your exception to live in student housing while not enrolled."

88.     Ms. Romo was the Assignments Lead, at Verano Place.

Enrolled in a full-time course at UCI

89.     Dr. Toohey did not inform the housing of Plaintiff's intent to enroll back to the university after her university-approved LOA until housing had already denied her application, which was pertinent information to housing. In fact, she did not have any enrollment plan as requested by Verano housing staff and as confirmed by Dr. Osborn's email to the Plaintiff dated November 10th, 2019.

90.     In an email to housing on 4/25/2019, Dr. Toohey stated: "I met with Jackie Muthoka today, and she remains upset about needing to vacate her apartment by 5/31/2019 if she is not enrolled in the Spring, which she is not." Plaintiff requested to be enrolled in an elective or independent study to avoid losing housing, but Dr. Toohey refused to help her.

91.     Plaintiff's LOA expired on 5/1/2019. It was signed for renewal by the P & H Chair, not until 5/20/2019 which makes it impossible for housing to be aware of the renewal. Ms. Romo had requested to be informed about Plaintiff's LOA status on 4/2/2019. She wanted to know if Plaintiff was going to be enrolled back to school after her LOA so that they could renew Plaintiff's housing contract that was expiring on 6/30/2019.

92.     Ms. Romo and Elizabeth Franklin ("Ms. Franklin") (Acting Associate Director of Apartment Life/Student Housing, Verano place) reached out to the School of Medicine Registrar, Joy Kim, and Dr. Toohey, to get information about Plaintiff's LOA status and intent to enroll back to school after the absence. This information was not provided to the housing office and one of the reasons Plaintiff was given until May 31st, 2019, to vacate her apartment.

93.     Additionally, Ms. Franklin called Dr. Toohey four times in an attempt to request Dr. Toohey to support the Plaintiff, but Dr. Toohey refused. Ms. Franklin later informed Plaintiff that Dr. Toohey would not help her, according to their conversation, and advised Plaintiff to start looking for an apartment.

94.     During a subsequently-filed OEOD investigation, alleged *infra*, Ms. Franklin confirmed Plaintiff's statements regarding calling Dr. Toohey four times and her refusal to help Plaintiff to be accurate.

95.     On 4/2/2019, Dr. Toohey emailed Verano housing stating the following "I am writing in support of a housing exemption for Ms. Jackie Muthoka. She is a student in the School of Medicine, who is currently not enrolled due to her need to study for a USMLE board examination. She is unable to proceed with her curriculum unless she passes this exam. This USMLE Step one examination is also a requirement for graduation. Jackie

has been most compliant in her pursuit of achieving this goal. She has taken a remediation course in order to prepare, as well as continued consultations with our Learning Skills Specialist. Jackie expects to take and pass this examination in July. It would be most helpful for her to continue to live on campus while she prepares. She expects to re-enroll as soon as she takes the exam. I very much appreciate your consideration of this housing exemption. I believe that this support will be important for her success."

96.     The above letter from Dr. Toohey did not have any pertinent information that would have helped Plaintiff to keep her on-campus housing. It did not include any information about the extenuating circumstances that Plaintiff told her to include in the letter. For example, Plaintiff told Dr. Toohey that she is an orphan, was in this country all by herself and would end up homeless since off-campus housing in Orange County was too expensive. It would also be difficult to pay for off-campus housing since Plaintiff had planned her budget based on Verano housing rent, which is significantly cheaper than off-campus housing. In addition, Plaintiff also informed Dr. Toohey that moving and trying to find a place to stay would also disrupt her studies for the USMLE Step 1 exam. However, Dr. Toohey refused to include any of that information in the above letter to the housing.

97.     On April 4th, 2019, Plaintiff received a denial letter from housing stating the following, "...when reviewing exceptions petitions and considering those that warrant an exception to Graduate & Family Housing Policies, the committee looks for those requests which are based on extreme and unusual circumstances. Based on the information you provided the committee; your request does not meet these qualifications."

98.     Once Plaintiff's application was rejected, she was distraught. She met again with Dr. Toohey on 4/25/2019 to discuss the denial letter. At the

meeting, Dr. Toohey told the Plaintiff that she was being stubborn and that she should consider going back to her country if it was difficult to find housing. After the meeting on 4/25/19, Dr. Toohey emailed housing. This time, including some of the information that Plaintiff had initially asked her to include. However, the letter below was written by Dr. Toohey after housing had already denied her request and the decision made final.

99.      In the letter, Dr. Toohey wrote: "I met with Jackie Muthoka today, and she remains upset about needing to vacate her apartment by 5/31 if she is not enrolled in the Spring, which she is not. She informed me today that she had previously been told that she would be able to stay in her housing situation until August. Therefore, she worked as a caregiver to be able to save money for her housing without her financial aid until August. She feels that she followed the directions given and is now in a very difficult situation. Jackie is in this country entirely alone and she has no one to assist her financially or with housing. Community apartments or rooms are all several hundred dollars more expensive than her current on-campus housing and she was not expecting to vacate the premises due to what she thinks she was told previously. She has not been able to take her National Board Examination because she has applied for accommodations due to her language issues as a foreign student and this process takes many months. The Disabilities Service Center is helping with Jackie's application for testing accommodations, but this process is very slow and is the reason she is currently not enrolled for Spring. I realize and greatly appreciate that housing is very tight, however, I am also very concerned that Jackie is in a difficult situation that will make it almost impossible for her to succeed. Had she been told earlier in the year that she could stay until August, or did she misunderstand this? I appreciate any help you can provide."

Moreover, Dr. Toohey's email contained several errors and lacked pertinent information. She said Plaintiff was a "foreign student" and had "language issues." Besides being discriminatory, these statements and labels were not applicable and played no role in Dr. Toohey's email as the Plaintiff is a U.S. Citizen and not a foreign student studying in America on a student visa.

100.    From the above communications with the on-campus housing leadership, Dr. Toohey was provided many opportunities to support the Plaintiff but refused to fulfill her duties as a Dean, a leader, and policy maker at the Defendant's institution.

101.    Additionally, in an email conversation on March 21, 2019, between Ms. Romo and Joy Kim (UCI SOM Registrar) it reads "After speaking with Joy Kim, Registrar-Medical Education, and getting update regarding your status, she agrees that it would be best for you to vacate and request housing at a later date." Again, the Defendant failed to assist Plaintiff when she deeply needed their assistance.

102.    As a direct result of Dr. Toohey's failure to perform her duty to support the Plaintiff as a medical student, the Plaintiff became homeless, living with her previous roommate, now Dr. Zavala. Her mental and physical well-being was affected. Her anxiety disorder worsened because she lost sleep, gained about 60 pounds of weight, lost concentration, and couldn't retain information.

103.    Even though the Plaintiff is a strong individual who has overcome many hardships in life, including losing both of her parents during adolescence, she was not immune to the discrimination, mistreatment, and hardships she faced from Dr. Toohey. This was still one of the lowest and most isolating periods of her life, where Dr. Toohey's discrimination almost

made her want to quit her education at Defendant's University and give up hope.

104.     On April 1st, 2019, the Plaintiff had a phone conversation about housing with the previous medical school Registrar, Joy Kim. During the conversation, the Plaintiff expressed her frustrations and explained that the medical school was not supporting her as a student to keep her on-campus housing.

105.     Per school public records, Joy Kim emailed Dr. Toohey about the Plaintiff, stating the following: "Jackline sounded very distraught, upset, and stressed out with this housing and stated that SOM was not doing enough or anything to help her. She doesn't have anywhere to go and is working hard to make money to pay off her debt. I informed her that she should try to do an appeal with the Housing Office, and we can try to advocate for her, but the ultimate decision lies with them since it is based off of their policies. I know that there isn't much we can do on our end, but I was hoping that someone could reach out to her and do a wellness check. She has a lot on her plate and sounded defeated over the phone." Dr. Toohey replied to her email saying, "Thanks so much. I have talked to Luis about this, and we have been trying to help... " Even though the Plaintiff was in a very bad state of mind after losing her on-campus housing, Dr. Toohey did not help her as necessary, and she never reached out to her regarding the Plaintiff's mental health. Additionally, the Plaintiff did not receive any wellness check as Joy Kim recommended to Dr. Toohey.

106.     Furthermore, Plaintiff witnessing Njoku go through a mental breakdown, quit medical school because of similar circumstances, and seeing the school cover-up was an experience she describes to be worse than burying her deceased parents twice- the Plaintiff was sure she was going to

be the next in line to lose her mind. However, since the Plaintiff had promised her deceased parents before they passed away that she was going to be a doctor; she held on to hope that she would fulfill that promise even amid the worst experience of her lifetime.

107.     She reached out to her pastors and church community, who rallied around her and provided financial, emotional, and spiritual support until she graduated from the Defendant's institution.

108.     After failing the Surgery shelf exam, Plaintiff was Placed under investigation and with the investigation reading the following: "First, she has an NBME Surgery Shelf failure during her Surgery Clerkship that was not remediated within one year from the end date of her surgery clerkship. While she did have discussions with the Surgery Clerkship leadership about the next steps, it does not appear that an extension was formalized. The grade for this Clerkship has been converted to a Fail. " (investigative report).

109.     After the Plaintiff did not pass the surgery shelf exam in July of 2018 because of issues discussed in the disability section of this complaint, she met with the surgery Co-director, Dr. Elfenbein, to devise a plan on when to retake the exam. Even though she was ready to take the exam at that time, Dr. Elfenbein advised against taking the surgery shelf exam until she had taken the Internal Medicine clerkship.

110.     Next, Plaintiff discussed the issue of Surgery failure with Dr. Toohey as per Staci Reichenecker's (Surgery Clerkship coordinator) email. Dr. Toohey advised Plaintiff not to worry about the surgery shelf retake until she had passed her USMLE Step 1 exam.

111.     While at the meeting with both Dr. Elfenbein and Dr. Toohey, it was not mentioned to her that in addition to these meetings and plans, Plaintiff

also needed to make a formal extension request over a one-year time limit to finish her incomplete grade assigned.

112.     In addition, Dr. Elfenbein and Dr. Toohey did not notify the Office of Curricular Affairs and the Registrar about the devised plans and changes that needed to be included in the Plaintiff's file. When notified, these two departments would update Plaintiff's file with the plans created with both leaders, actions that would prevent her grade from being converted to an F by the Registrar's office.

113.     Three days before the one-year deadline, Plaintiff received an email on July 12, 2019, from Dr. Wiechmann saying, " I was notified that as of today, you have not resolved the incomplete grade for your Surgery Clerkship shelf failure from July 12, 2018. According to the Grading policy in the student handbook (attached), this violates the requirements that "action must be taken within one year of the course/clerkship end date."

114.     Dr. Wiechmann's email was inaccurate as Plaintiff had taken actions within one year. She had met with both Dr. Toohey and Dr. Elfenbein, and devised plans. However, both leaders did not communicate with his office. More importantly, these two leaders did not inform Plaintiff that they did not communicate that information to the Office of Curricular Affairs and the Registrar. Strangely, the Plaintiff was never notified about the July 15th deadline until three days before the deadline! Lack of proper guidance and support from Defendant's leadership led to Plaintiff's Surgery clerkship grade being converted to an "F" from an incomplete. As a result, she was placed under investigation.

115.     When Plaintiff was placed under investigation in July 2019, the Defendant's investigative report stated that she was being held to the policy for the 2019- 2020 school year. The report states, "only quarters in which a

student is enrolled will be counted. In Ms. Muthoka's case, this policy would grant her additional time; however, she is being held to the standards of the 2019-2020." When Plaintiff started medical school in the fall of 2016, she entered into a contractual agreement with the school of medicine based on the 2016-2017 handbook policy, not 2019-2020. So, according to the investigative report, Defendant had changed Plaintiff's handbook policy in the middle of her contract and, more importantly, never informed her.

116.    In addition, the report claimed that Plaintiff agreed to a change in policy. However, she never signed anything that showed she agreed to an updated policy for 2019-2020. In fact, the Plaintiff was on LOA in 2019 and it was impossible for her to be signing agreements when she was not enrolled and not at school.

117.    The report stated as follows "starting in the 2017-2018 academic year it became standard practice for students to attest to the course objectives, grading policy, attendance requirements, any handbook updates at the start of each course. We have included a record of her attestation during the pharmacology course in 2017 and clinical foundation III course in 2018" The school report included an attestation that reads as follows "I have reviewed the course objectives, grading policy for this course. I understand that I can find additional information, resources and UCISOM policies in the student handbook on canvas."

118.    Nowhere in the provided attestation did it state that Plaintiff was agreeing to updated, or new grading policy for 2019-2020. More importantly, Plaintiff took the pharmacology and clinical foundation III courses in the 2017-2018 school year which was well before the creation of the 2019-2020 policy. It was practically impossible for the Plaintiff to be attesting two years

in advance to the 2019-2020 policy, as the school's investigative report was claiming.

119.     Furthermore, the school's investigative report stated that Plaintiff took the NBME Surgery shelf on July 12, 2018. The 2019-2020 policy was not in effect at the time she was taking the Surgery shelf exam or Surgery rotation. Thus, Plaintiff should not have been held accountable to the updated or changed policy. Instead, per 2016 handbook policy, Plaintiff still had additional time to request an extension, and her grade should not have been changed by the School of Medicine Registrar from an incomplete grade to an F.

120.     Plaintiff provided the following references to the 2016-2017 school policy that allowed her an extension to replacing her incomplete grade at the time of her P&H committee hearing.

121.     The policy states the following:

"only quarters in which a student is enrolled will be counted in determining the time after which the grade incomplete can no longer be replaced.

(b) Previously Registered Students

Students not currently enrolled may replace the grade Incomplete by another grade or notation subject to the following: 1) they have a maximum of one calendar year in which to replace the grade Incomplete; however, 2) in exceptional individual cases involving the student's prolonged inability to pursue a course of studies, extensions of up to two additional years may be granted by the instructor with the approval of the Dean of the unit offering the course; further, 3) students must petition for such an extension within one calendar year following award of the grade Incomplete. The requirements for removing an "I" should be submitted by

the Department following the end of a quarter/rotation to the student and to the Office of Student Affairs."

122.    Even after providing evidence that Plaintiff had met with Defendant's leadership and devised a plan on time, P&H committee failed to take this into consideration. Additionally, even after providing evidence, the investigative report utilized future policies to calculate Plaintiff's one-year timeline, and Plaintiff still had time at the hearing to request a formal extension that would reverse her grade to an incomplete; the defendant, through P&H, refused to make the changes. Instead, Plaintiff's grade was converted to an F.

<u>Promotions and Honor's (P&H) Committee hearing proceedings and the Decision letter</u>

123.    Due to the period, it took Plaintiff to obtain USMLE Step 1 exam reasonable accommodations, she could not take the test within one year of the last day of her second year of medical school, per school policy.  She was, therefore, required to have a hearing by the P&H committee.

124.    In July 2019, Plaintiff was notified by Dr. Warren Wiechmann ("Dr. Wiechmann") that she had been placed under investigation and went through the Notice of meeting setting on July 22, 2019, to be interviewed regarding the reasons for her failure to complete USMLE step 1 exam within the time stipulated in the handbook policy.  This is the standard procedure for due process within the Defendant's institution.

125.    Dr. Wiechmann is the Senior Associate Dean of Clinical Science Education & Educational Technology and a Professor of Clinical Emergency Medicine at the Defendant's institution.

126.    On August 23, Plaintiff was notified by Dr. Wiechmann that her investigative report was complete but was not provided with a copy.

127.    On 9/30/2019, after multiple attempts and failure to be provided the investigative report by Dr. Wiechmann, Plaintiff met with the Ombuds, Jennifer Moumneh. At the meeting, she complained about discrimination she faced and requested that the Ombuds' office request that Plaintiff be provided with a copy of the investigative report. The investigative report was then immediately provided to the Plaintiff the same day.

128.    According to the investigative report, Plaintiff was placed on investigation and was going through the due process for the following reasons:

a.) "First, she has an NBME Surgery Shelf failure during her Surgery Clerkship that was not remediated within one year from the end date of her surgery clerkship. While she did have discussions with the Surgery Clerkship leadership about the next steps, it does not appear that an extension was formalized. The grade for this Clerkship has been converted to a Fail.".

b.). The second issue involves the USMLE Step 1. Ms. Muthoka has taken the exam twice; however, has not passed the exam within 1 year of the end of her second-year curriculum. This makes her eligible for academic probation. Ms. Muthoka also must pass USMLE Step 1 on her third attempt before March 13, 2020, or she will be eligible for dismissal." (investigative report).

Please see the discussion of violations concerning USMLE Step 1 exam on the disability #1 and Disability #2 sections of this complaint.

c.) "The Notice of Meeting setting was held on July 22, 2019. During this time, Ms. Muthoka shared her struggles with getting testing accommodations for USMLE Step 1. She most recently submitted a

report in May to request accommodations and is awaiting that decision. Ms. Muthoka also highlighted some challenges in regard to her leave of absence and her housing situation, which she feels exacerbated her academic issues " (investigative report).

Please see discussion of violations concerning LOA and Housing on the on-campus housing section of this complaint.

129.    On October 11, 2019, after receiving the investigative report, Plaintiff wrote a letter to the P&H chair, Dr. Forthal addressing all the above issues in the report. She also requested that her appearance before the P &H Committee be canceled.

130.    On October 15th, Dr. Forthal replied to Plaintiff' email stating: "Regarding your request to not have a P & H committee hearing, please note that the Student Academic and Professional Standing Policy states that students will be referred to the Committee on Promotions and Honors for review and possible formal action (warning, probation, suspension, or involuntary administrative leave) in the event of a failure to pass USMLE step 1 within one year of the student's last day of the second-year curriculum. Thus, according to policy, we will need to conduct the hearing. However, it is important for you to realize that, in part, the purpose of the hearing is to allow you to voice the issues that you raise in your letter (attached to your email of 10/11/2019). The Committee will not come to a decision about an action without carefully considering your point-of-view and any circumstances that might have contributed to your course and USMLE exam failures."

131.    However, Dr. Forthal's email in October and what ended up happening at Plaintiff's hearing was contrary to his email. Plaintiff was denied proper due process and the overwhelming evidence she provided was not considered by the committee when they made the decision to place her on academic probation.

132.    In addition, Plaintiff's hearing was delayed multiple times and was held nearly a year after the policy violation.

133.    On December Dec 4, 2019, Dr. Osborn emailed Plaintiff, before her hearing that was previously scheduled for January 6th, 2020, stating the following: "I know that we will meet soon, but I did want to give you an update from the school regarding the P&H hearing. You indicated previously that you would have two family representatives present at the hearing. The school will have counsel present. Just a reminder about the items and deadlines in Dr. Forthal's letter (I have attached it; time correction 8:45a, not 8:00a)."

134.    Per the Defendant's due process policy, "[a]ll decisions regarding the conduct of the hearing shall be left to the discretion of the Committee Chair. While formal Rules of Evidence should not govern the proceedings, the Chair should assure that both the administration and the student have the full opportunity to present their respective positions. The standard to be employed by the Committee in evaluating conflicting contentions or evidence is 'preponderance of the evidence.' The student may elect to be represented by a non-UCI employee at the hearing. If so, the student must advise the Chair of the Committee no later than 10 business days before the hearing of this election. If the student elects to be represented, the Administration reserves the right to also be represented".

135.    The school brought a lawyer to the Plaintiff's hearing while she was going to have family members present. This was against their policy. The school had not brought lawyers to other students' hearings if students did not have their counsel present.

136.    On March 1st, 2020, a week before the hearing, which was scheduled for March 9th, 2020, the Plaintiff provided Dr. Forthal with a written documentation and more than 300 pages of email evidence. In the written

documentation, Plaintiff complained of misinformation, misadvising, and discrimination she suffered from the Defendant's employees.

137.   On March 9, 2020, at the hearing, which was recorded, Dr. Toohey stated that she was never informed that Plaintiff has a learning disability other than having "language issues" and that she was not aware that Plaintiff is a United States Citizen. However, records indicate that Dr. Toohey was informed and knew about Plaintiff's disability since 2017.

138.   Additionally, Dr. Toohey also stated that she called NBME regarding Plaintiff's reasonable accommodations. When Plaintiff requested that Dr. Toohey provide the name of the individual she spoke to at the NBME, Dr. Toohey claimed that she didn't remember as it had been a long time. However, NBME has confirmed with both the Plaintiff and Defendant that they do not make any reasonable accommodations decisions over the phone.

139.   After Dr. Toohey could not remember who she spoke to at the NBME, she changed her statement to state that she emailed NBME. Plaintiff requested that she be provided with the email Dr. Toohey send to the NBME, but she could not provide any written communication.

140.   Dr. Toohey was untruthful regarding her communications with the NBME; she could not provide records and Plaintiff could not find any records between the Defendant and NBME. It appears that Dr. Toohey made decisions on behalf of NBME and emailed those decisions to the Plaintiff. As result, Plaintiff failed her USMLE Step 1 exam twice, lost three years of salary, has a tainted academic record that has impacted her residency applications and suffered emotional anguish.

141.   On March 16th, 2020, the Plaintiff received the P&H decision letter. The letter was defensive and an inaccurate representation of what transpired despite the hearing being recorded. Part of the decision letter states the following:

"...During the hearing, your counsel confirmed that you were NOT claiming that UCI had failed to provide you reasonable accommodations during your education; you were not claiming that you were an alleged victim of racial or any other form of discrimination, and that, for purposes of the hearing, you were not contending that any faculty member or administrator was intentionally engaged in misconduct in an effort to see you dismissed by the School of Medicine...The Committee acknowledges that this matter is stressful for you and innocent mis-recollection frequently occurs."

142.     Plaintiff and her counsel never made these statements. In fact, Plaintiff submitted a written documentation to the P&H committee stating discrimination, misinformation and misadvising. Notably, the P&H decision letter is gaslighting the Plaintiff for being too stressed out to remember correctly what happened to her despite submitting 300 pages of email evidence.

143.     The P&H committee placed Plaintiff on academic probation despite the misadvising, misinformation, and homelessness she suffered under the Defendant's employees. Her Surgery grade, which was incomplete at that time, was also converted to an F.

144.     After receiving the Decision letter, Plaintiff's counsel contacted Peter Schneider ("Mr. Schneider") March 24th saying " I want to make crystal clear that I stated Ms. Muthoka was not relying on intentional conduct at the time nor was she raising issues of UCI's accommodations solely for purposes of that hearing. l categorically did not state that she had no claims in that regard or that she was waiving any such claims or ability to raise those claims in any other context. These statements were impelled in part by your statements that raising such issues at the hearing would necessitate a lengthy unstated administrative

process. The decision misrepresents my statements in that regard and therefore is concerning on a number of levels."

145.    Mr. Peter Schneider replied to my counsel's email on March 24th saying "any further statements made during the hearing regarding additional investigations are irrelevant. Nobody compelled either your client or you to make the statements that were made...Nobody required you to waive anything. In whole or in part; qualified or unqualified."

146.    These communications from the Defendant further establishes Plaintiff's disparate treatment she suffered by the Defendant.

OEOD Investigation process and investigative report

147.    Because of her ongoing concerns regarding disparate treatment related to race, gender, country of origin, and the defendant's continued refusal to honor her previously approved disability-related reasonable accommodations, the Plaintiff officially filed a discrimination complaint with the Office of Equal Opportunity and Diversity (OEOD) in May 2020.

148.    The OEOD is the Defendant's designated entity for processing and investigating students' claims of unlawful discrimination. It is possessed with the Defendant's authority to receive complaints about, investigate, and take corrective measures regarding discrimination and retaliation claims within the university.

149.    The Plaintiff's complaint was originally assigned to Adrian Y. Williams, an African-American woman as the senior investigator who accepted and emailed Plaintiff stating that she "…consulted with my supervisor, Interim Title IX Officer, Tierney Anderson, regarding your matter. We are both in agreement, based on the information you provided during our conversation, that you have a prima facie case." A few weeks later, the senior investigator was

switched to a non-black male, Raid Faraj. Adrian Williams left OEOD staff shortly thereafter.

150.     Notwithstanding the fact that Plaintiff was available and willing to assist in the investigative process, OEOD did not complete its investigation in a timely or objective manner. Instead, the timeframe for completing the investigation was extended twice.

151.     OEOD finally provided Plaintiff with a preliminary draft of the investigation, which included statements from alleged witnesses. The Plaintiff submitted a rebuttal to these statements.

152.     Thereafter, OEOD took additional time to issue the final report. The final report was written in such a manner that it protected Defendant and disclaimed that Plaintiff was subjected to discrimination based upon her race, gender, country of origin or that she was denied a reasonable accommodation (disability).

153.     The investigation conducted by the OEOD was problematic in 5 key areas:

   **a.)** Misrepresentation of facts- For example, OEOD referred to Dr. Toohey, respondent in the investigation complaint, as "former staff". However, Dr. Toohey was the Associate Dean of Student Affairs, a leader, and a policy maker for the Defendant.

   **b.)** Denied witnesses- For example, OEOD only interviewed the two Asian medical students that had traveled with the Plaintiff to Kenya in 2017 Clay Thibodeaux and Jenny Tang, but excluded Kelley Butler, an African American female student who also traveled to Kenya under Plaintiff's leadership. The rest of the medical students had already graduated apart from these three students. In addition, Plaintiff's

previous roommate and family representatives requested by the Plaintiff were not contacted or interviewed by the OEOD.

**C.)** Witness tampering - for example, during the OEOD's investigation and before Plaintiff had the opportunity to offer her rebuttal in November/December 2020, all OEOD witnesses claimed that no medical students traveled to Kenya in 2018 to conduct research and were supported by the Defendant. However, during her rebuttal, Plaintiff submitted evidence proving that a non-Black, non-Kenyan male student, Lobasso led a team that traveled to Kenya for a research project with full support from the Defendant (Funding and IRB approval). Suddenly, every witness interviewed after Plaintiff's rebuttal in November/December 2020 corroborated Plaintiff's testimony and testified that the non-black male medical student traveled to Kenya with full support from the university. OEOD also claimed that the Travel advisory at the State Department website had been changed to a less severe warning, therefore, that was the reason for the trip in 2018. However, OEOD failed to account for the fact that Dr. Toohey had instructed the Plaintiff to withdraw/ be excluded from her trip in 2018 due to Kenya being on the Travel ban list on the State Department website.

**d.)** Intentional Ex-post facto policy application: For example towards the end of 2020, the Plaintiff noticed that the Defendant was changing the electronic school handbook policy available online; upon noticing this change, the Plaintiff notified the senior investigator about this change via email. However, the senior investigator intentionally and deliberately used the new policies to make a determination of non-discrimination on the basis of disability in the final investigative report.

e.) Other problematic issues with the OEOD investigation include omission, and destruction of evidence, and altered testimony.

154.    Following the OEOD investigation completed in January 2021, Plaintiff suffered multiple retaliatory actions from Defendant. For example, the Plaintiff requested reasonable accommodations with respect to test taking and the completion of the Surgery subject NBME exam at Defendant's institution from February 1, 2021 through March 14, 2021 for the test she took on March 19, 2021. This is because of the trauma Plaintiff suffered from when she received an unjust investigative report from the OEOD on January 27th, 2021. Her anxiety disorder worsened, and she was in severe distress.

155.    Her grade had been converted to an F by the Registrar's office, please see extensive discussion about this issue on "Surgery issue #1 matter that was brought before P&H Committee hearing.

156.    On February 1, 2021, Plaintiff requested a reasonable accommodation from Dr. Shannon Toohey, who is also a relative to Dr. Jullianne Toohey, the previous Associate Dean of student affairs at the Defendant's University.

157.    On the same day Dr. Toohey replied to Plaintiff's email stating that P&H was going to make a decision and will get back to her later.

158.    Nearly a month later and only a week before the expiration of her exam date, Dr. Toohey contacted Plaintiff stating that P&H was not going to make a decision on this, instead Plaintiff needed to make her request through the DSC.

159.    Upon receiving these instructions on March 8, Plaintiff emailed Ms. Henderson requesting the needed reasonable accommodations for an extension for her Surgery shelf exam.

160.    On March 8, Plaintiff was evaluated by her healthcare provider who wrote a letter stating that Plaintiff was in significant distress and determined an extension of her exam be made as a reasonable accommodation request. She

then emailed her healthcare provider's letter to Ms. Henderson requesting reasonable accommodations.

161.     On March 10, 2021, Ms. Henderson required that Plaintiff provide additional documentation, stating that the 3/5/2021 letter from her healthcare provider did not provide sufficient information.

162.     On March 11th, 2021, Plaintiff spoke with Ms. Henderson via phone and clarified her request for reasonable accommodations and answered her questions. Plaintiff was then again re-evaluated and provided a new letter warranting a reasonable accommodation to Ms. Henderson.

163.     On March 12th, 2021, Plaintiff provided a third letter to Ms. Henderson via email, and reiterated her request for reasonable accommodations.

164.     On Friday, March 12th 2021 at 5:34 pm, Ms. Henderson improperly denied Plaintiff reasonable accommodations. Significantly, Ms. Henderson's response on a Friday evening was after business hours and was after the required test date of March 12th had already elapsed. No explanation was given as to why the decision had been delayed until after the relevant date had passed.

165.     However, the reasons for denial of Plaintiff's request by Ms. Henderson were meritless. She wrongfully stated that the requested reasonable accommodations would cause a "fundamental alteration to the school of medicine curriculum." However, she did not explain how.

166.     Notably, Plaintiff's reasonable accommodations request in no way caused a fundamental alteration to the Defendant's curriculum. This fact was verified by Ms. Karen Andrews, when she made a decision to reverse Ms. Henderson's denial without any further additional documentation.

167.     On March 13th, Plaintiff met with Karen Andrews and had a discussion of what happened and the harm that was going to be caused by the decision made by Ms. Henderson and the P&H committee to deny Plaintiff reasonable

accommodations. After the meeting, Plaintiff emailed Karen Andrews the information she had received from the school of medicine administration. After reviewing the facts and going through Plaintiff's request, Ms. Andrews reversed Ms. Henderson's decision to deny her reasonable accommodations. This request was honored on Wednesday March 17th at 5 pm.

168.    Plaintiff was scheduled to take the Surgery shelf exam on Friday, March 19th, 2021, at 10 am.

169.    From February 1, 2021 through March 14, 2021, Plaintiff was subjected to significant stress derived from both unnecessary and improper actions on the part of the Defendant. Defendant's employees' actions detracted from the Plaintiff's ability to focus on and study for the scheduled examination. Defendants' adverse actions against her caused substantial and undue harm to the Plaintiff.

170.    On March 19th, 2021, Plaintiff failed the scheduled exam by only 6 %.

171.    According to the School of Medicine policy on reasonable accommodations: "University policy, State and Federal law require that students with disabilities be provided with effective and timely auxiliary aids and accommodations. For faculty, this means that when students with verified disabilities self-identify to you or request appropriate accommodations, you should immediately begin to work with them and the Disability Services Center (DSC), if necessary, to implement the aids or accommodations that will allow students to participate in all programs and activities on the same basis as students without disabilities."

172.    However, Dr. Toohey and Ms. Henderson unreasonably delayed and denied the Plaintiff reasonable accommodations from February 1, 2021, through March 14, 2021, and only provided these accommodations after appealing the request to Karen Andrews. The theme for this reasonable

accommodation request was delay, deny, frustrate, appeal, grant, and demand that the Plaintiff take the test with no time to prepare for it. This was the common theme throughout all the Plaintiff's reasonable accommodation requests with the Defendant after her OEOD investigation.

Gold Humanism Honor Society award: After OEOD investigation

173.    After Plaintiff complained to OEOD about being subjected to unlawful discrimination, her peers nominated her for the Gold Humanism Honor Society Award.

174.    This award is a very high honor that is awarded to exceptional students who stand out with respect to clinical care, leadership, compassion, and dedication to patient service. Being a recipient of such a prestigious award could have bolstered Plaintiff's future efforts to be accepted into medical residency programs.

175.    The Society that oversees the award has chapters at various medical schools around the country.

176.    Each chapter has a selection committee that is supervised by a faculty member. The Plaintiff provided the committee with all the credentialing information it requested, such as a resume and a written statement on March 1st, 2021.

177.    The Plaintiff learned from a fellow medical student and a Gold Humanism Honor Society Committee member that the committee initially selected her to be a Gold Humanism Honor Society Award recipient but objected to her receiving the award because the Medical Education Leadership advised the faculty in charge of the committee that the Plaintiff has "some litigation issues with the school."

MBA Program acceptance rescinded after OEOD Investigation

178.    The Plaintiff was initially accepted into the MD/MBA dual program. She was scheduled to graduate with both degrees in the summer of 2021.   However, after she complained about unlawful discrimination the defendant rescinded her acceptance into the MBA program without an explanation, and the Plaintiff was prevented from an educational opportunity (MBA acceptance rescinded after she was already accepted to the program).

179.    On September 20, 2019, the Plaintiff emailed Dr. Osborn to update her on what was going on with her leave of absence and the USMLE Step 1 exam. She informed Dr. Osborn that the process to receive her reasonable accommodations was taking longer than expected and that she requested to start her MBA program in the fall to stop losing school time as she waited for the NBME to grant her reasonable accommodations. The excuse given was that the school year had already started, and she could not join the program. Notably, the MBA program had started just a few days before Plaintiff's email to Dr. Osborn above.

180.    Additionally, the Plaintiff was informed that the P&H Committee would need to approve that request for her to start the program. Furthermore, the Plaintiff requested the Ombudsman to assist her with the MBA program, and she was given the same information.

181.    In April 2022, the Plaintiff completed all the necessary classes and was ready and could to start the MBA program in the fall of 2022. Plaintiff contacted her career advisor, Dr. Paredes, who is also the MD, MBA program director at UCI School of Medicine. Dr. Parades confirmed with the Plaintiff that she could start classes in the fall.

182.    The Plaintiff further contacted the MBA program director, Melanie Coburn, to ensure everything was complete and she was ready to start the

program in the fall. Ms. Coburn sent the Plaintiff an email stating the following: "I wanted to see if we can schedule a 30-min call to better understand your background and motivation for pursuing the MBA now."

183.     The Plaintiff was still going through her third-year rotations and was preparing for the USMLE-step 2CK exam. At this point, the Plaintiff had already gone through interviews with the MBA program, submitted a written statement regarding her motivation to pursue an MBA, submitted multiple applications restating her background and motivation to pursue her MBA, and received an acceptance to the program. She requested that the director review that information as it had remained unchanged and let the Plaintiff know if there was anything else that the program needed from her.

184.     On June 3rd, 2022, the Plaintiff received a rejection from the MBA program, stating that she had failed to provide requested documentation to the program.

185.     Plaintiff requested that Ms. Coburn provide her with the email showing that the MBA program director requested additional documentation from the Plaintiff. The program director could not trace any email that she had asked Plaintiff for additional documentation and had rejected the Plaintiff's ability to start the MBA program without any tangible reasons.

<u>Disparate treatment during Internal Medicine rotation: after OEOD Investigation:</u>

186.     When Plaintiff resumed her clinical rotations, and after OEOD investigation, she was scheduled to start Internal Medicine (IM) rotation from 3/29/2021 to 5/21/2021.

187.     Given that she was on a LOA for close to two years, Plaintiff requested that she be provided with a training on how to use the electronic medical record ("EMR").

188.     The EMR is an electronic system that is used by healthcare providers to collect and store patient information, create treatment plans, provide patient care, and communicate patient information with other medical providers.

189.     This training was provided to medical students before they started their third-year clerkships.

190.     Plaintiff reached out to the relevant department, and she was informed that the next available date for the training was after she had completed her rotation.

191.     Plaintiff reached out to Dr. Cameron Harding, ("Dr. Harding") IM clerkship director for assistance with EMR training.

192.     Dr. Harding provided Plaintiff with links and videos for the Plaintiff to learn independently during rotations. When the rest of the students were preparing for their end of rotation exams after 12 hours of patient care during the day, Plaintiff was spending her time learning how to use the EMR to access and care for patients in addition to studying for her exam.

193.     This created unnecessary strain to the Plaintiff during this demanding rotation.

194.     Additionally, even after filing an investigation with the OEOD, Plaintiff continued to experience discriminatory treatment during her IM rotation. Plaintiff was the only black individual in the entire team. While on rotation with an all-Asian team, Plaintiff's supervising physician Dr. Hoang Anh Nguyen ("Dr. Nguyen") spoke with a patient, agreeing that the team appeared young. Dr. Nguyen went on to state that it was because "of our good Asian genes." The patient looked confused because Plaintiff wasn't Asian. He

just stared at the Plaintiff, wondering why the attending was saying something that clearly excluded her from the rest of the team. In response to the patient's stare and realizing Plaintiff was part of the team, Dr. Nguyen went on to say to the patient, "Don't worry, Jackie is Asian, too". There was silence following these statements.

195.    After patient's encounter, Dr. Nguyen made matters worse by trying to prove to the Plaintiff that she was not racist. She did this by showing Plaintiff photos that she has a sister/brother who is married to a Kenyan. A situation that made Plaintiff very uncomfortable.

196.    After that patient encounter, the team was faced with a rather challenging patient who was struggling to work with Plaintiff's team. During this Patient's encounter, Dr. Nguyen made yet another statement because the patient was having difficulty working with an all-female treatment team. Dr. Nguyen said to the team, "I think this patient is racist." Hearing these words, from the supervising physician, everyone in the team faced and stared at the Plaintiff. Again, this was another uncomfortable situation for the Plaintiff.

197.    When the team returned to the work room that day, Dr. Nguyen instructed Plaintiff to change her mask, which the Plaintiff did. However, no one else in the team was instructed to change their masks.

198.    After both incidents, Dr. Nguyen became overly friendly to the Plaintiff to an extend that it was uncomfortable for her. For example, during one of the teaching sessions, Dr. Nguyen placed her hand on Plaintiff's shoulder, something that she did not do with the rest of the team.

199.    Following these incidents, the two Asian students that Plaintiff worked with would work in their groups and were reluctant to include Plaintiff in their discussions. As a result, Plaintiff felt isolated from the rest of the team when it was a homogenous race that was not her own. The experience was

utterly humiliating. Because of non-inclusion, Plaintiff struggled to learn the concepts taught to the group.

200.     Additionally, these incidents created a toxic learning environment for the Plaintiff such that she required more time with her psychiatrist and therapist than normal. This experiences also made studying for her final shelf exam difficult and the time during which she was able to do so was significantly reduced. Because of this, Plaintiff's performance on her shelf exam was seriously impacted.

201.     At midpoint rotation but before transition to complete the rest of the rotation at the Long Beach Veteran's Affairs ("VA"), a hospital that treats veterans, it is standard practice for students to meet with their supervising physicians to discuss their experiences during the rotation.

202.     Supervising physicians are not allowed to seek evaluations from students during rotations. Students and supervising physicians' evaluations are electronically provided to the department at the end of the rotation.

203.     However, Dr. Nguyen was pressuring Plaintiff to evaluate her performance during the rotation saying that it was something she really needed to improve on.  Plaintiff did not comment on Dr. Nguyen's behavior during their meeting.

204.     After transitioning to the VA, Plaintiff encountered yet another disparate treatment from a resident physician, Dr. Peter Nguyen ("Dr. Peter"). For example, Plaintiff's Asian colleague accidentally pasted a patient's information to the wrong patient's discharge summary, she was not reprimanded, instead, encouraged by the resident saying, "do not worry because mistakes like these happen often and that it was okay if she corrected it."

205.    Fast forward the following week, when Plaintiff was given a patient, last minute, and worked to complete the discharge summary with minutes to spare, in front of the entire team, for a simple spelling mistake, she was reprimanded unnecessarily harshly. The resident, Dr. Peter stated the following to the Plaintiff: "At this point in your career, I do not expect you to be making grammatical errors. In addition, you needed to give proper instructions on what the receiving team should be doing to care for the patient."

206.    Plaintiff's discharge summary was incomplete because she received the patient towards the end of her shift. She started the discharge summary to make work easier for the team discharging the patient, in addition, Plaintiff was not scheduled to work the following day. Furthermore, the patient had just been admitted and there was no discharge plan by the team at the time Plaintiff initiated discharge summary. However, Dr. Peter did not consider any of the Plaintiff's circumstances.

207.    As a result of disparate treatment, Plaintiff suffered from isolation from the rest of the team when it was a homogenous race that was not her own. The experience was utterly humiliating. Because of non-inclusion, Plaintiff struggled to learn the concepts taught to the group.

208.    At the end of the eight-week rotation when submitting end of the rotation evaluation, Plaintiff submitted a complaint, but provided identifying information to the anonymous feedback system about disparate treatment during the rotation.

209.    Anonymous feedback information goes directly to Dr. Le-Bucklin, the Vice Dean of Medical Education. Dr. Le-Bucklin never contacted the Plaintiff regarding this issue.

210.    However, Dr. Osborn reached out to Plaintiff and offered to file an investigation with the OEOD on her behalf.

211.    The standard practice for filing an investigation with OEOD is that the student files the investigation, not the Defendant.

212.    Plaintiff declined this offer given the unjust treatment she had experienced with the OEOD. Instead, Plaintiff included this complaint while she filed an appeal for the OEOD investigation with the OCR in July of 2021.

213.    In July of 2021, the Plaintiff timely filed an administrative complaint with the Department of Education Office of Civil Rights of which Defendant was informed wherein she alleged that she had been and was continuing to be subjected to unlawful discrimination based upon her race.

214.    The complaint was filed in the OCR's San Francisco Regional Office. After its initial investigation was completed, OCR advised the Plaintiff of its preliminary findings and advised the Plaintiff of her appellate rights at that time.

215.    Based upon the information the OCR provided the Plaintiff filed an appeal which is currently pending in the Denver Colorado Appellate Office.

Four-hour-long exams without taking breaks: ADA-related: after OEOD Investigation

216.    During COVID-19 global pandemic, students were now taking their NBME subject exams from home. Previously, students would take these exams on campus.

217.    During psychiatry NBME subject exam, Plaintiff experienced interruption from a truck that was packed near her apartment that necessitated

that she pauses and close her test for nearly 30 minutes to address the distraction. She previously paused and took shorter beaks during her tests.

218.  After the test, and a lengthy disruption, Plaintiff emailed both the course leadership and Dr. Osborn and requested that her exam be canceled because of the circumstances that were outside her control. Her test was successfully cancelled.

219.  However, following this, Dr. Wiechmann, wrote an email to the Plaintiff informing her that she took unnecessarily long breaks and paused her exam and moving forward she was not allowed to pause her exam and or close it during breaks. She needed to leave the test timer running if she needed to take any breaks during her exam. Because of this decision, the Plaintiff would continue to lose time on her exams.

220.  Previously, Plaintiff had no issues taking short breaks and pausing her test. The NBME provided codes to test proctors who would then provide these codes to students. These codes allowed students to resume exams after breaks, and therefore did not lose any testing time.

221.  Plaintiff had previously utilized these codes to resume her exams without issues up until the later part of her education and after filing her investigation with the OEOD. The NBME, the test sponsor of national subject exams, had not raised any concerns with the Plaintiff taking breaks or pausing her subject exams.

222.  Because her NBME Subject exams were four hours long, it was unreasonable and impossible for the Plaintiff to take four-hour long exams without taking a break. More importantly, taking a couple of breaks even if short in a four-hour long exam would negatively impact her grade.

223.  Because of this new change, Plaintiff requested a new reasonable accommodation from the Defendant.

224.     According to the Defendant's handbook policy on reasonable accommodations: "University policy, State and Federal law require that students with disabilities be provided with effective and timely auxiliary aids and accommodations. For faculty, this means that when students with verified disabilities self-identify to you or request appropriate accommodations, you should immediately begin to work with them and the Disability Services Center (DSC), if necessary, to implement the aids or accommodations that will allow students to participate in all programs and activities on the same basis as students without disabilities."

225.     However, Plaintiff made multiple requests that were ignored, and unreasonably delayed.

226.      Interestingly, as soon as Plaintiff involved her lawyers in the email communications with the Defendant, her accommodations were granted the same day.

Third-year schedule rearrangement related: after OEOD investigation

227.     Another retaliatory behavior that the Plaintiff suffered was in regard to her third-year class schedule. The defendant, through Dr. Shannon Toohey, reorganized the Plaintiff's schedule in a manner that denied the Plaintiff any time to study for her national subject examinations between rotations. Per school policy, medical students create their own schedules in the third and fourth years. Dr. Shannon Toohey would later change the Plaintiff's schedule only after the Plaintiff's lawyers were included in the email communication and after subjecting her to unnecessary stress.

Inaccurate calculation of Plaintiff's Six-year graduation period: ADA-related:

1       After OEOD investigation

2

3       228.    In May 2020, Plaintiff was involved in a protected activity (filed a

4               complaint of discrimination and Retaliation against university officials to the

5               OEOD), a complaint that was completed in January 2021. Following

6               involvement in this protected activity, Plaintiff was subjected to various

7               retaliatory behaviors and micro-aggressions from various university members

8               that have harmed and continue to harm her education.

9       229.    On March 9th, 2020, Plaintiff had a hearing by the P&H Committee.

10              After the hearing, she was scheduled to take the USMLE Step 1 exam on May

11              3rd, 2020. On March 16th, 2020, the state of California went into lockdown

12              due to the COVID-19 global pandemic. Plaintiff's ability to take the USMLE

13              step 1 exam and the time frame to receive her requested reasonable

14              accommodations from NBME were also affected.

15      230.    As soon as Governor Newson released this information, Plaintiff

16              informed Dr. Forthal, on April 26th, 2020, and requested that the P&H adjust

17              the required time to take the USMLE Step 1 exam. On 4/27/2020, Dr. Forthal

18              replied to her request, saying, "No worries. We won't penalize you."

19      231.    The understanding of this penalty was two folds: a.) Plaintiff won't be

20              penalized for not having taken her exam on May 3, 2020 and b.) The time

21              period Plaintiff was at home would not count towards her six-year graduation

22              period. This is because Plaintiff could not continue to take classes until she

23              had passed the USMLE Step 1 exam as instructed by the committee.

24      232.    In July 2020, the Defendant entered into an agreement with the NBME

25              and received permission to serve as a testing center for the USMLE Step 1

26              and Step 2 CK exams in July and August 2020 due to the effects of the

27              COVID-19 global pandemic. Even as the Defendant made such efforts to

28

reduce the burden and challenges students faced scheduling their exams, not everyone could take their exams on the dates provided. For example, the Plaintiff could not take her exam on these dates as she was waiting for NBME to grant her the reasonable accommodations she is entitled to under the law. Additionally, Plaintiff had also not received a USMLE Step 1 exam permit (a permit is provided by NBME and is required to schedule the USMLE Step exams).

233.    Due to issues created by the global pandemic, exceptions were made to the school policy such that students were allowed to continue their education and incurred little to no interruption on their graduation timeline. However, the Plaintiff was not allowed to continue with her classes and her six-year graduation timeline was impacted.

234.    The standard procedure is that students are required, per Defendant's handbook policy, to complete the USMLE Step 1 exam before transitioning to third-year clerkships.

235.    Some students, known to the Plaintiff, continued to take their coursework and did not take their USMLE Step 1 and Step 2 CK exams until their last year of medical school. The Defendant worked with them by adjusting and making exceptions to the Defendant's policy without issues.

236.    However, the Plaintiff was instructed by the P&H committee to resume classes only after she had passed her USMLE Step 1 exam. Strangely, the P&H Committee penalized Plaintiff by taking this time away from her six-year graduation period for adhering to their instructions not to return to school until she had passed her Step 1 exam and for waiting to receive her reasonable accommodations from the NBME she's entitled to under law.

237.    Under standard practices, students can receive extensions to take exams at a later time and not require adjustments to their six-year graduation period

if the student is still continuing with their coursework. However, if the student is not progressing with their education because of reasons outside their control and the Defendant demand the student to only come back after these, the Defendant would need to adjust.

238.    On August 7th, 2020, Plaintiff's reasonable accommodations were granted by the NMBE. She still needed to wait until her test permit was issued by the NBME so that prometric test center officials could schedule her test (The test permit was issued on August 11th, 2020).

239.    Scheduling USMLE Step exams with reasonable accommodations differs from the standard processes for students who do not need reasonable accommodations. Without accommodations, students would receive a permit from the NBME, go to the Prometric website, and schedule their test. With accommodations, Prometric test center officials have to schedule tests for students manually. Scheduling Plaintiff's test took some time due to technical issues, limited test center availability due to COVID-19, etc. Prometric test center officials eventually scheduled the Plaintiff's test for October 12th and 13th, 2020.

240.    After Plaintiff received this information and the test was scheduled, she again provided Dr. Forthal with the written communications she had with Prometric test center officials. Dr. Forthal had requested that he and the university be provided with "ALL the correspondence regarding testing. This should include correspondence from NBME and Prometric." After providing the supporting documentation as requested by Dr. Forthal, the P&H Committee approved Plaintiff to take the USMLE Step 1 exam on October 12th and October 13th, which she did.

241.    On October 28th, 2020, Plaintiff received her USMLE Step 1 score, and despite the challenges she suffered from the Defendant's employees

leading up to the test day, she passed her exam. However, her score was severely affected by the various mistreatments and unnecessary stress she suffered from the Defendant's officials.

242.     In December 2020, Plaintiff resumed her medical school classes and received minimal support from the Defendant's administration and suffered multiple retaliatory and micro-aggressive behaviors from Dr. Shannon Toohey, who is also a relative to Dr. Julinanne Toohey, the previous Associate Dean of Student Affairs, and the respondent to Plaintiff's discrimination claim with the OEOD.  For example, Plaintiff made multiple requests to the new P&H chair to accurately calculate the time COVID-19 interfered with her ability to receive reasonable accommodations from the NBME.

243.     However, Dr. Toohey truncated Plaintiff's graduation period, which made it appear as if she granted Plaintiff "multiple extensions". However, that was not the case. Considering the COVID-19 global pandemic and Plaintiff's discussions and extensions provided by Dr. Forthal, Plaintiff's adjusted graduation period was January 18, 2023 at the start of her classes in December 2020. This was always her graduation period.

244.     In March 2021, Plaintiff received an email from Dr. Wiechmann stating she was running out of her six-year graduation period. The Plaintiff immediately emailed Dr. Toohey and requested that she accurately calculate her graduation period, considering that the university had requested her to stay home and only resume her classes after passing the USMLE Step 1 exam.

245.     Since April of 2021 to July 2022, Plaintiff made more than ten email requests for Dr. Toohey, to recalculate Plaintiff's six-year graduation period, but Dr. Toohey failed to do so.

246.     The Plaintiff even provided a breakdown of this time and requested Dr. Toohey do the same in an attempt to locate discrepancy and resolve the issue. Still, Dr. Toohey did not reply to Plaintiff's email. The theme of this request was delay, deny, frustrate, and ignore Plaintiff's requests; behaviors that continued up until July 2022.

247.     The six-year graduation period is significant as students are dismissed from the Defendant's institution if they cannot complete their course work within this time-period. Plaintiff was not allowed to continue with her coursework until she had passed her USMLE Step 1 exam, and the Defendant was penalizing Plaintiff for instructing her to only resume classes after she had passed her test. Even more strangely, the Defendant was expecting Plaintiff to stay at home, but at the same time be expected to complete her coursework at a time she was at home.

248.     Because of the ongoing frustration, lack of cooperation, and ignoring Plaintiff's requests Plaintiff filed a retaliation complaint against Dr. Toohey with the OEOD on August 16th, 2022.

249.     On September 7, 2022, the OEOD investigator met with the Plaintiff to gather more information about her complaint.

250.     On November 3rd, 2022, Plaintiff received a letter from the OEOD investigator Olga Golub stating the following: "Based on the assessment above, OEOD is unable to accept your concerns for a formal investigation. There is no appeal process within the University for this assessment."

251.     The OEOD failure to investigate letter was an inaccurate representation of facts and was a cover-up for the Defendant. In addition to gaslighting Plaintiff into believing that the University had calculated her graduation time and stating that Dr. Toohey had granted Plaintiff "multiple extensions," all which were untrue statements.

252.     After failure to investigate, the Plaintiff's counsel contacted the university counsel, Peter Schneider, requesting that the University correct and recalculate the Plaintiff's six-year graduation period.

253.     At this time, Plaintiff had just completed her fourth-year medical school rotations and needed a dedicated study time to prepare for the exam. After multiple email exchanges and the Plaintiff's counsel providing a breakdown of the Plaintiff's timeline, the university counsel realized and understood that the Defendant had inaccurately calculated the Plaintiff's graduation period. However, at this time, these conversations and delay to act were now eating away Plaintiff's time she could be studying for her test.

254.     Plaintiff's counsel requested that the Defendant toll the time it takes for them to make a decision. On November 9, Mr. Schneider wrote Plaintiff stating the following: "FWIW, I wouldn't count on the tolling of the current clock, whatever it turns out to be, given she elected to involve you only now, after multiple communications going back to 2021 advising her of the deadline. This could and should have been clarified, one way or another, months or at least weeks ago."

255.     His email was inaccurate as Plaintiff had emailed Dr. Toohey more than ten times, sent her the breakdown of her graduation time-line period and requested that Dr. Toohey do the same to identify the discrepancy, but Dr. Toohey failed to cooperate.

256.     More importantly, a student should not need to involve a lawyer to make requests on their behalf. Per the contractual agreement and the Defendant's handbook policy that students sign when they matriculate, the Defendant is expected to provide these services to students. Notably, students pay more $200,000 towards obtaining their medical degree.

257.     Failure to provide the needed support truncated Plaintiff's graduation period and denied her a dedicated opportunity to prepare for her USMLE Step 2 CK exam, an opportunity provided to the rest of the student body.

258.     On November 16th, Jay Jambeck, one of the Plaintiff's counsel, wrote a letter to Dr. Toohey demanding that the university immediately correct Plaintiff's six-year graduation period and provided Plaintiff's communication with Dr. Toohey ranging from spring of 2021 to July 2022. Since this process was eating up Plaintiff's dedicated period and created a toxic learning environment for Plaintiff, her counsel also requested that the university take into account the three weeks that Plaintiff lost attempting to resolve this issue at the last minute because she had been requesting this correction to be made for more than a year.

259.     However, Dr. Toohey only partially corrected the mistake and denied Plaintiff the opportunity to use the eight weeks she had on her schedule to study for step 2CK. The Plaintiff was forced to study and take the exam in three weeks. Other non-black students were provided sufficient time to prepare for the 2CK exam.

260.      As a direct result, of the multiple interruptions, truncated dedicated study time, emotional distress, and the toxic environment created by the Defendant, Plaintiff failed her USMLE Step 2 CK exam by four points for the first time in January 2023.

261.     On January 5th, 2023, Plaintiff requested reasonable accommodations to retake her USMLE Step 2 CK from Dr. Shannon Toohey, given the toxic environment created by the Defendant. Dr. Toohey spent nearly three weeks before responding to the Plaintiff, to which she replied and included Ms. Henderson, stating that DSC would handle that. Additionally, the Plaintiff

waited an additional three weeks before hearing from Ms. Henderson, at which point she was already preparing for her test retake.

262.    According to the School of Medicine policy on accommodations: "University policy, State and Federal law require that students with disabilities be provided with effective and timely auxiliary aids and accommodations. For faculty, this means that when students with verified disabilities self-identify to you or request appropriate accommodations, you should immediately begin to work with them and the Disability Services Center (DSC), if necessary, to implement the aids or accommodations that will allow students to participate in all programs and activities on the same basis as students without disabilities."

263.    However, Plaintiff's accommodation requests were unreasonably delayed for nearly six weeks from her initial request on January 5th by Dr. Toohey and Ms. Henderson. This was against the Defendant's policy.

264.    On February 14th, 2023, Ms. Henderson emailed the Plaintiff to begin her reasonable accommodations request interactive process, stating the following: "...I wanted to touch base with you to see if you are seeking support or accommodations from DSC regarding the email below or any other support regarding SOM."

265.    On February 15th, Plaintiff replied to Ms. Henderson stating the following: "Thank you for replying to Dr. Toohey's email dated January 24th, 2023, on February 14th, 2023. As you can see, I have been waiting for your email for nearly three weeks. Since I am now preparing for my test, I would like to protect my mental health by avoiding exposure to another toxic environment created by the school during my last test preparation. As such, I would like to use this time to focus on preparing for my exam and to have a conducive learning environment, like the rest of the student body. Due to the

above information, I will reach out to you regarding this issue after completing my exam."

266.    After Plaintiff's email, the Defendant did not contact her for nearly two months.

267.    On April 3, 2023 ("the April 3, 2023, email") while in the middle of her first day of the USMLE Step 2 CK exam (with reasonable accommodations, Plaintiff is required to take her test across two days), Plaintiff received an email from Dr. Wiechmann placing her under investigation based on false claims.

268.    The April 3 2023 email stated the following "This email is to advise you that I am undertaking an investigation of whether you violated the *Exam Administration and Procedures Policy* and the *Requirements for the MD Degree Policy* by not successfully completing your USMLE Step 2CK examination and therefore, not successfully completing all of your School of Medicine graduation requirements by the January 18, 2023 deadline that was set by the Committee on Promotions and Honors.  In response to your email of January 5, 2023, we referred you to Ms. Rosezetta Henderson at the Disability Services Center, but you declined their support or additional accommodations...We acknowledge that, according to the NBME website, you are retaking the examination today, April 3, 2023.  We ask that you notify me and the Committee on Promotions and Honors if you pass the Step 2CK in the meantime."

269.    The April 3, 2023, email indicates that Dr. Wiechmann knew that Plaintiff was taking her exam on that day. He ignored Plaintiff's request that Defendant does not contact her until she had completed her exam, and intentionally interrupted Plaintiff during her exam.

270.     Additionally, Dr. Wiechmann also knew that students could access their electronic devices, such as cell phones, during exam breaks as Dr. Wiechmann is a physician and has taken USMLE exams. This interruption created a toxic environment that caused a significant drop in Plaintiff's USMLE Step 2 CK score compared to her practice tests.

271.     More significantly, Plaintiff was scheduled to take her second portion of her exam on April 10, 2023.

272.     On April 9, 2023 ("the April 9, 2023, email"), while Plaintiff was preparing to take the second day of her USMLE Step 2 CK exam scheduled on April 10th, she received another email from Dr. Wiechmann scheduling to meet with her regarding the investigation.

273.     The April 9, 2023 email stated the following "I am following up on the email that I sent to you last Monday, April 3, 2023 regarding this investigation. I had allocated time for us to meet tomorrow, Monday, April 10th at 2p over Zoom; however, I have not yet heard confirmation from you…Please let me know which date you prefer as the Due Process policy requires that we meet within 10 days, or as soon as reasonable thereafter.  The policy also stated that if I do not hear from you, a hold will be placed on your records."

274.     On April 13th, 2023, after one week of severe emotional distress dealing with false investigation claims and in the middle of USMLE Step 2 CK testing, Plaintiff replied to Dr. Wiechmann's email stating the following "As you know and acknowledged in the email you sent to me on April 3rd, I was in the middle of taking my USMLE Step 2 CK exam when you sent me the email. As you know, I require two days of testing with my accommodations, which you are fully aware of. I have made multiple requests that UCI School of Medicine officials stop interfering with my exam testing

by creating a toxic environment around my exams, which you have violated. It would have been professional courtesy to send this email at any time after my test given that you are aware of my mental health issues. Still, despite multiple requests and your knowledge of my exam date and times, you attempted to interfere with my exam testing by sending me an investigative request against my wishes and in the middle of my exam blocks.  You also knew I was testing on April 10th, but you still requested me to meet with you at 2 pm during my exam. How could I meet with you and take my exam simultaneously? Furthermore, the school is fully aware that I suffer from an anxiety disorder, which you know, and still planned to create a malignant environment to destabilize me so that I don't perform well on my examination. I made these statements because these behaviors have happened too often, especially during my significant exams, to be overlooked as a coincidence. In your email, you stated the following "In response to your email of January 5, 2023, we referred you to Ms. Rosezetta Henderson at the Disability Services Center, but you declined their support or additional accommodations." could you please provide me with records indicating that I declined their support or additional accommodations? "

275.      On April 20, 2023, ("the April 20 email") Dr. Wiechmann replied to Plaintiff's email and stated the following "This email serves to confirm receipt of your email from April 13th, 2023.  In this email, you state that I knew you were testing on April 10th; however, this was not the case.  According to the NBME website, it said that your testing date was April 3, 2023 (please see attached).  Their website does not include any mention of your examination being split across two testing dates.  The NBME does not share the details of any accommodations for their exams directly with the School of Medicine and therefore I do not have any documentation

of your accommodation.  At your request, I have also an included an email between you and Rosezetta Henderson dated Wednesday, February 15, 2023, where you declined to participate in the interactive process, stating that you would instead reach out to Ms. Henderson "regarding this issue after completing [your] exam. Please let me know when we can schedule our meeting for the investigation."

276.     On May 2, 2023 ("the May 2 email") Plaintiff replied to Dr. Wiechmann's April 20 email stating the following "Your email of April 3rd, 2023, states the following "We acknowledge that, according to the NBME website, you are retaking the examination today, April 3, 2023.  We ask that you notify me and the Committee on Promotions and Honors if you pass the Step 2CK in the meantime. "From this email, it is clear that the school knew I was testing that day. Additionally, as a physician who has taken USMLE exams and as a Dean of Curriculum Affairs, it is common knowledge that students can access electronic devices and cell phones during breaks.  These facts alone justify why the school needed to wait until I completed my exam to send me such a detrimental email. This email caused me unnecessary stress, such that my score dropped significantly from my practice test scores. Furthermore, as accurately stated in your email dated April 20th, I requested that the school does not contact me until I had completed my exams per my email to DSC, which you provided. Therefore, if the school had not heard from me, that meant that I had not completed my exams- which your email to me dated April 20th supports my statement. Again, this is not the first time the School of Medicine officials have interfered with my exams. Do you have any additional records? The documentation you provided me does not say I declined or refused their services which is the basis of your investigation. It clearly states I will meet with them "regarding this issue after completing my

exam."  There is a significant context to this information that you omitted. Please see my email reply to Ms. Henderson below to understand the full context and the reason for my response. There is no mention that I "refused or declined their services" or even preferred to meet with Ms. Henderson at a later time. My response was driven by circumstances, not a preference. Since there are no records indicating I declined help from DSC, can the school provide me with my student rights to an appeal process?"

277.    After Plaintiff's May 2 email and request for further documentation, Dr. Wiechmann did not and could not substantiate his false claims of placing Plaintiff under investigation. Even after pressing this issue further, the school did not provide and could not provide any records. However, the Plaintiff had already suffered harm from Dr. Wiechmann's actions. Her USMLE Step 2 CK dropped significantly compared to her practice tests.

278.    After the Plaintiff passed her USMLE Step 2 CK exam, she informed Dr. Toohey of her passing in April and should have been provided with graduation information immediately as she was qualified to attend commencement.

279.    However, the Defendant delayed this process claiming that the Plaintiff would need approval from the P&H committee stating that she had completed her medical degree requirements within six-years.

280.    On May 9, Plaintiff emailed Dr. Wiechmann stating the following: "As I wait for the P&H Committee to make this decision. I would like to bring this to the attention of the school. I completed and passed my USMLE Step 2CK in April, and I notified Dr. Toohey, per your request, about my passing score on April 27th, 2023. Since then, I have been waiting for the school to make a decision regarding my 6-year MD completion timeline, which I have not exhausted. The time I was placed on a leave of absence by the school was not

spent on my education. Rather, that time was spent addressing issues created by gross negligence and incompetence from DSC, Dr. Toohey's (Julianne) discrimination, and retaliation from multiple members of UCI.I am currently preparing for and will be ready to take USMLE step 3 next month in preparation for my residency application in August/September. Per your previous email, I need P&H approval to take my step 3 exam, which is tied to my graduation status. Therefore, it is critical that P&H address this issue as soon as possible. If the school cannot make a decision that supports my education soon, I would like the school to know that any and all further damages that I will incur as a result of the school's delay in this decision will not be my liability. Please confirm receipt of my email."

281.    Dr. Wiechmann did not reply to Plaintiff's email, but her graduation status was approved by Dr. Toohey on May 11.

282.    However, this decision was delayed until less than two weeks before commencement when the P&H chair Dr. Shannon Toohey advised the Plaintiff that her graduation material had been forwarded to the team responsible for commencement.

283.     Due to the short notice, the Plaintiff requested the defendant to allow her to participate in commencement in 2024 since she had no time to invite her family living abroad and did not have enough time to prepare to attend the graduation ceremony. Defendant denied Plaintiff's request and reiterated that her graduation materials had been included in this year's commencement.

284.    The Plaintiff was forced to prepare and attend the graduation ceremony with less than a week to prepare.

285.    She had no blood family members to attend her ceremony.

286.     Strangely, the Plaintiff's graduation materials were different from the rest of the student body. For example, her information was hand-written on a yellow card, while others received a white professionally typed card.

287.      The Plaintiff received a 2022 graduation gown, and her graduation tassel was changed from 2022 to 2023 a few minutes before the ceremony began.

288.     More importantly, Plaintiff's achievements were not recognized in the commencement program. This created a toxic environment for the Plaintiff on what was supposed to be a joyous event.

289.     The Plaintiff has suffered and continues to suffer mental and emotional anguish related directly to being subjected to discrimination and retaliation.

## COUNT I HOSTILE ENVIRONMENT BASED UPON RACE AND NATIONAL ORIGIN
**(Title VI of the Civil Rights Act of 1964; 42 U.S.C. § 2000d, et seq.)**

290.     All previous paragraphs are incorporated into this count as though fully set forth herein.

291.     The Plaintiff is in a protected class. She is a Black/African American with an African national origin.

292.     The Plaintiff was subjected to a hostile environment throughout her tenure as a Medical Student at UCI School of Medicine as a result of her race and national origin.

293.     The Plaintiff experienced hostility from various faculty and staff members based upon the fact that she is black and/or of African national origin. The Former Dean of Student Affairs, Dr. Toohey and other faculty members did not treat non-black or non-African students in the demeaning and objectively hostile manner that they treated the Plaintiff. The Dean of Student

Affairs also did not treat white students with the contempt and hostility that she treated the Plaintiff with.

294.     The Hostile environment that confronted the Plaintiff daily was severe and pervasive. It began at the beginning of her tenure as a medical student and continued up to the point that Defendant begrudgingly acknowledged that Plaintiff had met all the requirements to graduate. The Plaintiff graduated from UCI in 2023.

295.     The harassment took many forms such as denial of expanded learning opportunities, with the respect to the Kenyan Ultrasound project to the Attending physician making racially insensitive and racially inappropriate comments during her Internal Medicine Rotation.

296.     The Plaintiff was also subjected to a hostile environment when the Dean of Student Affairs refused to provide the on-campus the requisite information that would ensure her ability to maintain student housing. The Dean of Student Affairs regularly provided such assistance to non-black medical students.

297.     The Dean of Student Affairs suggested that the Plaintiff go back to her home in Africa which was deeply offensive and highly inappropriate. The Dean never suggested to other students who were foreign that they return to their nation of origin.

298.     The Plaintiff was further subjected to a hostile environment because the Defendant repeatedly refuse to thoroughly investigate her complaints of unlawful discrimination.

299.     The Plaintiff was placed under investigation after she complained about being subjected to unlawful discrimination based upon her race.

300.    The Plaintiff filed a total of three complaints with OEOD none of the complaints were properly investigated. This failure encouraged offending staff members to continue their racially hostile behavior.

301.    There is a lawful basis to hold the Defendant responsible because it failed to take prompt and remedial action once it was made aware, repeatedly made aware, that the Plaintiff was being subjected to unlawful discrimination.

302.    Defendant's discrimination, through its agents and employees, proximately caused her numerous delays in her education which has resulted in lost wages and lost wage earning ability, along with general damages flowing from the discrimination.

### COUNT II FAILURE TO PROVIDE REASONABLE ACCOMMODATION BASED UPON DISABILITY (TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12132, et seq.)

303.    All previous paragraphs are incorporated into this count as though fully set forth herein.

304.    The Plaintiff is a qualified person with a disability as defined by the ADA and AADA, to which she has a Neurodevelopmental disorder related to visual processing as well as an anxiety disorder which affects the major life activities of learning and concentration, among other things.

305.    The Plaintiff was qualified to attend UCI as a medical student because she matched with this medical school as a result of an exhaustive search that takes into consideration the applicant's academic, and intellectual readiness to be a part of that particular medical program, and she performed well with accommodations.

306.    The Defendant was quite aware of the Plaintiff's disability because she applied for and was awarded, on paper, a reasonable accommodation to have

time and a half to take her exams in 2017. However, this accommodation was recognized and provided to her in a very inconsistent manner.

307.    Resultantly, the Plaintiff was denied reasonable accommodations at various points throughout her tenure as a student at UCI. Additionally, she was subjected to unreasonable delays in the instances that requested accommodations were provided.  The main accommodation she requested was to be allowed time and a half to take tests and, or to be permitted to take exams later than the scheduled timeframe.  One reason that caused reasonable delay is the Defendant's insistence that Plaintiff submit and resubmit supporting medical documentation although she submitted adequate medical documentation the first time. The Plaintiff was denied reasonable accommodations when the school psychiatrist provided insufficient documentation, and the DSC misinformed and misadvised the Plaintiff. Additionally, the Associate Dean interfered with the Plaintiff's request for accommodations to the NBME. The University regularly provided such assistance to students with known disabilities, but inexplicably, it failed to provide such assistance to the Plaintiff.

308.    Additionally, Defendant unreasonably delayed providing Plaintiff with a reasonable request as it relates to the completion of the Surgery Shelf exam. The Plaintiff properly requested a continuing accommodation. She also provided the requisite supporting medical documentation. However, Defendant denied the request and insisted that Plaintiff obtain additional medical support from her doctor.

309.    By the time Defendant responded to the Plaintiff regarding the requested accommodation, the time for taking the Surgery shelf exam had already passed.

310.     Defendant's failure to accommodate Plaintiff proximately caused her numerous delays in her education which has resulted in lost wages and lost wage earning ability, along with general damages flowing from the discrimination.

## COUNT III RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Title V of the ADA, 42 U.S.C. §12203)

311.     All previous paragraphs are incorporated into this count as though fully set forth herein.

312.     The Plaintiff engaged in protected activity when she made requests complained to OEOD about being subjected to unlawful discrimination. She also engaged in protected activity when she repeatedly requested reasonable accommodations and otherwise asserted her rights as a disabled person. These requests were initially denied and then further unreasonably delayed.

313.     The Plaintiff engaged in protected activity when in October of 2019 she complained to Dr. Forthal about what she reasonably believed was discrimination and requested that she be excluded from the Promotions and Honors Hearings.

314.     The Plaintiff also engaged in protected activity when she contacted the UCI Ombudsman regarding what she believed was discriminatory acts committed against her.

315.     The Defendant took an adverse action against the Plaintiff when it interfered with and opposed the Gold Humanism Society Award being given to her expressly because she "had litigation issues with the school" and had filed an OEOD complaint. The action is adverse because being a recipient of such a prestigious award would assist the Plaintiff in her future efforts to be admitted into a medical residency program.

316.     The Plaintiff complained again to OEOD about additional acts of discrimination and retaliation.

317.     In May of 2020 the UCI Office of Equal Opportunity and Diversity interviewed the Plaintiff. Staff member Adrian Y. Williams stated that she consulted with her supervisor, the Interim Title IX Officer, Tierny Anderson, regarding her matter and that both were in agreement that she had a prima facie claim for discrimination.

318.     The Plaintiff complained yet again to OEOD about continuing acts of retaliation and discrimination. She especially took exception to what she characterized as a bias investigation. She then inquired about the in-house appeal process.

319.     In May/June of 2021 the Plaintiff complained to Dr. Lee Buckline regarding the discrimination she experienced during her Internal Medicine Rotation.

320.     After all of the Plaintiff's repeated attempts to remedy the ongoing discrimination, by repeatedly filing of internal complaints failed, in July of 2021, she filed an administrative complaint of racial discrimination with the United States Department of Education, Office of Civil Rights. The complaint was filed at the San Francisco Regional Office.

321.     In October of 2021 the Office of Civil Rights advised the Plaintiff of an adverse preliminary ruling and then advised her of her appellate rights. The Plaintiff timely appealed the initial decision. The matter is currently pending in the Office of Civil Rights Regional Office in Denver Colorado.

322.     In August of 2022, the Plaintiff filed a third complaint of discrimination and retaliation with the OEOD. The complaint alleged discriminatory treatment perpetrated by Dr. Shannon Toohey. OED advised

the Plaintiff that based upon its assessment of the allegations it was unable to accept the complaint and that she did have the right to appeal.

323.    The Plaintiff suffered a series of retaliatory actions after she engaged in the various acts of protected activity, as alleged *supra*.

324.    The Defendant further retaliated against the Plaintiff by continuing to delay the processing of her reasonable accommodations request for continuing accommodations.

325.    There is a causal nexus between the Plaintiff's engagement in protected activity and the Defendant's blocking her from receiving an award that her peers believed that she was entitled to receive. The university expressly told the committee that it opposed the Plaintiff's nomination because of her protected activity.

326.    Defendant's retaliation, through its agents and employees, proximately caused Plaintiff numerous delays in her education which has resulted in lost wages and lost wage earning ability, along with general damages flowing from the retaliation.

### COUNT IV – VIOLATION OF CALIFORNIA EDUCATION CODE SECTION 220

327.    All previous paragraphs are incorporated into this count as though fully set forth herein.

328.    Defendant is an educational institution that receives state funding.

329.    Defendant subjected Plaintiff to discrimination based upon disability, race and national origin, as set forth *supra.*

330.     Defendant's discrimination, through its agents and employees, proximately caused her numerous delays in her education which has resulted

in lost wages and lost wage earning ability, along with general damages flowing from the discrimination.

## **PRAYER FOR RELIEF**

The Plaintiff demands a jury trial and is seeking all relief that is available and provided for by the above referenced statutes and related case law. The Plaintiff is seeking compensation for lost wages, lost earning ability, emotional anguish, related costs, record expungement, costs and reasonable attorney fees, and such other and further relief as the Court deems appropriate.

Dated:          November 17, 2023

s/***Jerry Girley***
Jerry Girley, counsel for Plaintiff
Jackline Muthoka

Dated:          November 17, 2023          LEIGH LAW GROUP, P.C.

s/***Jay T. Jambeck***
Jay T. Jambeck, counsel for Plaintiff
Jackline Muthoka