**OFFICE OF EQUAL OPPORTUNITY AND DIVERSITY (OEOD)
INVESTIGATION REPORT**

| | |
|---|---|
| **COMPLAINANT:** | Student |
| **RESPONDENT:** | Former Staff |
| **BASIS OF COMPLAINT:** | Discrimination on the basis of color/race, citizenship, national origin, sex, and disability |
| **POLICY:** | *Nondiscrimination Policy Statement for the University of California Publications Regarding Student-Related Matters*<br><br>*UC Policy on Discrimination, Harassment, and Affirmative Action in the Work Place*<br><br>*UCI Guidelines on Discrimination and Harassment* |
| **INVESTIGATOR:** | Raid Faraj, Senior Investigator |
| **DATE:** | January 25, 2021 |

UCI OEOD Report of Findings to CP Muthoka Released 1/27/202

**PARTY KEY:**

| Party | Name | Title/Affiliation | Date Interviewed |
|-------|------|-------------------|------------------|
| Complainant | Jackeline Muthoka | Medical Student, UCI School of Medicine | 8/7/2020 |
| Respondent | Julianne Toohey | Former Associate Dean for Student Affairs, UCI School of Medicine | Did not contact, no longer employed by UCI |
| Current Associate Dean | Megan Osborn | Associate Dean of Students, UCI School of Medicine | 10/1/2020, 10/8/2020 |

**WITNESS KEY:**

| Witness | Name | Title/Affiliation | Provided By | Date Interviewed |
|---------|------|-------------------|-------------|------------------|
| Witness 1 | Ellena Peterson | Professor Emeritus, Pathology Department; Associate Dean Emeritus, Admissions, School of Medicine | Complainant | 9/29/2020 |
| Witness 2 | Michael LoBasso | Medical Student, School of Medicine | Complainant | Did not respond, contacted 9/29/2020 |
| Witness 3 | Rosezetta Henderson | Senior Disability Specialist, Disability Services Center | Complainant | 10/1/2020 12/8/2020 |
| Witness 4 | Donald Forthal | Professor of Medicine-Infectious Diseases, School of Medicine Department | Complainant | 10/2/2020 |
| Witness 5 | Nathanael Morales | Medical Student, School of Medicine | Complainant | Did not respond, contacted 10/2/2020 |
| Witness 6 | John Fox | Department Chair/Professor of Clinical Emergency Medicine, School of Medicine | Complainant | 10/6/2020 |

UCI OEOD Report of Findings to CP Muthoka
Released 1/27/2021

| Witness 7 | Ursula Worsham | Director, Admissions, School of Medicine – Medical Education | Complainant | Did not respond, contacted 10/2/2020 |
|---|---|---|---|---|
| Witness 8 | Joy Kim | Registrar, School of Medicine | Complainant | 10/6/2020 |
| Witness 9 | Elizabeth Franklin | Acting Associate Director of Apartment Life, Verano Place Housing | Complainant | 10/7/2020 |
| Witness 10 | Marissa Lovio | Former Medical Student, School of Medicine | Complainant | Declined Interview |
| Witness 11 | Charles Vega | Health Sciences Clinical Professor, Family Medicine Department; Director, UC Irvine Program in Medical Education for the Latino Community (PRIME-LC); Associate Dean, School of Medicine | Complainant | 10/9/2020 |
| Witness 12 | Jia Tang | Medical Student, School of Medicine | Complainant | 10/9/2020 |
| Witness 13 | Clay Thibodeaux | Medical Student, School of Medicine | Complainant | 10/9/2020 |
| Witness 14 | Shadi Lahham | Assistant Clinical Professor, Emergency Department; Director of Emergency Ultrasound; Assistant Residency Program Director | Complainant, Witness 6 | 10/9/2020 |
| Witness 15 | Ashley M Selva Rodriguez | Learning Skills Counselor, School of Medicine – Medical Education | Complainant | Declined Interview |
| Witness 16 | Karen Andrews | Director, Disability Services Center | Complainant | 10/16/2020 |
| Witness 17 | Rick Jones | Former Research Coordinator, Emergency Medicine, School of Medicine | Complainant, Witness 14 | No contact information found |
| Witness 18 | Victoria Valdes | Former UCI Undergraduate Student | Complainant, Witness 14 | No contact information found |
| Witness 19 | Luis Medina | Former Director, Financial Aid Services-School of | Complainant, Witness 8 | Did not contact, no longer |

| | | | | employed by UCI |
|---|---|---|---|---|
| Witness 20 | Faith Njoku | Former Medical Student, School of Medicine | Complainant | No contact information found |
| Witness 21 | Jerusalem Tilahun | Medical Student, School of Medicine | Complainant | Did not respond, Contacted 10/28/2020 |
| Witness 22 | Carly Nguyen | Administration and Finance Director, Medical Education, School of Medicine | Associate Dean of Students, UCI School of Medicine | 1/13/2021 |
| Witness 23 | Victoria Jones | Chief Global Affairs Officer and Associate Vice Chancellor Global Engagement, Office of Global Engagement | Diana Stephens, Education Administrator, Institute for Clinical and Translational Science | 1/14/2021 |
| Witness 24 | Guiyun Yan | Professor, Public Health/Administration Department | Diana Stephens, Education Administrator, Institute for Clinical and Translational Science | 1/14/2021 |
| Witness 25 | Diana Stephens | Education Administrator, Institute for Clinical and Translational Science | Associate Dean of Students, UCI School of Medicine | 1/14/2021 |
| Witness 26 | Khanh-Van Le-Bucklin | Associate Vice Chancellor, Education, UCI Health Affairs and Vice Dean, Medical Education | OEOD | 1/15/2021 |
| Witness 27 | Carol Major | Assistant Dean, Medical Education; Professor, Obstetrics & Gynecology | Associate Vice Chancellor, Education | 1/15/2021 |

|  |  | Department, School of Medicine | UCI Health Affairs and Vice Dean, Medical Education |  |
| --- | --- | --- | --- | --- |
| Witness 28 | Christian Mungai | Pastor, Mariners Church, Irvine | Complainant | Not contacted |
| Witness 29 | Linda Kazibwe | Complainant's family representative | Complainant | Not contacted |
| Witness 30 | Sophia Spann | Former Research Coordinator of Ultrasound in Medical Education | Complainant | No contact information found |

## OFFICE OF EQUAL OPPORTUNITY AND DIVERSITY (OEOD)
## INVESTIGATION REPORT

**BACKGROUND**

In May 2020, Complainant submitted a complaint with OEOD alleging that Complainant was
subject to discrimination on the basis of color/race, citizenship, national origin, sex, disability,
and retaliation.

In her initial complaint, Complainant alleged that she was subjected to retaliation by the Chief
Health Sciences Counsel. However, after assessing this portion of the complaint, the information
provided did not establish an actionable complaint of retaliation under University policy.
Therefore, OEOD was not able to accept those allegations for a formal investigation. Thus, on
July 2, 2020, OEOD initiated an investigation into allegations that Respondent engaged in
discrimination against Complainant based on color/race, citizenship, national origin, sex, and
disability.

Respondent is retired and no longer working at UCI, effective June 2019. Thus, the new
Associate Dean of Students at the School of Medicine was noticed as the Respondent in this case
and is referred to as the "New Associate Dean" throughout this report.

On November 10, 2020 extension was granted to accommodate the unavailability of key
witnesses or parties, unavoidable obstacles to gather important evidence, and the completion of
the draft review. The completion date for the investigation has been revised to December 23,
2020. On December 18, 2020, OEOD emailed Complainant and the New Associate Dean
OEOD, informing them that OEOD amended the due date for the final investigation report in this
matter to account for the extension in the draft review process as well as the business days lost to
the campus curtailment. The due date for this matter was revised to January 25, 2021.

**ALLEGATIONS**

It is alleged that Complainant was subject to discrimination (disparate treatment) based on
Complainant's color/race, citizenship, national origin, sex, and disability.

Specifically, Complainant alleged that Respondent, in her role as Associate Dean in the School
of Medicine, treated Complainant differently based on her color/race, citizenship, national origin,
and sex when Respondent did not sponsor Complainant's project in Kenya in 2016-2017, yet
granted approval and funding for a white male student's project in Kenya in 2018-2019.

It is also alleged that Respondent demonstrated discriminatory animus when she told
Complainant that she should go back to her country, although Complainant is a U.S. citizen.

It is alleged that even though Complainant had a registered disability with the University's
Disability Services Center (DSC), Respondent told Complainant that she did not have a disability
but rather had trouble with language comprehension because of her national origin. It is alleged

that Respondent shared Respondent's belief that Complainant did not have a disability with DSC, Housing staff, and administrators of a national exam, which interfered with Complainant's access to accommodations and resulted in Complainant losing her housing.

**APPLICABLE POLICIES AND PROCEDURE:**

*Code of Student Conduct – Appendix C*
*Nondiscrimination Policy Statement for the University of California Publications Regarding Student-Related Matters*

The University of California, in accordance with applicable Federal and State law and University policy, does not discriminate on the basis of race, color, national origin, religion, sex, gender identity, pregnancy, physical or mental disability, medical condition (cancer related or genetic characteristics), ancestry, marital status, age, sexual orientation, citizenship, or service in the uniformed services. The University also prohibits sexual harassment. This nondiscrimination *policy covers admission, access, and treatment in University programs and activities.*

*UC Policy on Discrimination, Harassment, and Affirmative Action in the Work Place* (Section III.A. General)

 **A. General**

  The University prohibits discrimination against any person employed; seeking employment; or applying for or engaged in a paid or unpaid internship or training program leading to employment with the University of California on the basis of race, color, national origin, religion, sex, gender, gender expression, gender identity, gender transition status, pregnancy, physical or mental disability, medical condition (cancer-related or genetic characteristics), genetic information (including family medical history), ancestry, marital status, age, sexual orientation, citizenship, or service in the uniformed services, including protected veterans. This policy applies to all employment practices, including recruitment, selection, promotion, transfer, merit increase, salary, training and development, demotion, and separation. In addition, the University prohibits harassment based on the above protected characteristics of an employee, applicant, paid or unpaid intern, volunteer, person participating in a program leading to employment, or person providing services pursuant to a contract.

*UCI Guidelines on Discrimination and Harassment* (Sections C.1 Prohibited Conduct – Discrimination)

 1. **Discrimination** (differing treatment) is unequal treatment of an individual or group of people based upon race, color, national origin, religion, sex, gender, gender expression, gender identity, gender transition status, pregnancy, physical or mental disability, medical condition (cancer-related or genetic characteristics), genetic information (including family medical history), ancestry, marital status, age, sexual orientation, citizenship, or service in the uniformed services where there is no legitimate reason for such treatment.

**OEOD INVESTIGATION**

Parties were advised of the process and timeline of this investigation and the standard of evidence relied upon, the preponderance of evidence. Both parties were advised of their rights, options, and resources. They were asked to keep information related to the investigation confidential to the extent possible to allow this investigator to conduct a thorough and fair investigation. Testimony was not given under oath. The investigation proceeded under the good faith expectation and instruction to participants to answer truthfully. All participants were further advised that they are subject to the policies prohibiting retaliation for either bringing a claim or participating in an investigation and thus they should not retaliate. Both parties were provided with the opportunity to review a summary of the statements provided by the other party and witnesses prior to the finalization of this report. All documents and evidence, as permitted by privacy and confidentiality provisions, were made available to the parties to review and respond to during the investigation.

**COMPLAINANT'S STATEMENT**

Complainant was interviewed on August 7, 2020. Complainant's support person was present during Complainant's interview. Complainant was provided with the opportunity to review a draft report and all evidence on November 20, 2020, until December 9, 2020. The below is a summary of Complainant's testimony and written statements.

Complainant joined UCI's School of Medicine Post-Baccalaureate Program[1] in Fall 2015 as a conditional medical student. Complainant said that the program admits students with low Medical College Admission Test (MCAT) scores. Complainant did well in the Post-Baccalaureate Program, and in Fall 2016, she became a full-time medical student.

Complainant alleged that shortly after she began her studies as a full-time medical student, she was subjected to discrimination on the basis of her color/race, citizenship, national origin, sex, and disability by Respondent, former Associate Dean of Student Affairs, School of Medicine. Complainant specifically made the following allegations against Respondent:

<u>Ultrasound Trip to Kenya</u>

Complainant alleged that Respondent treated her differently based on her color/race, citizenship, national origin, and sex when Respondent did not sponsor Complainant's project in Kenya in 2016-2017, yet Respondent granted approval and funding for a student project in Kenya in 2018-2019 to Witness 2, a white male student.

Complainant stated that in Fall 2016, she enrolled in a service-learning project class with Witness 11, Health Sciences Clinical Professor, Family Medicine Department. Complainant said that she developed a proposal for an ultrasound project, and it was approved by Witness 11. The project consisted of two components, a water project and a research project. Complainant

---

[1] The program is designed to assist disadvantaged applicants in gaining acceptance to medical school, with the ultimate goal of increasing the number of physicians in underserved areas.

proposed to carry out her project in Kenya, an Eastern African country. Complainant added that several UCI medical students were interested in joining her in Kenya to work on this project, including Witnesses 12 and 13.

Complainant stated that sometime in Fall 2016, she learned that there was a travel advisory warning to Kenya by the U.S. State Department. However, the travel advisory did not include the area Complainant and the other medical students in her group intended to travel. Complainant stated that the travel advisory said that travelers needed to be "careful" but did not ban travel to Kenya. Complainant stated that she shared the travel advisory warning with the other medical students; however, all of them wanted to travel to Kenya, and "nobody backed out" based on the advisory.

Complainant stated that her project required an Institutional Review Board[2] (IRB) approval. Complainant stated that she submitted her IRB proposal to UCI's IRB Office in January 2017.[3] Complainant said she only corresponded with the IRB Office through email. Complainant noted that she was supposed to travel to Kenya in May 2017 to set up the logistics for the project, and that the other students were supposed to follow her in July 2017.

Complainant stated that around March 2017, Respondent told her that due to the travel advisory warning to Kenya by the U.S. State Department, she would not be able to get IRB approval or funding (approximately $1,000) for her project. Complainant stated that she was in a "difficult position" because she already paid for her flight tickets and lodging accommodations. Complainant said that she, along with the other members of her group, raised around $18,000 for their trip. Complainant added that Respondent did not tell her that she could not travel to Kenya, and as a result, Complainant and her group decided to continue with their travel plans.

Complainant stated that before she traveled to Kenya, she shared letters with Witness 6, ultrasound project coordinator, from the Kenyan government and the Kenyan Consulate in Los Angles. These letters indicated that it was safe to travel to Kenya. However, Complainant pointed out that the IRB office did not approve of her proposal before she traveled to Kenya in May 2017. Complainant stated that in July 2017, the other group members joined her in Kenya, and they worked together on the project for approximately five to six weeks. Complainant indicated that while in Kenya, the IRB office continued to ask her and the other members of the

---

[2] Under the U.S. Food and Drug Administration (FDA) regulations, an IRB is an appropriately constituted group that has been formally designated to review and monitor biomedical research involving human subjects. In accordance with FDA regulations, an IRB has the authority to approve, require modifications in (to secure approval), or disapprove research. The purpose of IRB review is to assure, both in advance and by periodic review, that appropriate steps are taken to protect the rights and welfare of humans participating as subjects in the research. To accomplish this purpose, IRBs use a group process to review research protocols and related materials (e.g., informed consent documents and investigator brochures) to ensure protection of the rights and welfare of human subjects of research (www.fda.gov).

[3] In response to the draft report on December 9, 2020, Respondent said she "started IRB editing with ultrasound research coordinators at end of January/early February and IRB was submitted to UCI IRB office in March/April 2017."

group for "edits" regarding the same information that they already provided and kept "dragging" out the IRB approval process.

Upon their return to California in August 2017, the IRB office[4] informed Respondent and the other group members that they would not approve their IRB proposal for their project because they were already back from their trip. Complainant stated that while in Kenya, they were able to carry out their research; however, they were not able to use the data that they gathered to write a research paper because they did not receive prior IRB approval.

Complainant stated that sometime in Fall 2017, Respondent sent Complainant an email saying that she checked the U.S. travel advisory and found that Kenya still had a travel warning. Complainant stated that at this point, she was not part of the ultrasound group meetings and did not have plans to travel to Kenya in 2018. Complainant said that medical students went on ultrasound trips annually.

Complainant stated that another student (Witness 20), who is also from Africa, was denied funding and IRB approval for her trip to Nigeria. Complainant said that Witness 20's trip was scheduled for May 2017, but it was canceled, and she did not know why the IRB was not approved.[5] Complainant said that Witness 20 left UCI in 2018 due to possible health-related issues. Additionally, Complainant alleged that sometime in 2019, she found out via School of Medicine email that Witness 2 planned to travel to Kenya in August 2019.[6] Complainant said that Witness 2 was approved to travel to Kenya even though that the U.S. State Department had a travel advisory warning during that period similar to the one in place during 2016-2017 when she traveled to Kenya.

**Discriminatory Comment**

Complainant alleged that Respondent demonstrated discriminatory animus towards Complainant when she told Complainant that she should go back to her country, although Complainant is a U.S. citizen.

In early May 2018, Complainant took the National Board of Medical Examiners (NBME), United States Medical Licensing Examination ( USLME) examination (Step 1 exam), a national exam required by all second-year medical students. In late May 2018, Complainant learned that she failed the exam. Complainant stated that not doing well on her exam created a "stressful experience" for her. Complainant stated that a student has only three attempts at passing the Step 1 exam, and per UCI guidelines, a student must pass the exam within one year after failing the exam. Additionally, in July 2018, Complainant failed her Surgery Clerkship class. Complainant stated that she did not retake the class and that there is a one-year deadline to retake the course.

---

[4] In response to the draft report Complainant indicated that it was Witness 18, research coordinator, who informed her.

[5] In response to the draft report Complainant said that she "did know that there was a travel advisory to Nigeria at that time as well."

[6] In response to the draft report Complainant said that Witness 2 planned to travel to Kenya in Summer of 2019.

Complainant stated that sometime around June 2018, Respondent requested to meet with Complainant about her Step 1 exam failure. Complainant told Respondent that she failed her exam because she did not receive a time and a half accommodation on her exam. Complainant told Respondent that she provided documents to the Disability Services Center (DSC). Respondent then asked Complainant if she could help her communicate with DSC and NBME.

Complainant said that Respondent followed up with NBME and told them that Complainant has "language" proficiency issues[7]. Respondent then told Complainant that NBME would not provide Complainant with a time and a half accommodation on her exam. As a result, Complainant called NBME and asked them if they shared their decision with Respondent. However, NBME informed Complainant that they do not share their decisions over the phone and that they always communicate their decision through a letter. Complainant stated that when she asked the new Associate Dean[8] about the letter, the New Associate Dean told Complainant that she could not find the letter. The New Associate Dean then asked the UCI's Registrar Office at the School of Medicine to call NBME to inquire about the letter. NBME informed the Registrar's Office that if they sent a letter, it would have been sent directly to Complainant. Complainant said that she never received such a letter.

Complainant stated that since Fall 2018, she has been on an academic leave of absence to study for her Step 1 exam. Complainant stated that she retook the Step 1 exam in October 2018; however, she did not pass a second time.

Complainant added that in January 2020, the Committee on Promotions and Honors[9] (P&H) scheduled a hearing to discuss her academic probation[10] because she has not passed her Step 1 exam in one year from the date she failed the exam. Ultimately, the P&H hearing was postponed and was held on March 9, 2020, instead. Complainant stated that the hearing committee decided to put her on probation, in which time she needed to retake and pass the Step 1 exam first and then retake the Surgery Clerkship class. Complainant said that Witness 4 (the chair of the P&H), Respondent, the former DSC Director[11], and Complainant's attorney were present at the hearing. Complainant felt that Witness 4 sided with Respondent regarding Respondent's comment to Complainant that she "should go back to her country." Complainant said that Respondent made a comment to her during a meeting on April 25, 2019. Complainant stated that during the same hearing, there was a "back and forth communication" between Respondent and former DSC Director about Complainant having "language" proficiency issues.[12]

---

[7] In response to the draft report Complainant said Respondent told NBME that Complainant has "language issues."

[8] The new Associate Dean of Student Affairs assumed her position in June 2019.

[9] The Committee on Promotions and Honors (P&H) is a standing committee of the faculty and is charged with monitoring student academic progress, taking appropriate action for students in difficulty, and making recommendations for promotions, honors, leaves of absence, dismissals, and graduation. The Committee functions and renders recommendations in accordance with the rules adopted by the School of Medicine Academic Senate. The Committee monitors the progress of all students throughout their educational experience, identifies individuals in either academic or professional difficulty, evaluates the individual situation, and develops a plan as appropriate.

[10] In response to the draft report Complainant said the purpose of the hearing was to "discuss her academic challenges around Step 1."

[11] In response to the draft report, Complainant said it was "current DSC Director."

[12] In response to the draft report, Complainant the reference was "language issues."

Complainant stated that on March 16, 2020, P&H sent her a letter saying she needed to take her Step 1 exam (third attempt) by May 3, 2020. However, Complainant noted that through her counsel, she requested that the May 3 deadline be extended due to COVID-19. Complainant indicated that NBME gave her a "place holder[13]" to take her Step 1 exam by August 30, 2020. However, she did not hear back from NBME regarding the deadline to take her exam. Complainant stated that she plans to retake the Step 1 exam in the Summer of 2020.

**Non-Accommodation due to Disability**

Complainant alleged that even though she had registered her disability with the University's Disability Services Center (DSC), Respondent told Complainant that she did not have a disability. Instead, she had trouble with language comprehension[14] because of her national origin. Complainant alleged that Respondent shared Respondent's belief that Complainant did not have a disability with DSC, Housing staff, and administrators of a national exam, which interfered with Complainant's access to accommodations[15] and resulted in Complainant losing her housing.

Complainant stated that in early 2017 she registered her disability with the Disability Services Center (DSC) at UCI. Complainant's disability accommodations included a separate room for exams and time and a half on her exams.

Complainant stated that in August 2017, she met with Witness 3 from the DSC Office to go over her application for NBME Step 1 exam accommodation application form. Complainant said that she submitted the accommodation application form to NBME in August 2017, requesting time and a half on her Step 1 exam. On December 1, 2018, NBME requested a comprehensive "psychiatric" evaluation for Complainant, instead of the brief evaluation that she initially filed. Complainant said that she emailed Witness 3 and told her what she has learned from NBME. Witness 3 told Complainant that she only submitted to NBME documents already in Complainant's file at DSC. Witness 3 also confirmed that Complainant did not have on file at DSC a comprehensive psychological evaluation. Complainant stated that NBME denied her accommodation request on January 2, 2018, because she did not have a thorough psychological assessment and did not have a neuropsychological evaluation. Complainanat acknowledged that she did not have either one of these evaluations.

Complainant stated that in April 2018, Witness 3 told Complainant she spoke with NBME about Complainant's accommodation request. NBME told Witness 3 that Complainant's application "Does not qualify for a disability" accommodation. In May 2019, Complainant (with DSC's help) appealed NBME's January 2, 2018 denial of accommodation letter. In response, NBME

---

[13] In response to the draft report, Complainant indicated that she requested this date as a "placeholder" because she "did not know when she would hear back from the NBME, schedule, and take her Step 1 exam" and that she "plans to take the Step 1 exam as soon as her reasonable accommodations are granted by NBME."

[14] In response to the draft report Complainant said Respondent told her that she had "language issues as a foreign student."

[15] In response to the draft report Complainant stated that not having reasonable accommodation caused her to fail Step 1 exam "multiple times."

agreed to offer Complainant a private room for her exam and an extended break. However, NBME denied Complainant's request for a time and a half for her Step 1 exam. Complainant then appealed NBME's decision based on a recommendation by Witness 15, a learning specialist at the School of Medicine.

Complainant stated that Witness 3 knew that she planned to submit an appeal from NBME's decision of January 2, 2018; however, Witness 3 told Complainant that she already called NBME in April 2018 and that NBME told Witness 3 that Complainant did not "qualify" for that specific accommodation.

Additionally, Complainant stated that Respondent did not help her to secure housing at Verano Place Housing (Verano). Complainant said that her leave of absence as a medical student expired on May 1, 2019. Complainant noted that Verano tried "very hard" to help her, and they explained to Complainant that she only could continue to live at Verano if (1) she was a full-time medical student, (2) had an exceptional circumstance, or (3) had a letter of support from the School of Medicine. Complainant stated that she met with Respondent on April 25, 2019, to discuss her housing problems and overall challenges. Complainant told Respondent that if she could not continue living on campus, she would become "homeless." Respondent then told Complainant, "If it is that difficult for you, why don't you go back to your country?" Respondent was also not supportive and discriminatory when she incorrectly told housing that Complainant was a "foreign student" and that Complainant has "language issues." Respondent also did not provide a letter to Verano explaining why it was important for Complainant to continue to live on campus.[16]

On April 18, 2019, Complainant met with Witness 9, Verano Place Housing Acting Director, to speak about her housing challenges. Witness 9 told Complainant that she talked to Respondent about Complainant's situation; however, Respondent did not write a letter of support to Complainant to stay at Verano because Respondent did not know whether Complainant would be able to pass her Step 1 exam or not. Complainant stated that ultimately housing decided to extend her ability to live at Verano Place Housing until May 30, 2019.

Complainant stated that as a result of Respondent's lack of support, Complainant started raising concerns about Respondent. For example, Complainant recalled sharing some of her worries about Respondent not being supportive of her with witnesses 1 and 7.[17] However, around July 2019, Respondent left UCI. Complainant learned later that Respondent had retired.

Complainant believed that had Respondent done her job, she would not have gone through all of these challenges.

---

[16] In response to the draft report Complainant added that "Respondent wrote a discriminatory letter after the housing decision had been made final. In addition, the letter lacked pertinent information that was requested by the housing office. Furthermore, when the Respondent wrote this letter, she was also required to inform Complainant so that the Complainant could write a letter that would accompany the Respondent's letter. The Respondent never informed the Complainant when she sent the letter to the housing office."

[17] In response to the draft report Complainant included Witness 15 as well.

**NEW ASSOCIATE DEAN STATEMENT**

The New Associate Dean was interviewed on October 1 and October 8, 2020. The New
Associate Dean was provided with the opportunity to review a draft report and all evidence from
November 20, 2020, until December 9, 2020.  The below is a summary of the New Associate
Dean's testimony.

The New Associate Dean said that she did not know what issues Complainant encountered
between January 2019 and June 2019. The New Associate Dean said that when Respondent
retired in June 2019, she became the New Associate Dean effective July 1, 2019, and only then
she became more aware of Complainant's academic problems.[18] The New Associate Dean stated
that on July 23, 2019, she emailed Complainant to find out why she did not take her Step 1 exam.
The New Associate Dean knew at this point that Complainant took the Step 1 exam the first time
on May 7, 2018, and then the second time on October 30, 2018; however, Complainant failed
both exams.

Additionally, the New Associate Dean knew that on May 30, 2018, Respondent emailed
Complainant to touch base with her for not passing her Step 1 exam. Additionally, on June 18,
2018, Complainant emailed Respondent, asking if she heard from NBME about accommodating
her for the Step 1 exam. Respondent told Complainant that she did hear from NBME, and they
denied Complainant's accommodation request. The New Associate Dean stated that the School
of Medicine was not the decision-maker regarding NBME student accommodations.

In January 2019, the New Associate Dean[19] wrote a letter to Complainant, informing her that
since she did not pass her Step 1 exam, per School of Medicine policy, Complainant needed to
pass the Step 1 exam by March 15, 2020. Complainant was informed through the same letter that
if she did not pass the Step 1 exam, she would be subject to academic probation. However,
Complainant did not respond to the New Associate Dean's letter.

During Complainant's meeting with New Associate Dean in July 2019, Complainant told the
New Associate Dean that the School of Medicine did not help her with her housing needs
because Respondent did not write an adequate letter of support to Complainant regarding
Complainant's housing challenges. The New Associate Dean told Complainant that she would
contact housing to inquire about her situation. The New Associate Dean said that she contacted
the assistant to the Verano Place Housing Director and was informed that since Complainant was
no longer enrolled as a student at UCI (academic leave of absence since Fall 2018), Complainant
was required to vacate from Verano in April 2019. However, Housing extended Complainant's
stay at Verano until May 30, 2019. Complainant was asked to provide a letter clearing her from
her leave of absence by May 1, 2019; however, Complainant did not do so and kept arguing that
she should stay in housing despite being on academic leave. Ultimately, Housing told

---

[18] In response to the draft report on December 9, 2020, the New Associate Dean clarified that "She stated that she
was aware, through her previous role as Chair of Promotions and Honors Committee, that Complainant had note
[sic] passed the Step 1 exam."
[19] In response to the draft report, the New Associate Dean added, "in her previous role as Chair of Promotions and
Honors."

Complainant that she must vacate by the end of May 2019, and Complainant left. The New Associate Dean said that Complainant might still be on academic leave.

The New Associate Dean said that when she met with Complainant, Complainant also told her that Respondent told NBME that Complainant had language issues. As a result, she was denied an accommodation for her Step 1 exam. The New Associate Dean told Complainant that she would look into any written correspondence between Respondent and NBME. The New Associate Dean did not find any correspondence, and Complainant did not provide any documentation showing that NBME communicated with Respondent in writing.[20]

The New Associate Dean added that Complainant also did not pass the exam for the Surgical Clerkship class in 2018. As a result, Complainant received an incomplete grade, and no grade was posted. The New Associate Dean said, like for the Step 1 exam, Complainant had one year to pass the exam. However, Complainant did not retake the Surgical Clerkship exam. The New Associate Dean stated that since Complainant was not enrolled as a student, her financial aid was not paid in the Summer 2018 or Winter 2019. As a result, Complainant owed a substantial amount of money. The New Associate Dean told Complainant that for her to re-enroll, she needed to pass her Step 1 exam and address her financial aid situation.[21]

The New Associate Dean stated that Complainant's hearing with P&H was repeatedly postponed and was ultimately held on March 9, 2020. At the hearing, Complainant said that "no one helped" regarding her situation. The New Associate Dean said that this was inaccurate because she spent at least twenty hours trying to help Complainant with her issues.[22]

The New Associate Dean recalled that prior to the P&H hearing, Complainant told her that Respondent said "go back to your country," and that Respondent "diagnosed" Complainant with a "language disorder." The New Associate Dean noted that, based on discussions with the Respondent, Complainant's statements were "not true." The New Associate Dean explained that Respondent told her it was Complainant who said that she spoke multiple languages, that this interfered with her ability to process information. As a result, she needed more time on her exams. Respondent said that she was simply repeating what Complainant told her. The New Associate Dean said that Respondent reiterated the same information during the P&H hearing on March 9, 2019. However, Complainant denied that she made these comments (Regarding language issues) to Respondent.

---

[20] In response to the draft report, Complainant said that she did not ask the New Associate Dean to look for "any written information." Complainant said that she only wanted the New Associate Dean to "inquire about what transpired between NBME and Respondent."

[21] In response to the draft report, the New Associate Dean clarified that "since Complainant had incomplete grades on two of her clerkships, her financial aid was not paid in the Summer 2018 or Fall 2018 quarters. As a result, Complainant had a balance on her student account." The New Associate Dean also told Complainant that "in order for her to re-enroll, she needed to pass her Step 1 exam as well as address her financial aid situation."

[22] In response to the draft report the New Associate Dean clarified that said that this was "inaccurate because she spent several hours trying to help Complainant with her issues."

Nonetheless, the New Associate Dean said that based on the DSC intake form that Complainant filled out, Complainant said, "I speak multiple languages, and that interferes with my information processing time. I would really appreciate it if I get additional time while taking exams." The New Associate Dean said that Respondent was not diagnosing Complainant. Additionally, when the New Associate Dean asked Respondent if she ever told Complainant to go back to her country, Respondent said that when Complainant failed her first Step 1 exam in May 2019, Complainant was in a "state of despair." Respondent tried to support Complainant by telling her what she needed to do. Respondent told Complainant that it was "not the end of the world." Respondent asked Complainant, "is there an opportunity for you to train in Kenya?" Respondent said she made this comment in case it was difficult for Complainant to find a school to match with in the U.S. for her residency and because Complainant is from Kenya and had family members there. Respondent noted that the context of her conversation with Complainant was "solution-based" and denied that she told Complainant to go back to her country. The New Associate Dean said that Respondent was trying to help Complainant, and Respondent wanted Complainant to "succeed."

Additionally, the New Associate Dean said that prior to the P&H hearing, Complainant told her that she might bring an attorney as a representative to her March 9, 2020 hearing.[23] The New Associate Dean said that she relayed this information to UCI counsel.

The New Associate Dean said that IRB approval is necessary for any medical student who intends to do research. The New Associate Dean recalled that in 2017, the School of Medicine started to adhere to the U.S. State Department's travel advisory. The New Associate Dean recalled that there were medical students who wanted to travel to other countries on the State Department's travel warning list. As a result, the School of Medicine did not financially support these trips.

The New Associate Dean said that Witness 2 went to Kenya in October 2019 but did not know if his trip included a research component or whether it needed to be supported by the School of Medicine.

**WITNESS STATEMENTS**

All witnesses were referenced by Complainant. The witnesses who were interviewed as part of this investigation were advised to keep information related to the investigation confidential to the extent possible in order for this investigator to conduct a thorough investigation. The witnesses were also advised that they were subject to the policies prohibiting retaliation for either participating in an investigation or bringing a claim. Witnesses 2, 5, and 7 did not reply. Witness 10 and Witness 15 declined to be interviewed. Witnesses 17, 18, 19, and 20 are no longer affiliated with the University and had no contact information available.

Witness 10 and Witness 15 declined to be interviewed for this investigation. I did not interview Witness 28 and Witness 29 because their anticipated testimony would not have been relevant to

---

[23] The New Associate Dean added that Complainant "told the Director of Student Affairs her [sic] that she was bringing two family member representatives to her March 9, 2020 hearing, one of whom had legal expertise."

Complainant's allegations.

**Witness 1**

Witness 1 stated that before she retired in June 2019, she was the Associate Dean of Admissions at the School of Medicine. Currently, Witness 1 is working at the Pathology Department.

Witness 1 stated that in 2014, Complainant joined UCI's School of Medicine Post-Baccalaureate Program to prepare her to gain acceptance to UCI Medical School. Witness 1 said that she oversaw the Post-Baccalaureate Program until June 2019. Witness 1 recalled that Complainant worked very hard during her first year of the program and passed her classes. However, Complainant did not do well on the Medical College Admission Test (MCAT). The Post-Baccalaureate Program Committee met and decided to give Complainant a chance and offered her conditional acceptance for a second year. During her second year, Complainant took more MCAT prep classes and enrolled in courses with first-year medical students. Life her first year, Complainant did not get a competitive MCAT score the second time she took the exam. As a result, in May or June 2016, Witness 1 and other committee members were concerned about admitting Complainant to the medical school and rejected her medical school admission. However, in a follow-up committee meeting and based on one administrator's advocacy, Complainant was admitted to the medical school.

Witness 1 stated that sometime in 2018, Complainant spoke to her about not passing her Step 1 exam. Witness 1 encouraged Complainant to work hard in hopes that she would pass the exam. Complainant told Witness 1 that she needed more time on her Step 1 exam; however, Witness 1 said that she was unsure if Complainant petitioned NBME to extend the time of the exam for Complainant. During her meeting with Complainant, Complainant told Witness 1 that she did not feel that Respondent "advocated enough" on her behalf with NBME. Witness 1 stated that she knew that NBME is very strict regarding any extended time accommodation request. Witness 1 added that this is she was personally concerned about admitting Complainant to medical school specifically because Complainant struggled with standardized exams.

Witness 1 stated that Complainant is a "wonderful human being" and is "very persistent." However, for some reason, standardized tests seem to be a challenge for Complainant. It is "not due to a lack of effort."

Witness 1 stated that Complainant never shared that she was treated differently or discriminated against based on any protected category.

**Witness 3**

Witness 3 is a Senior Disability Specialist at the Disability Services Center. Witness 3 said that she first met with Complainant on November 9, 2017, because Complainant wanted DSC's help to submit paperwork to NBME requesting accommodation for her Step 1 exam. Complainant wanted to extend the time on her Step 1 exam to a time and a half.

Witness 3 stated that during her meeting with Complainant, she learned that in February 2017, Complainant discussed her disability with the former Director of DSC, and DSC approved Complainant for the following accommodations: (1) one and a half extended time for exams, (2) separate location for exams, and (3) text to speech software. However, it did not appear that Complainant utilized any assistive technology as part of her accommodation.

At the same meeting, Witness 3 told Complainant the documentation that DSC had in Complainant's file did not meet the accommodations requirements for the NBME because NBME has their own standards for accommodation requests. Witness 3 stated that Complainant was familiar with NBME's accommodation process and requirements because they were listed on NBME's website. Witness 3 then walked Complainant through the process and the type of forms Complainant needed to submit to NBME in order to request an accommodation. Witness 3 helped Complainant fill out the necessary documents and told Complainant that it could take up to sixty days before NBME provided a response for Complainant's accommodation request. Complainant told Witness 3 that she already paid the fees and wanted to move forward with her Step 1 exam. Witness 3 did not recall when Complainant took her Step 1 exam in Fall 2017.

Witness 3 stated that on January 2, 2018, NBME sent a denial letter for Complainant's accommodation request saying in part that Complainant's disability did not demonstrate "substantial limitation on a major life activity." Witness 3 stated that in April 2018, she received an email from Complainant asking her if she contacted NBME to inquire about NBME's denial of Complainant's accommodation request for her Step 1 exam. Within a few days from receiving Complainant's email, Witness 3 contacted NBME. Upon speaking to NBME, Witness 3 did not recall sharing Complainant's name with NBME, but she inquired about the type of documentation needed to demonstrate a barrier to a major life activity. Witness 3 did not discuss with NBME Complainant's disability or language-related issues.

Witness 3 said that Complainant was not satisfied with NBME's decision regarding their denial of Complainant's accommodation request. As a result, Witness 3 helped Complainant file an appeal with NBME on May 6, 2018. Witness 3 said she wrote a letter of support to Complainant as part of the appeal request to NBME and helped Complainant get other medical assessments that met the requirements set by NBME. Witness 3 said that DSC does not offer in-depth assessments like psychological evaluations, required by NBME, but not by DSC. Witness 3 said that she did not know the NBME decision's outcome because NBME's decision is directly communicated to Complainant. Witness 3 later learned that Witness 16, Director of DSC, worked with Complainant and offered her additional support.

Witness 3 stated that sometime right before Respondent retired around June 2019, Respondent called Witness 3 because she was trying to find out how DSC might be of help to Complainant. Witness 3 told Respondent that DSC's primary focus is providing support and disability-related accommodations to students who are registered with DSC. During the phone call, Respondent asked Witness 3 if the fact that Complainant speaks multiple languages could be used as an argument to request accommodations for Complainant from NBME. Witness 3 told Respondent that speaking multiple languages does not qualify for an accommodation. Witness 3 said that Respondent was just trying to find a way to help Complainant get accommodation for her exam.

Witness 3 added that Respondent's comment was not meant to imply that Complainant had comprehension issues or that Complainant was targeted due to her race or national origin. Moreover, it was Complainant who first brought up the conversation about language with Respondent. Additionally, Witness 3 denied that Respondent intervened or influenced Witness 3's work with Complainant in any way. Witness 3 stated that she was the one who mentioned to Complainant that she spoke to Respondent about her situation.

Witness 3 stated that on August 10, 2020, Complainant sent both her and Witness 16 an email saying that NBME granted her extended time accommodation for her Step 1 exam.

**Witness 4**

Witness 4 is a Professor of Medicine at the Infectious Diseases Department and the Chair of P&H. Witness 4 stated that Complainant had difficulty passing her Step 1 exam as well as passing at least one class, Surgical Clerkship.

Witness 4 said that the entire allotted time for students to finish medical school is six years. Medical students take the Step 1 exam at the end of their second year of medical school. Witness 4 stated that when a student does not pass the Step 1 exam, P&H has the authority to give the students a warning, place them on probation, or dismiss the student. In this case, P&H decided to place Complainant on probation in March 2020.

Witness 4 said that P&H was very cooperative and allowed Complainant to retake her Step 1 exam; however, Complainant kept delaying the exam date. Around March 2020, P&H held a hearing and discussed Complainant's situation. At the hearing, Complainant and her counsel were present, as was Respondent. During the hearing, Complainant claimed that Respondent told her to go back to her country; however, Respondent denied telling Complainant to go back to her country. Additionally, Complainant claimed that Respondent said that she had a language-related disability. Respondent denied this claim and insisted that she was only trying to help Complainant and make a case for her accommodation.

Complainant felt that Witness 4 sided with Respondent regarding Respondent's comment to Complainant that she should go back to her country. Complainant stated that during the same hearing, there was a "back and forth communication" between Respondent and former DSC Director about Complainant having language proficiency issues.

Witness 4 denied saying that he agreed with Respondent's comment that Complainant should go back to her country. Witness 4 said that he provided Complainant with a notice of her hearing and ensured no conflict. Witness 4 offered Complainant an opportunity to provide witness names and asked her to give input on the date and time of the hearing.

Witness 4 said that P&H was aware Complainant was placed on academic leave since 2018 since she did not pass her Step 1 exam, and as a result, her financial aid and housing were impacted because she was not enrolled as a student.

Witness 4 said that ultimately Complainant signed up to take her Step 1 exam on two days during the month of October 2020. Witness 4 said that usually, the Step 1 exam is done in one day; however, NBME accommodated Complainant and allowed Complainant to complete the exam in two days.

Witness 4 said that he did not believe that Complainant was subjected to discrimination based on any protected categories.

**Witness 6**

Witness 6 is Department Chair and Professor of Clinical Emergency Medicine, School of Medicine.

Witness 6 stated he is also the Director of the Ultrasound Fellowship, which provides interested medical students with opportunities to go to a country of their choice to teach local doctors how to use ultrasound equipment. Witness 6 stated that the overwhelming majority of medical students travel to Panama, Tanzania, and Switzerland because of the program's well-established contacts in these three countries. Witness 6 stated that medical students raise their own funds to support their ultrasound projects. Witness 6 indicated that he loans the ultrasound machines that medical students take with them on their trips through a third-party that is not affiliated with UCI.

Witness 6 stated that sometime in early 2017, Complainant approached him and said she wanted to travel to Kenya for the ultrasound program because she had contacts there. Witness 6 was happy to learn about Complainant's plans and told her that he would be willing to support her. Witness 6 said that Witness 14 was the Principal Investigator (P.I.) for Complainant's IRB proposal, which required Complainant to do a couple of surveys.

Witness 6 stated that around the time Complainant told him about her travel plans, the School of Medicine started looking at any possible risks associated with countries that UCI medical students planned to visit. In order to assess safety issues, the School of Medicine relied on the U.S. State Department's Travel Advisory. At that time, Witness 6 learned that while the area that Complainant wanted to travel to in Kenya was not included in the travel warning, but the country as a whole was included. As a result, Respondent was not able to approve Complainant's IRB application or endorse Complainant's plans due to "safety reasons." Complainant became "upset" and tried to collect letters of support from Kenya and the Kenyan Consulate; however, the School of Medicine was not able to ignore the State Department's travel warning.

Complainant was scheduled to travel to Kenya in June 2017 for approximately one month; however, she did not submit her IRB information until April 5 and April 12, 2017. Witness 6 said that IRB proposals usually take six months for approval. UCI's IRB Office sent a request to Complainant for edits related to her IRB proposal in May 2017. However, Complainant decided to travel to Kenya as planned in June 2017, prior to receiving IRB approval. Complainant was told that she was free to travel to Kenya, but the medical school would not be able to endorse her travel.

Witness 6 said that several medical students traveled to Panama, Tanzania, and Indonesia around the time Complainant traveled to Kenya; however, none of these countries had a travel warning by the U.S. State Department. Witness 6 said some medical students wanted to travel to Mexico, but due to the State Department's travel warning, UCI's School of Medicine did not endorse their travel plans, either.

Witness 6 added that the School of Medicine only checks the travel warning list for medical students who request to do research in the countries they plan to visit. Medical students who do not ask to do research are not required to submit an IRB proposal. Witness 6 said that no UCI medical student went to Kenya between 2017 and 2020 to conduct supported research that required an IRB proposal, and if anyone did, they did so on their own accord.

Finally, Witness 6 stated that another medical student, Witness 20, wanted to travel to Nigeria in 2017 for her project; however, Witness 20 failed to submit an IRB proposal. Witness 20 then decided that she did not want to do a research project, and instead, she just wanted to teach. Witness 6 said that Witness 20 chose not to travel to Nigeria and dropped out of medical school in 2017 for "unknown reasons."

**Witness 8**

Witness 8 is a Registrar at the School of Medicine and responsible for keeping medical student records related to grades, financial aid, and diplomas.

Witness 8 stated that in February 2018, Complainant contacted her. Complainant requested that the Registrar Office provide a letter to Complainant, saying that she was still a medical student so that Complainant could continue to live at Verano. Complainant stated that nobody was helping her, and as a result, she was "stressed out." Witness 8 said that in 2018, Complainant was on academic leave and was not enrolled as a medical student.

Witness 8 indicated that the Registrar's Office attempted to help Complainant by filing a document with campus housing, asking them to extend Complainant's ability to continue living at her campus housing apartment.

Witness 8 said that Complainant also took the Step 1 exam on May 7, 2018; however, she failed that exam. Witness 8 said that in July 2018, Complainant requested and submitted an academic leave of absence, returning in November 2018. Although Complainant was not enrolled as a medical student, campus housing allowed Complainant to stay at her campus apartment from July 2018 until November 2018. During her academic leave, Complainant took her Step 1 exam on October 30, 2018, and said that she was "confident" that she passed her exam. As a result, Complainant was approved to re-enroll for Fall 2018 on the condition that she passed her exam. However, Complainant failed her exam. Complainant needed to pass the Step 1 exam to re-enroll as a medical student and be allowed to continue to live on-campus housing as an enrolled student.

Witness 8 said that since Complainant was not enrolled as a medical student, Complainant had financial problems and owed around $28,000 for tuition and fees. Witness 8 stated that Witness 19, former Financial Aid Director, helped Complainant with some of her financial aid problems, but Witness 8 was not aware of all of the details. Complainant said that she also needed money for her housing costs for Fall 2018. However, Witness 8 reminded Complainant that they could only re-enroll Complainant as a medical student on the condition that she passes her Step 1 exam, but Complainant did not qualify for financial aid when she did not pass the exam. Witness 8 said that in December 2018, she told Complainant to log into her account to check her financial documents and fees.

Witness 8 said that on December 3, 2018, Complainant submitted her second academic leave of absence request and indicated that she would return upon her passing the Step 1 exam, but did not specify a return date.

Witness 8 indicated that on March 21, 2019, she contacted Verano Housing regarding Complainant and was told that per housing policy, they would not be able to continue to extend Complainant's stay at Verano housing if Complainant was not enrolled or working on correcting her academic status.

Witness 8 said that multiple people were trying to help Complainant, including Respondent. For example, Respondent helped Complainant by allowing her to start her pediatric clerkship in Fall 2018, even though the course date falls under the Winter term of 2019.

Witness 8 stated that on November 1, 2019, she contacted NBME at the request of the New Associate Dean to find out if they sent a denial letter to a third party regarding Complainant's accommodation request. NBME told Witness 8 that they did not provide any letter to a third party involving Complainant.

**Witness 9**

Witness 9 is the Acting Associate Director for Apartment Life and is in charge of the move-in for graduate students at Verano Housing.

Witness 9 said that for a graduate student (such as Complainant) to live at Verano, they need to be enrolled as full-time students, have all but dissertation status, or be on a temporary leave of academic absence. Witness 9 said that academic leaves of absences are usually offered on a quarterly basis.

Witness 9 stated that Housing's Exceptions Committee was tasked to look into Complainant's housing problems as a non-enrolled student on an academic leave of absence. Witness 9 said that the Exceptions Committee approved Complainant for an academic leave of absence from December 3, 2018, through May 3, 2019.

Witness 9 said that on several occasions around April 2019, Complainant came to Witness 9 "distressed" due to her housing situation and expressed that she was not supported by her

department. Witness 9 said that Complainant was not enrolled as a medical student at that time; however, Witness 9 did not know the reasons behind Complainant's non-enrollment. Complainant told Witness 9 that she spoke to Respondent about her situation and that Respondent agreed to send Witness 9 a letter of support so that Complainant could continue to stay at her Verano apartment.

On April 25, 2019, Respondent sent an email to Witness 9, asking if Complainant could continue to stay at Verano. When Witness 9 spoke to Respondent about Complainant's situation, Witness 9 learned that Complainant was still not enrolled as a medical student because she did not pass one of her exams. On May 2, 2019, the Registrar's Office confirmed that Complainant was not enrolled as a medical student.

Witness 9 stated that she also spoke with Witness 3 from DSC. Witness 3 confirmed that Complainant was not enrolled as a UCI student, and as a result, Witness 3 could not work with Complainant. Witness 3 added that Complainant did not submit any documents that necessitated a housing accommodation.

Witness 9 acknowledged that when she spoke to Respondent about Complainant's situation around April 2019, Witness 9 told Complainant that Respondent was not helpful because Respondent did not provide a letter to Witness 9 in support of Complainant to stay at Verano.

**Witness 11**

Witness 11 is a Professor and Associate Dean at the School of Medicine. Witness 11 said that he first met Complainant during her first medical school year when she was enrolled in a service-learning class with him in Fall 2016. Witness 11 said that the service-learning class requirements include a planning document for the project, a midterm paper, and a final paper.

Witness 11 indicated that Complainant told him she wanted to do her service-learning project in Kenya. However, Witness 11 told Complainant that Kenya had safety issues and that safety was "paramount." Witness 11 said that he never told Complainant not to travel to Kenya; however, he said Complainant that since Kenya was on the State Department's travel warning list, her travel would not be "approved" by the School of Medicine. Witness 11 told Complainant that some medical students wanted to travel to Mexico for their projects, and he had to assess risk factors due to safety issues. Eventually, Witness 11 told students that he could not support their travel plans because Mexico was not safe.

Witness 11 also recalled Complainant told him that there was some violence in or around the areas to where she planned to travel in Kenya. Witness 11 said that he managed more than a hundred projects at any given time, and he did not remember the resolution of the Complainant's project.

Witness 11 stated that the projects associated with his service-learning class do not have an IRB requirement and that the students only get course credit at the end of their projects. Witness 11 said that out of more than a hundred projects he supervises each year, he receives perhaps two

projects that might require an IRB proposal. Witness 11 said that Complainant did not need IRB approval for her service-learning project. However, Complainant told Witness 11 that she wanted to do additional projects while in Kenya that required IRB approval. Witness 11 told Complainant getting IRB approval in such a short period would be "very tough" and that she might face challenges on the way.

Witness 11 said that Complainant did not raise any issues or concerns with Respondent, and he was not aware of any problems between them.

**Witness 12**

Witness 12 joined UCI in 2016 and is currently a fourth-year medical student. In Fall 2016, Witness 12 signed up for the same service-learning class. Witness 12 said that the service-learning class project was not research-based and did not require an IRB proposal.

Witness 12 said that many medical students signed up to go on an ultrasound trip during the first medical school year. Witness 12 said that Witness 6 was the mentor for the ultrasound trip. Witness 12 stated that the ultrasound trip was separate from Witness 11's service-learning project for Witness 12, but he decided to join Complainant and four other students on their trip to Kenya. Witness 12 said that the trip was planned for June 2017, and he started meeting with other group members to plan the trip in Spring 2017.

Witness 12 said that the group decided to do a group project for the Kenya trip that required IRB approval. One component of the project needed a survey to assess water safety, and another part involved a research study on the efficacy of ultrasounds for dehydrated patients. Witness 12 said that the group ultimately submitted their IRB proposal for the Kenya trip in April 2017. Witness 12 added that the Kenya trip was scheduled from June 6, 2017, until July 3, 2017.

Witness 12 said that he heard about the U.S. State Department's travel advisory warning to Kenya in Spring 2017. At that point, the group had already submitted their IRB proposal, purchased their airline tickets, and reserved their lodging. Witness 12 said one of the group members confirmed there was a travel warning to the entire country of Kenya, especially near the Somali border. Witness 12 did not recall the name of the group members who confirmed that there was a travel warning to Kenya. Nonetheless, the group as a whole decided to travel despite the travel warning. Witness 12 said while the group was in Kenya, they visited two places, and one of the two sites was Complainant's village in Kenya.

Witness 12 said that the IRB proposal was not approved before June 6, 2017, because they learned that the IRB review process takes some time. The group, including Complainant, still went on the Kenya trip as scheduled. While in Kenya, the group received feedback on their IRB proposal, and the proposal required some edits and revisions. Witness 12 said that Witness 18 was the liaison with whom they worked on the IRB proposal and that Witness 18 told the group that they needed to do a number of edits to their IRB proposal. However, due to some internet challenges in Kenya, the group was not able to work as fast as they wanted on the edits. Witness 12 said that while they were in Kenya, they did receive IRB approval to conduct their survey

assessment; however, they did not get IRB approval for the second part of their project involving ultrasounds for dehydrated patients.

Witness 12 said upon returning to UCI from their Kenya trip; Witness 18 told the group that it was not worth it to pursue the other component of their IRB proposal because they had already returned to the U.S., and no data was collected for that project. Witness 12 said that the group submitted data regarding the survey assessment component of their IRB proposal and used the data to develop a poster, which was displayed at the medical student retreat. Witness 12 said that they could have used the survey data to publish a research paper, but the group decided not to pursue publishing at that time. Witness 12 said that had the group submitted their IRB proposal earlier, and they probably would have had enough time to complete IRB approval before they went on their trip.

Witness 12 said that in October 2017, several members of his group were trying to promote a trip to Kenya again for Summer 2018. However, Complainant shared an email with Witness 12 from Respondent saying that the group would not be able to travel to Kenya anytime soon because Kenya was still listed on the State Department's travel advisory warning list.

Witness 12 said that after the Kenya trip, he remained in contact and friends with Complainant; however, due to "personal issues," he stopped talking to Complainant around the end of 2017.

Witness 12 stated that in late 2018 or early 2019, he heard that there was a trip to Kenya. However, Witness 12 did not know any details about the trip and whether it was one person who went on the trip or a group of medical students. Additionally, Witness 12 did not know if there was a travel warning to Kenya at that time.

Witness 12 said that Complainant never told him that she was subjected to discrimination from anyone at UCI.

**Witness 13**

Witness 13 joined UCI in 2016 and is currently a fourth-year medical student. Witness 13 said that in Fall 2016, he took the service-learning class with Witness 11 and that his project for the class did not require an IRB proposal.

In Winter Quarter 2017, Complainant, Witness 13, and several other students started to prepare for their Kenya trip, which was scheduled for June 2017. Witness 13 said that Complainant was the lead person for the Kenya trip. Witness 13 told the group to do a group project for the trip, and they submitted their IRB proposal around March 2017. Witness 13 said that the group did two IRB proposals, one for a survey study on the water quality and another one on using ultrasound to assess dehydration.

Witness 13 said that around late April 2017, the group learned from Complainant that there was a U.S. State Department travel warning to Kenya, especially near the Somali border. However,

the group decided to proceed with their Kenya trip because, by that point, they had already submitted the IRB proposals and purchased their airline tickets.

Witness 13 said that the group did its own crowd fundraising[24] for their Kenya trip. Witness 13 said that they raised $17,749 for their Kenya trip.

Witness 13 said that before they traveled to Kenya in early June 2017, they might have received feedback on their IRB proposal from Witness 18. Witness 13 said that it was expected that they finalize their IRB proposal before they went on their trip; however, the group decided to travel before having the IRB proposal completed. Witness 13 said that Witness 6 loaned them two ultrasound machines for their Kenya trip and that they brought the devices back to Witness 6 upon their return from the trip. Witness 13 said that when the group arrived in Kenya, they made some edits to the IRB proposal and resubmitted it for additional review. Witness 13 said that due to internet connection problems, it took them a week to submit the first round of edits. The group then did another round of edits and resubmitted the IRB proposal for additional review. Then, while they were still in Kenya, the IRB proposal for the survey portion of their research was approved.

Witness 13 said that upon returning from the Kenya trip, Witness 18 emailed the group. Witness 18 said that since they were already back in the U.S. and the IRB for their other research project was not approved while they were in Kenya, there was "no point to continue with that portion of the IRB." Witness 13 said that the group used the data that they have collected as part of the survey that they conducted in Kenya to develop a poster and presented it at a medical student conference.

Witness 13 said that around October 2017, the group started to promote the project that they were not able to finish for Summer 2018. However, Complainant told the group that she received an email from Respondent saying they could pursue their project independently, but the School of Medicine would not support them because Kenya was still on the travel warning advisory list.

Witness 13 said that after Fall 2017, he did not interact much with Complainant because he tried to focus on his studies. Witness 13 said that in 2018, Complainant signed up for some of the classes in which he was enrolled. However, Complainant did not show up for the classes. Witness 13 said that he saw Complainant in November 2019, and Complainant told him that she took some time off to work on "stuff related to our Kenya trip."

Witness 13 said that in 2019, a group of UCI medical students might have traveled to Kenya. However, it was not an ultrasound trip, and UCI did not support the trip. Witness 13 said that he did not know if Kenya was still on the travel advisory list in 2019.

**Witness 14**

Witness 14 is an Assistant Clinical Professor in the Emergency Department and the Director of

---

[24] Crowdfunding is the practice of funding a project or venture by raising small amounts of money from a large number of people, typically via the Internet.

Emergency Ultrasound.

Witness 14 did not recall details related to Complainant's IRB proposal. However, Witness 14 stated that whenever a medical student inquires about the IRB process, they are told that the IRB process is quite lengthy and requires multiple rounds of edits. The students are also informed that if the School of Medicine does not support their travel plans, the School of Medicine cannot help the students with their IRB requests.

Witness 14 said that Witness 18, a former undergraduate student, was a volunteer at the IRB office, and she graduated in 2018. Witness 14 said that if Complainant communicated with Witness 18, she most likely told Complainant about the importance of meeting specific deadlines during the IRB process. Witness 14 said that Witness 17 was the Research Coordinator for the Emergency Department and reported to Witness 6; however, Witness 17 left UCI several years ago.

Witness 14 said that every year, several IRB proposals are rejected for a variety of reasons. One of the critical reasons a proposal may be rejected is if a student plans to travel to a country on the State Department's travel advisory warning list. Witness 14 said that in such cases, he tells students that they are free to travel, but he would not be able to support their travel plans or IRB proposals.

Witness 14 said that some students went to Indonesia for a couple of years in a row, but no more students were approved to travel due to safety issues.

**Witness 16**

Witness 16 is the Director of DSC. Witness 16 said that Complainant first registered her disability with DSC in Winter 2017. Complainant worked with the former DSC Director before her retirement in early 2017.

When Complainant had her initial meeting with the former DSC Director on February 16, 2017, Complainant said that she had reading challenges in school, both in the U.S. and previously in her country of origin, Kenya. The former DSC Director reviewed different technology options with Complainant, and Complainant authorized the former DSC Director to speak to Complainant's doctor. Witness 16 said in March 2017; the former DSC Director sent a letter to Complainant and Respondent saying that Complainant's disability accommodation included time and a half for exams and a private room for Complainant during her exams.

Witness 16 stated that in November 2017, Complainant worked with Witness 3, a DSC staff member, regarding matters related to Complainant's accommodation. Specifically, Witness 3 worked with Complainant on preparing a disability accommodation application for Complainant's Step 1 exam. Witness 16 said that NBME is the entity responsible for reviewing accommodation requests for the Step 1 exam. DSC only "assists" students in filling out the forms required by NBME for the student's accommodation request. Witness 16 said that all students are informed the process is not easy and is very time-consuming.

Witness 16 said that after Complainant failed her first Step 1 exam in the summer of 2018, Complainant appealed NBME's decision not to accommodate her. Witness 3 helped Complainant fill out paperwork requesting accommodation for her second Step 1 exam; however, NBME denied Complainant's accommodation request appeal. Complainant took her second Step 1 exam in October 2018.

Witness 16 said that in May 2019, Complainant came to speak to her regarding her housing challenges because she was no longer enrolled as a UCI medical student. Witness 16 said that if students are not enrolled in classes, students are not eligible to continue living in student housing. As a result, Complainant wanted Witness 16 to help her continue living at her campus apartment. Witness 16 told Complainant that DSC would support Complainant to continue living on-campus housing until June 30, 2019. Witness 16 said that she worked with Verano to ensure that they would allow Complainant to stay at her campus apartment until that date so that Complainant could find a new place. Witness 16 said that Complainant was still not satisfied and wanted to live on campus indefinitely; however, housing was not able to do that because Complainant did not pass her Step 1 exam and was not an enrolled student since early May 2019.

Witness 16 said she met Complainant on November 7, 2019, along with a representative from the Ombudsman's office. During the meeting, Complainant expressed her frustration with the Medical School, NBME, housing, and Witness 3. Witness 16 told Complainant that she would be willing to fill out the necessary paperwork to appeal NBME's decision regarding Complainant's accommodation request for time and a half on her exam and a private exam room. Complainant then said that NBME might have denied her accommodation request because the Respondent told them that Complainant had language issues. Witness 16 told Complainant that NBME does not consider language proficiency in their accommodation assessments. However, Witness 16 said that when she commented to Complainant, she did not know that Complainant stated on her initial intake with DSC in early 2017 that she had language issues.

Additionally, Witness 16 said that when Complainant first submitted her initial intake request for accommodation with DSC in early 2017, Complainant stated that she had issues with language. Witness 16 said that she pointed that out at Complainant's P&H hearing that took place in March 2020. Witness 16 said that DSC never used any issues related to Complainant's language skills to deny her accommodation and that DSC has been very supportive of Complainant.

Witness 16 said after the November 2019 meeting with Complainant, Complainant submitted another accommodation appeal request with DSC's help to NBME. This time NBME only agreed to provide Complainant a private exam room, but they declined to extend the time on Complainant's exam. Witness 16 then helped Complainant appeal the appeal response with NBME. This time the appeal request was granted, and the extended time was approved by NBME in the summer of 2020.

Finally, Witness 16 said that NBME is "notorious" for denying accommodations for Step 1 exams. Witness 16 added that Complainant was fully aware of NBME's accommodation requirements for the Step 1 exam because Complainant had access to this information on

NBME's website. Also, NBME decisions regarding all accommodation requests are directly communicated with the students, not DSC or any other entity. Additionally, NBME has a national board committee that reviews all accommodation requests before a decision is made and communicated with students.

**Witness 22**

Witness 22 is the Director of Administration and Finance for Medical Education Department at UCI's School of Medicine. Witness 22 is also a member of the Scholarship Committee that disperses award funding for recipients through the Financial Aid Office and in coordination with the Office of Dean of Student Affairs.

Witness 22 said that around May 2019, medical students, Witness 2 and Witness 21, were awarded $1000 each for their trip to Kenya from the School of Medicine based on the Scholarship Committee's recommendation. Witness 22 was not sure when Witness 2 and Witness 21 traveled to Kenya but thought they might have traveled sometime later that summer.

Additionally, Witness 22 stated that medical students are free to raise their own funds for their research and travel through UCI ZotFunder's website; however, it is not endorsed by the School of Medicine.

**Witness 23**

Witness 23 is the Chief Global Affairs Officer and Associate Vice Chancellor Global Engagement, Office of Global Engagement. Witness 23 stated that before January 2020, there was no centralized and mandatory approval process for UCI's student international travel. Instead, the process for international travel was decentralized, and each school was responsible for administering international travel for their students and researchers. Each school also had its own international travel standards. For example, travel approval for a humanities researcher working at a library is different in terms of risk assessment requirements from a traveler conducting clinical research and coming in contact with multiple human subjects.

Witness 23 said that at least since January 2020, all students and researchers planning to travel internationally as part of their university studies or research must go through an approval process and demonstrate that they are aware of all risks associated with their travel. Also, to ensure their safety, travelers must demonstrate how they would mitigate any risks or challenges they might face in the country they plan to visit. Afterward, the Office of Global Engagement determines whether the student or researcher's mitigation plan is reasonable or not. If they do not approve the mitigation plan, the case would be transferred to the International Risk Review Committee for review.

Witness 23 indicated that it is possible that two students requesting to travel to the same place, at the same time, and for the same purpose, would get different answers regarding their travel. The travel request for a student who presents a convincing argument and demonstrates how they

would mitigate risks and ensure their safety, would be supported. In contrast, the travel request for a student who fails to show any preparedness level would not be supported.

Witness 23 stated that the U.S. State Department's travel warnings are only one criterion used to assess international travel risk. Students must also demonstrate self-awareness of the risk and have a detailed safety plan.

**Witness 24**

Witness 24 is a Professor at UCI's Public Health Administration Department. Witness 24 stated that he is the Principal Investigator for a research project that he has been running for several years in Kisumu, Western Kenya, approximately a thousand miles from Kenya's border with Somalia.

Witness 24 said that UCI medical students Witness 2 and Witness 21 have been working in his lab in the last couple of years and helping him with his research on Malaria. On June 10, 2019, Witness 2 and Witness 21 traveled to Kisumu, where Witness 24 has been researching Malaria for several years. Witness 2 and Witness 21 only observed data at the research site, and they did not interview any human subjects. Witness 2 and Witness 21 returned to the United States from their travel to Kenya on July 1, 2019. Witness 2 and Witness 21 were the only UCI medical students who traveled on this trip to Kenya.

Witness 24 included both Witness 2 and Witness 21 on his IRB proposal and explained that Witness 2 and Witness 21 did not have their own IRB because Witness 24 is the Principal Investigator for the research project. It took Witness 24 approximately six months before he obtained IRB approval for his project in Kenya.

Witness 24 added that before Witness 2 and Witness 21 traveling to Kenya, he submitted a risk travel assessment plan to the office of the Institute for Clinical and Translational Science (ICTS) at UCI for both Witness 2 and Witness 21, and ICTS determined that there was no risk associated with Witness 2 and Witness 21 travel plans.

Witness 24 identified Witness 2 as a Chinese American male and Witness 21 as an Ethiopian American female.

**Witness 25**

Witness 25 is an Education Administrator at UCI's Institute for Clinical and Translational Science.

Witness 25 said that in 2019 the Office of Global Engagement conducted a risk assessment for both Witness 2 and Witness 21 and determined that the risk mitigation plan for both of them was satisfactory and adequately documented. Witness 25 added that Witness 24 was the Principal Investigator and the risk assessment plan included the sight of research in Kenya. Witness 24

also ensured that Witness 2 and Witness 21 had UCI affiliated faculty support at the research site in Kenya while they were there for a couple of weeks in June 2019.

Witness 25 said that starting in 2018, all medical students interested in research in a foreign country had to follow a specific administrative protocol to assess risks associated with their travel plans. Before 2018, each school had its own procedures, and that Respondent was responsible for communicating those procedures to medical students. Witness 25 added that Respondent had many concerns about students' safety and wanted to ensure that students who planned to visit a foreign country had a safety plan in place.

**Witness 26**

Witness 26 is Associate Vice Chancellor, Education, UCI Health Affairs and Vice Dean, Medical Education. Witness 26 stated that when Complainant approached the School of Medicine in late 2016 early 2017 asking for support for her travel to Kenya, Respondent informed the Dean's Medical Education executive team, which consisted of seven to eight people, of Complainant's request. The executive team discussed Complainant's request to travel to Kenya; however, they did not support Complainant's travel request because Kenya was on the U.S. State Department's travel warning list, and upon assessing safety issues, they determined that it was not safe to travel. The executive team also felt that it was not safe to travel because Complainant organized an independent trip and did not have a faculty member affiliated with UCI in Kenya to ensure the safety of Complainant as well as the safety of any other medical students who might have planned to join Complainant on her trip. Nonetheless, the executive team felt that Complainant was free to travel to Kenya on her own if she wanted to do so. The School of Medicine did not offer Complainant a stipend because they did not endorse her travel to Kenya.

Witness 26 said that Respondent was among several administrators who reviewed Complainant's application and denial for support for her travel to Kenya, and Respondent reported the information back to Complainant. Witness 26 said the process to approve international student travel used to be decentralized; however, in the last couple of years, a more structured protocol was put in place. Students planning to travel internationally must involve the Office of Global Engagement and ICTS if there is a research component as part of their travel.

Witness 26 added that there might have been some "miscommunication or administrative mistakes" on the part of Respondent communicating the School of Medicine's decision regarding the nonsupport of Complainant's travel to Kenya. From Witness 26's perspective, Respondent did not engage in discrimination towards Complainant, and Respondent always tried to help Complainant. Additionally, the School of Medicine administration always tried to help Complainant. For example, the School of Medicine paid more than $27,000 that Complainant owed, even though Complainant was not enrolled as a student because Complainant failed her Step 1 exam. Also, Witness 27, who is part of the executive team at Medical Education, played an active role in supporting and mentoring Complainant.

**Witness 27**

Witness 27 is Assistant Dean, Student Inclusive Excellence, Medical Education; and Professor, Obstetrics and Gynecology Department, School of Medicine.

Witness 27 stated that she always supported and guided Complainant in her studies at UCI Medical School. Complainant did not share with Witness 27 that she had problems with Respondent. However, Witness 27 knew that Complainant experienced some challenges getting approval for her travel to Kenya.

Witness 27 said that Respondent was supportive of Complainant's travel; however, upon discussing Complainant's travel plans with the Dean's Medical Education executive team, no one felt comfortable supporting Complainant's travel. Still, Complainant was informed that she could travel independently. According to Witness 27, part of the reason the School of Medicine did not support Complainant's travel to Kenya was that there was no UCI faculty or UCI affiliated faculty at the sight of Complainant's study in Kenya. A UCI faculty or an affiliated UCI faculty is very important to ensure safety and adherence to research protocol. Ultimately, Complainant and several other UCI medical students decided to travel to Kenya without the School of Medicine's support. Complainant also traveled to Kenya without securing IRB approval, and as a result, Complainant was not able to use the data that she collected in Kenya. Witness 27 said that the IRB process is usually lengthy and requires multiple revisions before approval.

Witness 27 also recalled that Complainant's travel was not approved because the U.S. State Department had a travel warning to Kenya. Additionally, another medical student, Witness 20, requested to travel to Nigeria; however, Witness 20's travel was not approved by the executive team due to safety issues. Witness 27 said that a protocol for international travel had been established recently, and it requires that the Office of Global Engagement handle all international travel requests. Prior to this current protocol, international travel requests were decentralized, and the School of Medicine handled international travel requests on its own.

Witness 27 stated that Complainant's accommodation request regarding testing was granted by UCI. However, NBME had its own accommodation criteria. Complainant was "angry" because NBME did not grant her the accommodation that she wanted. Witness 27 stated that Respondent would not have played any role in influencing NBME's decision regarding Complainant's accommodation request and that NBME is an independent entity.

Witness 27 indicated that a lot of people in the School of Medicine thought that Complainant had "language struggle" because English was her "sixth language."

Witness 27 recalled checking-in with Complainant while Complainant was studying for her Step 1 exam and knew that Complainant ultimately passed the Step 1 exam on the third exam attempt. Since Complainant did not pass the Step 1 exam the first time, Complainant had enrollment issues, which negatively impacted her financial aid and housing. Students must be enrolled in order to maintain their student status.

Witness 27 said, "I can't picture" Respondent telling Complainant, "If it is that difficult for you, why don't you go back to your country?" because Respondent always supported Complainant. Witness 27 believed that there might have been "bad communication" between Complainant and Respondent but did not believe Respondent discriminated against Complainant. Additionally, Witness 27 thought that the administration at the School of Medicine supported Complainant; however, Complainant was frustrated because the School of Medicine was not able to help with certain things like keeping Complainant living at campus housing. After all, Complainant was not enrolled as a student. Witness 27 added, "I am not sure what we could have done differently. Had [Complainant] passed Step 1 exam, these issues wouldn't be here."

Witness 27 stated that she reached out to Complainant recently and congratulated her on passing the Step 1 exam and invited Complainant to join a funding support group at UCI at the recommendation of Witness 26.

**OTHER EVIDENCE**

During the course of this investigation, the below documents were reviewed.

| Exhibit Number | Description | Provided By |
| --- | --- | --- |
| 1 | Complainant's Complaint | Complainant |
| 2 | Email Correspondence between Complainant and Witness 4 & Step 1 Exam Accommodation Letter | Complainant |
| 3 | Email Correspondence between Complainant and Witness 4 Related to Scheduling of Step 1 Exam | Complainant |
| 4 | Complainant's DSD Intake Form Dated 2/16/2017 | Witness 16 |
| 5 | Complainant's Zotfunder for Kenya Trip | OEOD |
| 6 | Witness 2 and Witness 21 Zotfunder for Kenya Trip | OEOD |
| 7 | U.S. State Department Kenya Travel Warnings for 2016 & 2017 | OEOD |
| 8 | U.S. State Department New Travel Advisory & Newspaper Article on Travel to Kenya | OEOD |
| 9 | UCI School of Medicine Exam Administration Procedures | OEOD |
| 10 | UCI School of Medicine Due Process Policy | OEOD |
| 11 | UCI School of Medicine Leave of Absence Policy | OEOD |
| 12 | Text Messages between Complainant and Witness 21 | Complainant |
| 13 | Complainant's Email regarding her Passing Step 1 Exam | Complainant |
| 14 | Denial of Accommodation letter from NBME to Complainant | Witness 3 |
| 15 | Complainant's Email Request to DSC to Share her Accommodations with OEOD | Witness 3 |

| 16 | International and Independent Study Research Rotation Application | Complainant |
| 17 | Complainant's Response to the draft report | Complainant |
| 18 | The New Associate Dean's Respondent to the draft report | New Associate Dean |
| 19 | Complainant Email and School of Medicine Policies | Complainant |

**Exhibit 1**

Messages are produced in full below. Typos are from the parties.

**<u>Communicated Related to Ultrasound Trip, IRB, and Travel Warning to Kenya</u>**

**On February 2, 2017,** Complainant emailed Witness 6, Department Chair, School of Medicine, saying in part,

*"I would like to thank you for taking your time to answer my questions today-thank you! I have a quick question, Kenya still has a travel advisory notification from the U.S. department of state on the border of Somali and Kenya. I spoke to [Witness 30] earlier today and she mentioned that we might have trouble with our IRB approved due to this issue*…" (Exhibit 17, p. 115).

**On February 28, 2017**, Witness 30 emailed Complainant saying that the Kenya "IRB Survey Study – needs to be changed to exempt" and pointed out two other elements of Complainant's IRB "needs to be edited" (Exhibit 17, p. 119).

**On March 19, 2017**, Witness 6 emailed several leaders from the School of Medicine, including Respondent, Witness 26, and Witness 27, saying,

*"So I was approached by [Complainant] at Match and I explained (briefly) that as of January 2017 Kenya has a U.S. Dept. of State Travel Warning and I showed her this website <u>https://travel.state.gov/content/passport/en/alertswarning/kenya-travel-warning.html</u>* [The website link is no longer active] (Exhibit 1, p. 301).

**On March 20, 2017**, Complainant emailed Witness 17, Former Research Coordinator, Emergency Medicine, saying,

*"[Witness 30] mentioned that you would be able to help us go over/edit our IRB to make sure they are ready for submission…"* (Exhibit 17, p. 122).

**On March 21, 2017**, Respondent emailed Complainant [and CC'ed Director of Student Affair and Witness 6, Department Chair] saying,

*"As promised, I reviewed the travel warning for Kenya with [Witness 26, Associate Vice Chancellor, Education, UCI Health Affairs and Vice Dean, Medical Education].*

*Due to this warning, UCI will not be able to officially sponsor the trip. This means that the school cannot provide financial or administrative support. In addition, the principal investigator on the IRB must be aware of the travel ban and not be a Medical Education Dean.*

*Of course, students may go to the Kenyan ultrasound trip without this being an official SOM event. I urge everyone participating to review the warning carefully and to seek advice regarding traveling in this area as well as obtaining travel insurance.*

*Please let me know if you have any remaining questions about the travel policy. I know how important this trip is to you and I wish you the very best!"* (Exhibit 1, p. 300).

**On May 10, 2017,** Witness 30 emailed Complainant saying in part,

*"Kenya: Waiting for response/request for edits from IRB"* (Exhibit 17, p.126).

**On May 31, 2017**, Witness 18 emailed Complainant a letter from the IRB office requesting that Complainant make multiple edits to her IRB proposal (Exhibit 17, p.127).

**On June 8, 2017**, Complainant emailed Witness 18, saying,

*"Thank you for forwarding us the edits. Unfortunately, we cannot seem to access the "editable IRB application" that is mentioned for both this study..."* (Exhibit 17, p. 127).

**On June 27, 2017**, Complainant emailed Witness 18 saying,

*"I am enquiring regarding the status of our IRB. We sent out an email with the elements requested by the IRB team on June 16th but have not heard back"* (Exhibit 17, p. 131).

**On July 4, 2017,** Witness 18 emailed Complainant saying,

*"A member of the IRB team D has told us that he has received the edits and that they are currently being reviewed. We await their response/approval"* (Exhibit 17, p. 132).

**On October 25, 2017**, Respondent emailed Complainant and Witness 21 saying,

*"I hope both of you are outstanding... We are beginning our planning of the ultrasound trips and of course, I have been concerned about the travel warnings for both Nigeria and Kenya. Unfortunately I have confirmed that there have been no change to the US State Departments Travel Advisories for both of these countries, so UCI will not be able to sponsor these trips. We will be meeting with the ultrasound trip leaders soon and I want to make sure you understand there is no disrespect if we continue without you. If there is any information you wish to obtain for now or future years, please feel free to join any scheduled meetings.*

*I certainly hope that these issues change in the near future and wish you the very best in your endeavors. Please feel free to contact the University office for International Travel for any information they may be able to provide"* (Exhibit 1, p. 301).

Complainant replied on the same day to Respondent's email saying,

*"Thank you Dr. [Respondent]! I forwarded your email to the rest of the group and we will get back to you. Thank you again for your support :)"* (Exhibit 1, p.302*).*

Complainant provided a document showing that on **April 19, 2019**, the US State Department's Travel Advisory listed Kenya at level two*: "Exercise increased caution in Kenya due to crime, terrorism and kidnapping..."* (Exhibit 17, p. 109).

### Communication-Related to DSC, NBME, Step 1 Exam and Complainant's Accommodation

**On January 23, 2017**, Respondent emailed the former Director of DSC saying,

*"...I have a wonderful student, [Complainant], who is actually brilliant and speaks several languages. I have copied her on this email. However, since English is not her first or second language, doing well on exams has been a challenge. I realize that this is a language comprehension issue.*

*Can you assist us with this? I believe that increased time for exams would make sense for her..."* (Exhibit 1, p. 203).

Complainant emailed Respondent regarding the above email saying,

"Thank you so much Dr. [Respondent]"

Respondent replied,

"You are so welcome-keep me posted!"

Complainant replied,

"I will. Thank you,
[Complainant]" (Exhibit 1, p. 203)

**On February 1, 2017**, Respondent emailed the former Director of DSC saying,

"Were you able to see [Complainant??] I am worried about her-she is so wonderful and I don't want her language comprehension to set her back..." (Exhibit 1, p. 204).

**On March 1, 2017,** the former DSC Director, emailed Respondent regarding Complainant saying,

*"I am providing this letter of verification for the purpose of validating the student's disability related need for accommodations. The student has a professionally documented disability and is currently registered with the Disability Service Center at UC Irvine"* (Exhibit 1, p. 313).

The same email shows Complainant was approved for the accommodations: extended time on exams: Time and one half; Separate Location (DSC); and Assistive Technology: Kurzweil.

**On December 1, 2017**, NBME emailed Complainant saying,

*"The National Board of Medical Examiners (NBME) processes requests for test accommodations on behalf of the United States Medical Licensing Examination (USMLE) program. We have received your request for test accommodations for the USMLE Step 1…*

*Please provide us the documentation from your mental health provider that [Witness 3] said she received in her November 20, 2017 letter."*

*Once we have received this additional documentation, we will process your request and submitted documentation. If necessary, we may contact you to request additional information.*

*All written correspondence regarding your request, including the decision letter, will be sent to you electronically via email. When our review is complete, you will receive an email from us with the decision letter attached as a pdf document…"* (Exhibit 1, p. 171).

**On January 2, 2018**, NBME sent a letter to Complainant at Complainant's home address regarding Complainant's request for accommodation for her Step 1 exam. NBME wrote in part,

*"We have thoroughly reviewed the documentation provided for your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 1…*

*In your personal statement you write that you are requesting additional testing time for the USMLE Step 1 due to "Test Anxiety disorders." You reportedly struggled with test anxiety during your first year of medical school. You explain that you were on the "verge of failing classes" because of the number of questions on exams, the "level of speed and concentration" required for the exams, and the "short amount of time that is required to finish exams." You worked with advisors, counselors, and school psychiatrist, and were diagnosed with "specific phobia-test anxiety." You write, "I went through proper procedures that are required by my institution and was approved for an extended time to take my exams in an isolated room to reduce destructions [sic]. This determination fixed my problems."*

*Included with your request was a November 20, 2017/letter of support by [Witness 3], MS, Senior Disability Specialist, who writes that your diagnosis of "Specific Phobia-Test Anxiety" does not hinder your abilities except in timed examination that require high levels of sustained concentration. [Witness 3] states that she "wholeheartedly" supports your request for additional testing time…"*

*The purpose of testing accommodations is to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA, not to optimize test performance or ensure a passing score..."*

*Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations..."* (Exhibit 14).

**On April 16, 2018**, Complainant emailed Witness 3 from DSC saying,

*"...I am just checking to see if you heard back from USMLE regarding step 1 accommodation. Please let me know"* (Exhibit 1, p. 208).

**On April 19, 2018**, Witness 2 replied,

*"...I have not heard back. I can try calling again. When are you taking it?"*

Complainant replied,

*I'm taking it on May 3. Please let me know what they say"* (Exhibit 1, p. 208).

**On April 30, 2018**, Complainant emailed Witness 3 saying,

*"...Have you heard anything from NBME? Should I call them to follow up or what's your advice? Also, I just wanted to let you that I changed my test date to Monday May 7th just so that I can review one last time. Please let me know if there is anything I need to do"* (Exhibit 1, p. 209).

**On May 7, 2018**, Witness 3 emailed Complainant saying,

*"I was out of the office last week. I was informed you call me this morning. I left you a voicemail a few minutes ago. I am glad to hear that you were able to push back for another week to give you extra time to prepare. I believe you may be taking your exam now. I wish you the best. The NBME decision is that your request did not qualify as a disability"* (Exhibit 1, p. 209).

**On May 30, 2018**, Respondent emailed Complainant stating,

*"I was informed today that unfortunately you did not pass Step 1. I am very sorry to hear this and know that you worked very hard to prepare for the exam. Please do not panic-we will figure out what is your next best course!*

*We really need to reflect on why you think you did not perform to your capability-anxiety that is not controlled, reading issues, prep materials or text taking strategy. Think about this a bit and we should meet soon to discuss. I usually strongly recommend a formal prep course in this situation- I know that they are expensive, but they have good results.*

*For now, you will complete your current clerkship, then take an academic leave of absence in order to prepare for and pass Step 1…"* (Exhibit 1, p. 177).

**On June 1, 2018**, Witness 3 emailed Complainant saying,

*"I am still working on providing a definite answer. Wanted to keep you updated"* (Exhibit 1, p. 209).

**On June 1, 2018**, Respondent emailed Complainant saying the following:

*"I have spoken extensively to the NBME regarding any possible recourse for additional time due to a language issue.*

*I have received their final word that because this is not a defined ADA disability, they are unable to provide any assistance.*

*I am sorry that this is not possible for you. Please let me know how you are doing with exam preparation"* (Exhibit 1, p. 175).

**On June 18, 2018**, Complainant emailed Respondent saying,

*"… I was wondering if you've heard back from NBME regarding step 1 accommodation. Please let me know, thank you…"* (Exhibit 1, p. 177).

**On July 5, 2018**, Respondent emailed Complainant saying,

*"We have received the final work for NBME-they will not be extending accommodations for you. I am sorry about this and want to ensure that you are doing all you need to do your best on the exam. Have you decided to take a formal course or do you think continuing to work on questions will serve you best?"* (Exhibit 1, P. 177).

**On July 20, 2018**, Witness 19, Former Director, Financial Aid Services-School of Medicine, emailed Complainant saying,

*"I met with [Respondent]. As per her email, she is approving the Kaplan prep course [for the Step 1 Exam]. We will offer you a GraduatePLUS loan in the amount of $5,225 to cover the prep course, step 1 fees, and study material subscriptions"* (Exhibit 1, p. 182).

**On November 4, 2019**, Complainant emailed Witness 3 saying,

*"…I was wondering if you can email me the decision email/letter that you received from NBME stating that my request did not qualify as a disability from the email you sent me on May 07, 2018"* (Exhibit 1, p. 211).

**On November 10, 2019**, Witness 3 emailed Complainant saying,

*"…Seeing you in the lobby today reminded me that I needed to double to check to see if I responded to you. I realize that I did not, my apologies. I was not contacted by NBME directly. That was from our conversation about the denial letter you received"* (Exhibit 1, p. 212).

**On November 10, 2019**, the New Associate Dean emailed Complainant saying,

*"I was not able to locate any written communication between the NBME and the school with respect to your question, but I can continue to search"* (Exhibit 1, p. 217).

**Campus Housing Exemption**

**On April 2, 2019**, Respondent emailed Witness 9, Acting Associate Director of Apartment Life, Verano Place Housing, saying,

*"I am writing in support of a housing exemption for [Complainant]. She is a student in the School of Medicine, who is currently not enrolled due to her need to study for a USMLE board examination. She is unable to proceed with her curriculum unless she passes this exam. This USMLE Step one examination is also a requirement for graduation.*

*[Complainant] has been compliant in her pursuit of achieving this goal. She has taken a remediation course in order to prepare, as well as continued consultations with our learning Sills Specialist.*

*[Complainant] expects to take and pass this examination in July [2019]. It would be most helpful for her to continue to live on campus while she prepares. She expects to re-enroll as soon as she takes the exam.*

*I very much appreciate your consideration of this housing exemption. I believe that this support will be important for her success"* (Exhibit 1, p. 242).

**On April 4, 2019**, the Assignments Supervisor at Verano Place Housing emailed Complainant stating,

*"This letter is in response to the Exceptions Petition you submitted to the Verano Place Housing Office on April 3, 2019. The Exceptions reviewed our request for an extension of stay/lease rental renewal for 2019/2020.*

*Your request to remain in housing until the date you requested has been denied, however, you have been given a vacate date of May 31, 2019. The vacate date will not be extended beyond May 31, 2019 and a lease renewal is not an option. Because you are not enrolled as a full-time UCI student, you are not eligible for on-campus housing.*

*When reviewing exceptions petitions and considering those that warrant an exception to Graduate & Family Housing Policies, the committee looks for those requests which are based on extreme or unusual circumstances. Based on the information you provided the committee, your request does not meet these qualifications"* (Exhibit 1, p. 241).

**On April 25, 2019**, Respondent emailed Witness 9 saying,

*"I met with [Complainant] today and she remains upset about needing to vacate her apartment by 5/31 if she is not enrolled in the Spring, which she is not…*

*[Complainant] is in this country entirely alone and she has no one to assist her financially or with housing. Community apartments or rooms are all several hundred dollars more expensive than her current on campus housing and she was not expecting to vacate the premises due to what she thinks she was told previously. She has not been able to take her National Board Examination because she has applied for accommodations due to her language issues as a foreign student and this process take many months. The Disabilities Services Center is helping with [Complainant's] application to testing accommodations, but this process is very slow and is the reason she is currently not enrolled for Spring.*

*I realize and greatly appreciate that housing is very tight, however, I am also very concerned that [Complainant] is in a difficulty situation that will make it almost impossible for her to succeed…"* (Exhibit 1, p. 220).

**Leave of Absence (LOA) Petitions**

Documents submitted by Complainant show that Complainant was approved for an LOA from 12/3/2018 until 5/1/2019. The justification given for Complainant's LOA was "to study and retake Step 1" (Exhibit 1, p. 243).

Additionally, documents submitted by Complainant show that Complainant submitted another LOA on 5/2/2019. The justification for this LOA indicated, "Student unable to proceed with MS 3 curriculum due to USMLE Step 1 failed attempts" (Exhibit 1, p. 245).

**Promotion and Honors Committee (P&H) Investigation**

**On August 23, 2019**, the Associate Dean of Clinical Education wrote a letter to Complainant informing her since she was in violation of the Grading Policy because Complainant,

*"failed to resolve an Incomplete grade for Surgery Clerkship shelf failure within one year of the clerkship end date."* Additionally, Complainant was in violation of the Student Academic and

*Professional Standing Policy, since she "has not passed the USMLE Step 1 exam within one year of the last day of her second-year curriculum"* (Exhibit 1, p.28).

**On September 30, 2019**, Witness 9, chair of P&H, emailed Complainant informing her that the Associate Dean of Clinical Education, informed P&H that she has violated the above two policies. As a result, Complainant was "*eligible for Academic Warning, Probation, Suspension, or Dismissal from the School of Medicine*" (Exhibit 1, p. 27). Witness 9 informed Complainant that P&H would review her case on January 6, 2019.

The P&H investigation regarding the policy violations concluded the following:

*"[Complainant] has two academic policy issues that need to be addressed. First, she has an NBME Surgery Shelf failure during her Surgery Clerkship that was not remediated within one year from the end date of her surgery clerkship. While she did have discussions with the Surgery Clerkship leadership about next steps, it does not appear that an extension was formalized. The grade for this clerkship has been converted to Fail. The second issue involves the USMLE Step 1. [Complainant] has taken the exam twice; however, has not passed the exam within 1 year of the end of her second year curriculum. This makes her eligible for academic probation. [Complainant] also must pass the USMLE Step 1 on her third attempt before March 13, 2020 or she will be eligible for dismissal"* (Exhibit 1, p. 29)

**Exhibit 2**

**On August 6, 2020**, NBME wrote in a letter to Complainant that in addition to "Separate Testing Room," they would be providing Complainant with the following accommodations for the USMLE Step 1 exam:

*"**Additional testing time – time and one half.** The exam will be administered over two days.*
  o  ***Day one** will be 6 hours and 30 minutes in length and will include a 30 minute tutorial and 7 blocks with approximately 20 questions per block.*
  o  ***Day two** will be 6 hours in length and will include 7 blocks with approximately 20 tutorial questions per block. You will have up to 45 minutes to complete each block. You will receive 45 minutes to break time each day, including lunch…"*

**On April 26, 2020**, Complainant emailed Witness 9, Chair of P&H, saying,

"I am still in the process of obtaining accommodations from NBME and attorney is dealing with that. Thus, I am requesting that I be given an extension tentatively through August 30, 2020. I am choosing this date to request as a placeholder due to the uncertainty of the current circumstances" (Exhibit 1, p. 16).

**On May 11, 2020**, Witness 9, saying,

*"At this May 4th, 2020, the Committee on Promotions and Honors ("Committee") took up your request to extend the previously set deadline for taking the USLME Step 1 exam. The Committee*

*agreed to extend the deadline to August 30, 2020. In addition, the Committee is requiring that you submit to the Committee all written correspondence from this time forward between you and NBME regarding scheduling of test"* (Exhibit 1, p. 8).

**Exhibit 4**

**On February 17, 2017**, Complainant submitted an intake document from to DSC describing her disability or diagnosis as follows:

*"I speak multiple languages and that interferes with my information processing time. I would really appreciate if I can get additional time while taking exams."*

**Exhibit 5**

The document shows a UCI ZotFunder webpage that Complainant utilized to privately raise $17, 749 for her June 2017 ultrasound trip to Kenya.

**Exhibit 6**

The document shows a UCI ZotFunder webpage that Witness 2 and Witness 21 utilized to privately raise $1, 630 for their trip to Kenya in the summer of 2019.

**Exhibit 7**

On June 30, 2016, the U.S. State Department issued a travel warning to Kenya for U.S. citizens due to "potential terrorist threats and the high risk of crime throughout the country." A second U.S. State Department travel warning to Kenya from January 13, 2017 indicated that Kenya faces "potential terrorist threats and the high risk of crime throughout the country."

**Exhibit 8**

On January 10, 2018, the U.S. State Department introduced a travel advisory system to U.S. citizens, replacing the previous "Travel Warnings and Travel Alerts." The new system provided levels of advice ranging from 1 to 4:

- Level 1 – Exercise Normal Precautions
- Level 2 – Exercise Increased Caution
- Level 3 – Reconsider Travel
- Level 4 – Do Not Travel

A newspaper article published in a Kenyan newspaper dated January 11, 2018 confirmed the U.S. State Department's new travel advisory system. The same article indicated that Kenya was "placed in the second tier under the new system" and "When visiting countries in that grouping, U.S. citizens are urged to 'exercise increased caution.'" The article went on to say that "The US

in the past warned against travel to Kenya, prompting complaints that such notifications were unjustified and damaging to the nation's economy."

**Exhibit 9**

UCI School of Medicine policy regarding USMLE Step 1 examination indicates,

"*Students are required to take USMLE Step 1 examination after passing all second-year modules/courses. Students must take the USMLE Step 1 prior to the start of Clinical Foundations III and third-year clerkships or prior to the start of an approved Academic leave of absence after the second year. If a student is not able to meet the deadline to take USLME Step 1, they will be placed on Administrative Leave... This will result in the student's exclusion from the Clinical Foundations III course, the third-year clerkships, and/or graduate courses.*"

Regarding exam accommodations and reports, the same policy states,

"*Any special accommodations need to be requested directly from the NBME (refer to the USMLE Test Center Accommodations site). Students around encouraged to utilize the UCI Disability Services Center (DSC) for assistance during this process (refer to UCI Disability Services Center site). Examination results will be mailed directly to students from the NBME...*"

The policy also mentions that students who fail the USMLE Step 1 exam will be placed on Administrative leave and,

"*Subsequent attempts to pass USMLE Step 1 will be scheduled in accordance with USMLE rules. To be taken off of Administrative Leave and return to their course of study, the student must pass USMLE Step 1 by their third attempt, within 24 months of the end for that student's second-year curriculum, which comes first, provided they have fulfilled all other curricular requirements...*"

Additionally, "*Students are eligible for academic probation if they do not pass the USMLE Step 1 within one year of the end of that student's second-year curriculum. Students are eligible for dismissal from the School of Medicine if they do not pass the USMLE Step 1 exam after three attempts within 24 months of the end of that student's second-year curriculum.*"

**Exhibit 12**

**On October 27, 2020**, Complainant provided a few text messages she said she had with Witness 21, about Witness 21's trip to Kenya with Witness 2.

In response to one of Complainant's questions, Witness 21 wrote, "*we each received $1000 for our trip. I am not sure if this was from UCISOM admin or from ICTS[25] directly.*"

---

[25] UCI's Institute for Clinical and Translational Science (ICTS) is funded by the National Institutes of Health (NIH) under the Clinical and Translational Sciences Award (CTSA) program. Currently, there are more than 50 medical research institutions throughout the United States that receive CTSA program funding. ICTS functions as a local

Witness 21 also wrote,

*"We did not have to provide documentation regarding security. That was all handled by ICTS for us. Also, we did not actually need to write or submit an IRB. Our PI already had one made for the project and that was the one that was submitted and approved."*

Witness 21 added, "We didn't do ultrasound research, we're doing malaria research so we're working more with other diagnostic tools…"

Complainant asked Witness 21 "Who was the group leader for the Kenyan trip?"

Witness 21 replied,

*"There were only two of us on the trip so there wasn't really a group leader, but the other person I went with was [Witness 2]."*

Complainant asked,

*"Was he [Witness 2] the one who organized the trip or it was you? Just wanted to know coz I never got a chance to publish my work and I'm trying to get a resolution for that. Btw, neither you nor hi will get in trouble. The school would just want to make sure that there was no other reason for the differences between my trip and our trip, that's all. Do you know who created the trip?"*

Witness 21 replied,

*"We both played an equal role, but neither of us were involved in logistics. That was all done through ICTS. All we had to do was buy our ticket, have a passport, raise money, and sign some forms and everything else was pretty much done for us. Oh, and secure a hotel for ourselves too."*

**Exhibit 13**

**On October 28, 2020**, Complainant emailed OEOD saying,

*"I would like to inform you that my Step 1 score is out and I PASSED my exam!"*

**Exhibit 17**

**On December 9, 2020**, Complainant provided her response to the draft report. Complainant's responses where relevant regarding her statement are incorporated in the body of this report. Complainant also made multiple comments and raised questions regarding the New Associate

centerpiece for the national program, and is dedicated to advancing scientific discovery and medical breakthroughs (www.icts.uci.edu).

Dean's statement and as well as the statements of several witnesses. In some instances, Complainant disputed aspects of the New Associate Dean and well as witness' statements. However, Most of Complainant's comments and questions are not related to the scope of the investigation, or the information requested is not available.

In her response to the draft report requested that two additional witnesses, Witness 28 and Witness 29, be interviewed as part of this investigation.

**Exhibit 18**

**On December 9, 2020**, the New Associate Dean provided her response to the draft report. Complainant's responses are incorporated in the body of this report.

**ANALYSIS & FINDINGS:**

The role of the OEOD Investigator is to be a neutral factfinder. In conducting this investigation, the Investigator does not set out to prove or disprove the allegations or responses but rather gathers information in a neutral fashion and objectively analyzes the information to reach reasoned conclusions. The Investigator may gather information by contacting the witnesses suggested by the parties for interviews. The Investigator may also identify and interview additional witnesses with relevant information. The purpose of interviewing these individuals is to gather material information irrespective of whether the information turns out to be favorable to one party or another. The Investigator also reviews all documentary evidence submitted by parties and witnesses and gathers additional information as necessary.

**Credibility Determinations**

When there are disputed issues of fact, it is necessary for the investigator to conduct credibility assessments. The determination as to whether parties and witnesses are credible is not a determination as to whether they are honest people or whether the investigator believes the parties and witnesses are telling the truth. Rather, credibility assessments require the fact-finder to weigh the relevancy and veracity of information received during the investigation. The following factors are used in conducting credibility assessments: the consistency of information provided or lack thereof; the inherent plausibility of statements made; demeanor; corroborating evidence or lack thereof; actual knowledge; omissions in testimony; and motives to falsify (possible bias or exaggerations).

The investigator will examine any contradictions in testimony during an interview or across multiple interviews to determine if they are major or minor shifts. If there are inconsistencies in the testimony provided by interviewees, the investigator will determine whether the inconsistent or omitted information is material to the case. It is important to note that a single lie from a party or a witness, or a single piece of information that is omitted, inconsistent, not corroborated, or is not initially provided, but provided later, does not destroy credibility entirely in most cases. The investigator must weigh whether the lie or inconsistency is isolated or if it is enough to undermine the credibility of the party or witness entirely.

The credibility assessment conducted in this case is discussed in detail below.

**Complainant**

Complainant provided plausible and consistent testimony throughout the investigation. There were no notable omissions in Complainant's testimony. During the investigation, there was nothing remarkable about Complainant's demeanor, and no possible bias or motive to falsify was suggested or identified. Corroboration of the Complainant's testimony is discussed below.

**Respondent**

This investigator did not contact Respondent because she retired in June 2019, is no longer employed by UCI, and was not available to participate in this investigation. Therefore, the New Associate Dean of Students at the School of Medicine was treated as the Respondent in this case. There were no notable omissions in the New Associate Dean's testimony. During the investigation, there was nothing remarkable about the New Associate Dean's demeanor, and no possible bias or motive to falsify was suggested or identified. Corroboration of the New Associate Dean's testimony is discussed below.

**Witnesses**

Overall, I found the testimony of the witnesses to be credible. While each witnesses' testimony was limited by their unique opportunity to have direct knowledge of the specific allegations, I found that they individually provided their best recollection of events spanning over multiple years. The witnesses provided factually consistent accounts of events and corroborated each other's testimony with enough unique details that I determined there was no collusion. I found nothing remarkable about the demeanor of the witnesses.

In Complainant's response to the draft report, Complainant disputes aspects related to the testimony of several witnesses and provides her own perspective regarding what may have occurred, but in many instances did not provide alternative evidence or support showing that witness statements should be viewed as unreliable.

**Findings:**

The factual findings, in this case, were made by carefully and objectively analyzing the testimonial and documentary evidence under the preponderance of the evidence standard required by the applicable University policy. The preponderance of the evidence as a standard of proof requires that a fact be found when its occurrence, based on evidence, is more likely than not.

Based on the factual findings, the Investigator is required to make a determination as to whether the applicable University policy was violated. In an OEOD investigation, a Respondent cannot

be found responsible unless, following a thorough and impartial investigation, the preponderance of the evidence shows that the alleged conduct occurred in violation of University policy.

The applicable University policy for this investigation is the *Nondiscrimination Policy Statement for the University of California Publications Regarding Student-Related Matters; UC Policy on Discrimination, Harassment, and Affirmative Action in the Work Place (Section III.A. General);* and *UCI Guidelines on Discrimination and Harassment (Sections C.1 Prohibited Conduct - Discrimination).*

**Ultrasound Trip to Kenya**

Complainant alleged that Respondent, in her role as Associate Dean in the School of Medicine, treated Complainant differently based on her color/race, citizenship, national origin, and sex when Respondent did not sponsor Complainant's project in Kenya in 2016-2017, yet granted approval and funding for a white male student's project in Kenya in 2018-2019.

Based on party and witness statements, as well as the documentary evidence, the U.S. State Department issued a travel warning to Kenya for U.S. citizens due to "potential terrorist threats and the high risk of crime throughout the country" on June 30, 2016. On January 13, 2017, a second travel warning to Kenya was issued by the State Department, reiterating the same June 2016 warning. It is unclear when Complainant and Respondent first spoke about the U.S State Department's travel restrictions to Kenya. However, the evidence shows that Complainant was aware of the travel restrictions as early as 2017. For example, the evidence shows that on February 2, 2017, Complainant emailed Witness 6, Department Chair, School of Medicine, telling him that "Kenya still has a travel advisory notification from the U.S. Department of State on the border of Somali Kenya." The evidence also shows that on March 19, 2017, Witness 6 emailed Witness 26, Witness 27, and several other leaders from the School of Medicine informing them that he spoke to Complainant in early 2017, letting her know that Kenya was on the U.S. State Department's travel warning list.

It is also unclear when Respondent told Complainant that UCI's School of Medicine would not support her travel to Kenya for the ultrasound trip. However, the evidence shows that on March 21, 2017, Respondent emailed Complainant letting her know that she reviewed the travel warning to Kenya with Witness 26, Associate Vice Chancellor, UCI Health Affairs, and Vice Dean, Medical Education, and due to the warning, UCI would not be able to sponsor Complainant's trip which meant that the school could not provide financial or administrative support. Respondent added that Complainant and other students were free to travel to Kenyan ultrasound trip without being "an official [School of Medicine] event." This demonstrates that Respondent and Complainant were engaged in a conversation about travel restrictions to Kenya and the School of Medicine's non-support of the trip sometime at least since March 21, 2017.

Additionally, both Witness 6 and Witness 11 indicated that in early 2017 they informed Complainant that due to "safety reasons," UCI's School of Medicine would not support her ultrasound trip to Kenya. Complainant suggested that had she received earlier notice of her application funding denial she would have amended the application for review by the committee.

However, in light of the evidence Complainant would not have been able to satisfactorily amend her application for approval due to safety reasons, incomplete IRB proposal, and the unavailability of a UCI affiliated faculty support at the site of study in Kenya to many examples cited in the denial

Two medical students, Witness 12 and Witness 13, also corroborated that they became aware of the School of Medicine's lack of support to their ultrasound trip to Kenya due to the U.S. State Department's travel warning sometime in the Winter quarter of 2017. However, both Witness 12 and Witness 13 indicated that despite the travel warning to Kenya and the lack of support to their trip by the School of Medicine, they decided, along with Complainant and several other medical students, to proceed with their plans to travel to Kenya, which was scheduled from June 6, 2017, until July 3, 2017.

Complainant submitted her IRB proposal for the ultrasound trip to Kenya in early 2017. However, the evidence shows that as early as February 2, 2017, Witness 30, former Research Coordinator of Ultrasound in Medical Education, warned Complainant that her IRB might not be approved due to the travel restrictions to Kenya. Nonetheless, the evidence shows that Witness 30 and Witness 18 continued to help Complainant with her IRB proposal. For example, on February 28, 2017, Witness 30 emailed Complainant, letting her know that her IRB proposal needed further editing. On May 10, 2017, Witness 30 emailed Complainant the IRB office did not conclude editing her IRB proposal. Notably, on May 31, 2017, approximately one week before Complainant's scheduled ultrasound trip to Kenya, Witness 18 shared with Complainant a letter from the IRB office requesting that she make multiple edits to her IRB proposal. The evidence further shows that while Complainant and other medical students were in Kenya, they continued to work on the IRB proposal. Several witnesses, including Witness 6, Witness 14, Witness 26, and Witness 27, said that the IRB process is lengthy and it could take at least six months before it is finalized and approved. Further, none of the witnesses indicated that Respondent influenced the processing of the Complainant's IRB proposal.

The preponderance of the evidence supports that Respondent did not arbitrarily make her decision to deny support to Complainant's ultrasound trip. Further, the evidence supports that Respondent consulted with members of the School of Medicine's executive team, including Witness 26 and Witness 27. Both Witness 26 and Witness 27 indicated that after discussing Complainant's travel plans, all executive team members did not support Complainant's travel request due to safety reasons because Kenya was listed on the U.S. State Department's travel warning list. However, the executive team did not object to Complainant independently traveling to Kenya. Further, Witness 26 and Witness 27 said that the executive team did not support Complainant's travel to Kenya because Complainant did not have a UCI affiliated faculty at the research site that Complainant identified in Kenya.

Concerning Complainant's claim that she was subjected to disparate treatment based on a protected category because Respondent did not support her ultrasound trip to Kenya, but yet supported and funded a white male (Witness 2) student's project in Kenya in 2018-2019, that the preponderance supports that the circumstances surrounding Witness 2's trip to Kenya were different from Complainant's such that there were legitimate, non-discriminatory reasons for the

differing treatment. Witness 2's trip to Kenya was in June 2019, two years after Complainant's 2017 trip, when the U.S. State Department's travel warning varied in-part regarding travel restrictions (Exhibits 7, 8, and 17). The 2016/2017 travel warnings stated that "potential terrorist threats and the high risk of crime throughout the country," and urged U.S. citizens to avoid traveling to the border between Somalia and Kenya due to terrorist threats as well as avoiding travel to multiple other cities in the northerneastern region and around the capital. However, in 2018, the U.S. State Department replaced the previous travel warning system providing levels of travel advice from 1 to 4. In 2019, the travel warning to Kenya was listed at level two, "Exercise increased caution in Kenya due to crime, terrorism, and kidnapping..." It urged U.S. citizens to avoid traveling to the Kenya-Somali border and one other area due to crime.

Further, Witness 2's trip was part of an already established research site in Kenya under the direct supervision of a UCI faculty member, Witness 24, Principal Investigator. Witness 2 and Witness 21, a second UCI medical student, who also traveled to Kenya with Witness 2, were listed by Witness 24 on Witness 24's IRB proposal so they did not need to have their own IRB proposal and approval. Additionally, Witness 2 and Witness 21 traveled to Witness 24's research site in Kenya as part of their work on Malaria as observers only, and they did not collect any data from human subjects. Witness 24 and Witness 25 also corroborated that a risk assessment for the study sight and risk mitigation plan for Witness 2's travel were satisfactory and adequately documented.

Although both Witness 2 and Witness 21 received $1000 each from the School of Medicine for their trip to Kenya after their travel approval, they raised the remainder of the funds ($1,630) for their trip through UCI ZotFunder's website (Exhibit 6). The evidence also shows that Complainant utilized the same UCI ZotFunder's website to raise her funds ($17,749) for her trip to Kenya (Exhibit 5 and Exhibit 6).

Thus, the preponderance of the evidence supports that the School of Medicine did treat Complainant and Witness 2 differently when they denied Complainant funding for her travel to Kenya, but provided some funding to Witness 2 to travel to Kenya. However, the preponderance of the evidence also supports that the School of Medicine and Respondent had legitimate reasons to treat the students differently, including safety and risk concerns, timing, and the nature of the research they intended to perform. The preponderance of the evidence does not support that Respondent or the School of Medicine considered or utilized the color/race, citizenship, national origin, or sex in making their decisions to deny or approve funding.

<u>**Non-Accommodations**</u>

Complainant alleged that even though she was registered with DSC, Respondent interfered with her ability to obtain reasonable accommodations by suggesting that Complainant had "language issues" rather than a disability. Complainant alleged that she lost her housing and failed her Step 1 exam on multiple occasions due to this interference.

The evidence supports that on February 17, 2017, Complainant submitted an intake document to DSC describing her disability as follows, "I speak multiple languages and that interferes with my

information processing time. I would really appreciate if I can get additional time while taking exams" (Exhibit 4). Complainant acknowledged that she speaks multiple languages; however, Complainant insisted that Respondent erroneously labeled her as having language issues.

The evidence also shows that on two occasions before Complainant submitting her intake document form to DSC, on January 23, 2017, Respondent emailed the former Director of DSC saying in part, "…I have a wonderful student, [Complainant], who is actually brilliant and speaks several languages. I have copied her on this email. However, since English is not her first or second language, doing well on exams has been a challenge. I realize that this is a language comprehension issue. Can you assist us with this? I believe that increased time for exams would make sense for her…" (Exhibit 1, p. 204). Complainant e-mailed Respondent to thank her for sending the e-mail. The evidence further shows that on February 1, 2017, Respondent emailed the former DSC Director again saying, "Were you able to see [Complainant??] I am worried about her-she is so wonderful, and I don't want her language comprehension to set her back…" (Exhibit 1, p. 204).

The evidence indicates that on March 1, 2017, the former DSC Director emailed Respondent, saying, "I am providing this letter of verification for the purpose of validating the student's disability-related need for accommodations. The student has a professionally documented disability and is currently registered with the Disability Service Center" (Exhibit 1, p. 313). The same email included Complainant's three accommodations effective March 1, 2017, until May 31, 2018, including extended time on exams (time and a half), separate testing location (at DSC), and assistive technology (text to speech software). The preponderance of the evidence supports that Complainant was able to obtain academic accommodations through DSC and does not support that Respondent interfered with the process. Rather, the evidence supports that Respondent submitted correspondence in support of Complainant's accommodations and did not deny that Complainant had a disability for which she may need accommodations.

Around November 2017, Complainant met with Witness 3, Senior Disability Specialist at DSC, and discussed Complainant's application for NBME Step 1 exam accommodation application, which Complainant filed with NBME shortly after her meeting with Witness 3. On December 1, 2017, NBME emailed Complainant acknowledging receipt of her application for test accommodations for the Step 1 exam. On January 2, 2018, that NBME mailed a letter to Complainant regarding Complainant's accommodation request for the Step 1 exam, informing her that NBME was unable to provide her accommodation request because the documentation did not demonstrate a substantial limitation in a major life activity (Exhibit 14). However, the preponderance evidence does not support that Respondent influenced NBME's decision regarding their denial in any manner. Further, the evidence suggests that DSC staff provided support to Complainant in the accommodation request process with NBME, without interference from Respondent.

When Complainant took her Step 1 exam the first time on May 7, 2017, and ultimately failed, Respondent emailed Complainant saying the following,

> *"I was informed today that unfortunately you did not pass Step 1. I am very sorry to hear this and know that you worked very hard to prepare for the exam. Please do not panic-we will figure out what is your next best course!*
>
> *We really need to reflect on why you think you did not perform to your capability-anxiety that is not controlled, reading issues, prep materials or text taking strategy. Think about this a bit and we should meet soon to discuss. I usually strongly recommend a formal prep course in this situation- I know that they are expensive, but they have good results.*
>
> *For now, you will complete your current clerkship, then take an academic leave of absence in order to prepare for and pass Step 1…"* (Exhibit 1, p. 176).

Respondent's email suggests that Respondent was concerned about Complainant's success and showed a willingness to help Complainant. For example, on June 1, 2018, Respondent informed Complainant that she spoke to NBME *"regarding any possible recourse for additional time due to a language issue,"* but the NBME maintained that they could not provide the accommodation as requested in Complainant's application. Although the evidence does support that Respondent referred to Complainant as having language issues, the comments do not appear to be assertions that Complainant did not have a disability and thus should not qualify for accommodations. Rather, Respondent appears to refer to Complainant's language issues in support of Complainant obtain reasonable accommodations.

On July 5, 2018, Respondent emailed Complainant again to inform her that NBME would not be extending Complainant accommodations for her exam re-take. In the correspondence, Respondent apologized to Complainant and asked whether she had signed up for a formal prep course to study for the exam (Exhibit 1, p.178). Further, on July 20, 2018, Witness 19, former Director, Financial Aid Services-School of Medicine, emailed Complainant saying that Respondent had approved a loan for $5,225 to cover a "prep course for Step 1 exam. Although the NBME denied Complainant's accommodations, the preponderance of the evidence supports that Respondent attempted to provide several instances of support to Complainant, both in obtaining test accommodations and other exam prep advice and opportunities.

In Fall of 2018, Complainant went on an academic leave of absence to study for the Step 1 exam. On October 18, 2018, Complainant retook her Step 1 exam without accommodation and failed a second time.

Complainant claimed that on April 25, 2019, she met with Respondent to discuss her housing problems, specifically that if not allowed to continue living on campus, Complainant would become "homeless." Complainant alleged that in response, Respondent told her, "If it is that difficult for you, why don't you go back to your country?" Complainant felt that Respondent's statement was discriminatory and that she was targeted based on her national origin. Although there were no witnesses present when Respondent allegedly made this statement to Complainant, at least one witness, Witness 27, who worked closely with Respondent and Complainant, said, "I can't picture" Respondent making such a statement to Complainant, because Respondent always supported Complainant. Moreover, Witness 26 and Witness 27 indicated that Complainant and

Respondent had a miscommunication and/or "bad communication" between each other. However, even if Respondent made this comment as alleged, the preponderance of the evidence supports that Respondent was attempting to help Complainant based on the circumstances and context of the comment. The preponderance does not support that Respondent made the comment to harass Complainant on the basis of her national origin. Further, a single comment in this context is insufficient to demonstrate discriminatory animus and is insufficient to support a hostile environment. Although Complainant is a U.S. Citizen, Respondent was also aware of Complainant's connection to Kenya because Complainant grew up and had family there, which may have contributed to Respondent's belief that Complainant might consider going back to Kenya.

Witness 3 and Witness 16 from DSC continued to help Complainant. Around May 2019, Complainant disclosed to Witness 16 that she was no longer enrolled as a UCI medical student and was no longer eligible to live on-campus housing because she did not pass her Step 1 exam. Witness 16 told Complainant that she would support Complainant to continue living on campus until June 30, 2019, so that she could find a new place. Also, it is worth mentioning that graduate housing is very competitive and requires that students be actively enrolled to obtain and remain in graduate housing.

Around November 2019, Witness 16 helped Complainant fill out the necessary paperwork to appeal NBME's decision regarding Complainant's accommodation request. This suggests that DSC continued to support Complainant (who was also registered with their office) and that Respondent did not stifle Complainant's access to University resources or accommodation assistance. In the summer of 2020, the NBME ultimately granted Complainant's appeal request and offered Complainant a time and one-half accommodation for her Step 1 exam. Complainant then re-took her Step 1 exam and passed. However, the preponderance of the evidence does not support that NBME's decision was influenced by Respondent's participation or non-participation in the process, but rather a troubleshooting effort by Complainant and DSC to improve Complainant's accommodation application.

Thus, the preponderance of the evidence does not support that Respondent propagated that Complainant did not have a disability with DSC, Housing staff, or NBME administrators or that Respondent interfered with Complainant's ability to obtain accommodations. Rather, the evidence supports that Complainant was able to obtain academic accommodations on-campus and received at least one additional month to move-out of her housing with support from DSC. Further, the evidence does not support that Respondent interfered with or influenced Complainant's accommodation request to the NBME and ultimate denial. However, DSC continued to provide support to Complainant in the appeal process, suggesting that Respondent did not negatively impact Complainant's access to support resources or accommodations. Further, the preponderance of the evidence does not support that Respondent was responsible for Complainant's ineligibility for graduate housing. Additionally, the preponderance of the evidence does not support that Respondent demonstrated discriminatory animus when she told Complainant that she should go back to her country, although Complainant is a U.S. citizen.

CONCLUSION:

The preponderance of the evidence **does not** support that Respondent treated Complainant differently based on her color/race, citizenship, national origin, and sex when Respondent did not sponsor Complainant's project in Kenya in 2016-2017, yet granted approval and funding for a male student's project in Kenya in 2018-2019, in violation of the *Nondiscrimination Policy Statement for the University of California Publications Regarding Student-Related Matters, UC Policy on Discrimination, Harassment, and Affirmative Action in the Work Place,* and *UCI Guidelines on Discrimination and Harassment.*

The preponderance of the evidence **does not** support that Respondent demonstrated discriminatory animus when she told Complainant that she should go back to her country, although Complainant is a U.S. citizen, in violation of the *Nondiscrimination Policy Statement for the University of California Publications Regarding Student-Related Matters*, *UC Policy on Discrimination, Harassment, and Affirmative Action in the Work Place,* and *UCI Guidelines on Discrimination and Harassment.*

The preponderance of the evidence **does not** support that Respondent propagated that Complainant did not have a disability. Further, the evidence **does not** support that Respondent interfered with Complainant's access to accommodations causing her to lose her housing and fail the Step 1 exam on multiple occasions in violation of the *Nondiscrimination Policy Statement for the University of California Publications Regarding Student-Related Matters*, *UC Policy on Discrimination, Harassment, and Affirmative Action in the Work Place,* and *UCI Guidelines on Discrimination and Harassment.*

Prepared by:

_____

**Raid Faraj**
**Senior Investigator**
**Office of Equal Opportunity and Diversity**
**University of California, Irvine**

**Date:** January 25, 2021